IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| Apiário Diamante Comercial Exportadora Ltda and Apiário Diamante Produção e Comercial de Mel Ltda, | |
| Plaintiffs, | |
| v. | Court No. 22-00185 |
| United States, | **PUBLIC VERSION** |
| Defendant, | |
| and | |
| American Honey Producers Association and the Sioux Honey Association, | |
| Defendant-Intervenors. | |

PLAINTIFF'S MEMORANDUM IN SUPPORT OF
RULE 56. 2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiffs*

Dated: December 7, 2022

**TABLE OF CONTENTS**

**Page No.**

PLAINTIFFS' STATEMENT PURSUANT TO US CIT RULE 56.2(C) ....................................... 1

I.    Administrative Determination to Be Reviewed ...................................... 1

II.   Issues of Law and Fact Presented ...................................... 1

III.  Reasons for Contesting the Final Results ...................................... 2

IV.   Standard of Review ...................................... 3

STATEMENT OF FACTS ...................................... 5

ARGUMENTS ...................................... 16

I.    Introduction ...................................... 16

II.   Summary of Arguments ...................................... 17

III.  Legal framework ...................................... 19

      A.    Facts otherwise available ...................................... 19

      B.    Adverse inference ...................................... 21

IV.   The alleged discrepancies did not constitute a lawful basis for applying AFA to Supermel ...................................... 22

      A.    The alleged discrepancies did not indicate any informational gap or Supermel's failure to provide requested information ...................................... 22

      B.    Supermel was not required to "verify" its information against documents submitted by the beekeepers ...................................... 23

      C.    Commerce already decided to rely on Supermel's acquisition costs. ...................................... 25

      D.    The alleged discrepancies did not demonstrate that Supermel's honey purchase data were unreliable ...................................... 26

V.    Commerce unlawfully used "facts otherwise available" ...................................... 27

      A.    Supermel reconciled its honey purchase data ...................................... 27

      B.    Supermel's honey purchase data were verifiable and verified ...................................... 31

      C.    Supermel did not fail to provide requested information ...................................... 33

      D.    Commerce failed to describe the alleged discrepancies ...................................... 36

i

VI.     Supermel did not fail to act to the best of its ability ........................................................ 39

V.      Supermel is a producer of the subject merchandise ........................................................ 41

CONCLUSION ............................................................................................................................... 46

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
    70 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) .................................................................. 4

*Ausimont USA, Inc. v. United States,*
    19 CIT 151, 882 F. Supp. 1087 (1995) ...................................................................... 3

*Changzhou Wujin Fine Chem. Factory Co., Ltd., v. United States,*
    701 F.3d 1367 (Fed. Cir. 20120) ............................................................................3, 4

*Chevron U.S.A. Inc. v. Natural Res. Def. Council,*
    467 U.S. 837 (1984) ................................................................................................ 4

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197 (1938) ................................................................................................ 3

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ................................................................................................ 4

*Hartford Fire Ins. Co. v. United States,*
    772 F.3d 1281 (Fed. Cir. 2014) ................................................................................ 4

*Hung Vuong Corporation, et al. v. United States,*
    Ct. of Int. Trade Slip Op. 20-174 (December 3, 2020) .................................19, 21, 22

*Nippon Steel Corp. v. U.S.,*
    337 F.3d at 1382 (Aug 8, 2003) ........................................................................ 22, 40

*Siemens Energy, Inc. v. United States,*
    806 F.3d 1367 (Fed. Cir. 2015) ............................................................................3, 32

**Statutes and Regulations**

19 U.S.C. 1677m(d) ................................................................................................... 36

19 U.S.C. § 1516a(b)(1)(B)(i) ..................................................................................... 3

19 U.S.C. § 1677b .................................................................................................... 35

19 U.S.C. § 1677b(b)(3)(A) ....................................................................................... 42

19 U.S.C. § 1677b(b)(l) ................................................................................ 41

19 U.S.C. § 1677e(a) ............................................................................... 20, 22

19 U.S.C. § 1677e(a)(1) ................................................................................ 20

19 U.S.C. § 1677e(b)(1) ................................................................................ 21

19 U.S.C. § 1677m(c)(1) ........................................................................ *passim*

19 U.S.C. § 1677m(d) ........................................................................20, 21, 36

Administrative Procedure Act, 5 U.S.C. § 706(2)(A)(2012) ............................ 3

19 C.F.R. § 351.401(g)(3) ............................................................................. 35

19 C.F.R. 351.224(g)(1) ................................................................................ 13

19 C.F.R. 351.307 ........................................................................................ 23

19 C.F.R. 351.307(d) .................................................................................... 23

**Other Authorities**

Final Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit
   from Thailand, 60 Fed. Reg. 29,553 (June 5, 1995) ................................. 43

Certain Preserved Mushrooms From Indonesia: Final Results of Antidumping
   Administrative Review, 66 Fed. Reg. 36,754 (July 13, 2001) ................... 43

Notice of Final Results of Antidumping Duty Administrative Review: Individually
   Quick Frozen Red Raspberries From Chile, 70 Fed. Reg. 6,618 (Feb. 8, 2005)...................... 43

Notice of Preliminary Determination of Sales at Less Than Fair Value,
   Postponement of Final Determination, and Negative Critical Circumstances
   Determination: Certain Frozen and Canned Warmwater Shrimp From
   Thailand, 69 Fed. Reg. 47,100 (Aug. 4, 2004) ......................................... 43

Individually Quick Frozen Red Raspberries from Chile, Investigations Nos. 701-TA-
   416 and 731-TA-948 (Preliminary), USITC Pub. No. 3441 (July 2001) .................................... 43

**PLAINTIFFS' STATEMENT PURSUANT TO US CIT RULE 56.2(C)**

> **I.      Administrative Determination to Be Reviewed**

Plaintiffs Apiário Diamante Comercial Exportadora Ltda and Apiário Diamante Produção e Comercial de Mel Ltda. ("Plaintiffs" or collectively, "Supermel") contest the final determination issued by the United States Department of Commerce (the "Department" or "Commerce") in the antidumping investigation on raw honey from Brazil.  *See Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 22,182 (April 14, 2022) (the "Final Determination") (PR 358).  Plaintiffs challenge the factual and legal conclusions of the Department as set forth in its "Issues and Decision Memorandum" for the *Final Determination.  See Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Raw Honey from Brazil (April 7, 2022)* (the "Final Decision Memo") (PR 354).

> **II.     Issues of Law and Fact Presented**

1.  **Did the alleged discrepancies between the submissions by Supermel and its unaffiliated beekeeper suppliers *per se* constitute a lawful basis for applying AFA?**

    No, the alleged discrepancies did not indicate any informational gap or Supermel's failure to provide requested information or fully cooperate in the investigation.

2.  **Did Commerce meet the legal requirements for applying "facts otherwise available?"**

    No, Commerce failed to demonstrate that necessary information is not available on the record.  Commerce also failed to demonstrate that Supermel did not provide information requested by Commerce.

3.  **Did Supermel reconcile its honey purchase data and provide supporting documentation?**

1

Yes, the record evidence demonstrates that Supermel reconciled its honey purchase data and provided supporting documentation.

**4. Did Supermel provide verifiable honey purchase data?**

Yes, the record evidence demonstrates that Supermel's honey purchase data were not only verifiable but also verified.

**5. Did Supermel fail to provide requested information?**

Yes, the record evidence demonstrates that Supermel did not provide any information including the requested journal entries. Also, Commerce failed to consider the entirety of the record in determining whether Supermel failed to provide the requested journal entries.

**5. Did Commerce describe in its questionnaire the alleged discrepancies?**

No, the alleged discrepancies did not exist at the time Commerce issued its last questionnaire on Supermel's cost of production. Moreover, the question cited by Commerce in its Final Determination did not describe the alleged discrepancies.

**6. Did Commerce show that Supermel failed to act to the best of its ability**

No, Commerce failed to consider many factors affecting Supermel's ability to comply. For example, Commerce failed to consider that Supermel operated as a "micros and small business" under the Brazilian tax regime and, as such, was not required to maintain inventory and consumption values for unprocessed honey in its accounting books.

**9. Did Commerce unlawfully determine that beekeepers are the producers of the subject merchandise?**

Yes, Commerce's determination was based on the finding that the processing performed by the processors was "minimal" and did not "result in significant changes to the subject merchandise." The record evidence demonstrates that the processing was extensive and resulted in significant changes to the subject merchandise.

### III.    Reasons for Contesting the Final Results

Plaintiff contests the Final Determination because Commerce's factual and legal conclusions therein are not supported by substantial evidence and otherwise not in accordance with the law. Commerce's application of total AFA to Supermel was unlawful because Commerce failed

to meet the legal requirements for applying "facts otherwise available" and "adverse inference."  Commerce also made its determination based on certain findings that are unsupported by substantial evidence.  Plaintiff' reasons for contesting the Final Results are explained in detail below in the *Arguments* section of this Memorandum.

### IV.    Standard of Review

The Court will hold unlawful agency determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Ausimont USA, Inc. v. United States*, 19 CIT 151, 157, 882 F. Supp. 1087, 1092 (1995).  Substantial evidence means that there is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Support by substantial evidence must be determined on the entirety of the record, considering the evidence that detracts from the agency's conclusion. *See Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)).

"{A}n agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd., v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 20120) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). While "the substantial evidence standard applies to review of factual determinations{,}" where "we are evaluating the agency's reasoning . . . {we} review{} under the arbitrary and capricious (or contrary to law) standard." *Id*. (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48–49 (1983)); *see also*

Administrative Procedure Act, 5 U.S.C. § 706(2)(A)(2012) (directing that the Court shall "hold

unlawful and set aside agency action, findings, and conclusions found to be arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."). Additionally,

"{a}n agency acts arbitrarily, and therefore unreasonably, when it 'entirely fail{s} to consider an

important aspect of the problem' or 'offer{s} an explanation for its decision that runs counter to

the evidence before {it}." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 70 F. Supp. 3d

1328, 1335, n.33 (Ct. Int'l Trade 2015) (citing *Motor Vehicle Mfrs. Ass'n* , 463 U.S. 29).

In applying its standard of review involving the Department's interpretation of a statute,

the Court must do so within the framework established by *Chevron U.S.A. Inc. v. Natural Res.*

*Def. Council*, 467 U.S. 837, 842-43 (1984). Under *Chevron*, the Court must first ask whether

Congress has directly spoken to the precise question at issue. If Congress has done so, the

inquiry ends; the Court "must give effect to the unambiguously expressed intent of Congress."

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S.

at 842-43). Commerce must act reasonably and may not be arbitrary and capricious. *See e.g.*,

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012)

("Commerce's decision will be set aside if it is arbitrary and capricious."). {A} clear error of

judgment occurs when an action is arbitrary, fanciful, or clearly unreasonable. (quoting *Robert*

*Bosch LLC v. Pylon Mfg. Corp.,* 659 F.3d 1142, 1147-48 (Fed. Cir. 2011) (internal citations and

quotations omitted) *Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281, 1286 (Fed. Cir. 2014).

**STATEMENT OF FACTS**

Supermel is a Brazilian producer and exporter of processed honey that is subject to the antidumping duty order on raw honey from Brazil. *See* Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 87 Fed. Reg. 35,501 (June 10, 2022) (PR 362).

On May 11, 2021, Commerce initiated the antidumping investigation on raw honey from Brazil. *See Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 26,897 (May 18, 2022) (PR 53) ("Initiation Notice").

On June 7, 2021, Commerce selected Apiário Diamante Comercial Exportadora Ltda ("Apiario Export") and Melbras Importadora E Exportadora Agroindustrial Ltda. ("Melbras") as the mandatory respondents in the antidumping investigation. *See* Memorandum Re Less-Than-Fair-Value Investigation of Raw Honey from Brazil: Respondent Selection (June 7, 2021) (CR 37; PR 64).

Apiário Diamante Comercial Exportadora Ltda (i.e., Apiario Export) and Apiário Diamante Produção e Comercial de Mel Ltda ("Apiario Production") are connected through family ownership and operate under the trade name of Supermel. *See* Memorandum Re Less-Than-Fair-Value Investigation of Raw Honey from Brazil: Preliminary Affiliation and Single Entity Memorandum for Apiário Diamante Comercial Exportadora Ltda and Apiário Diamante Produção e Comercial de Mel Ltda (November 17, 2021) (CR 391; PR 285). As such, Commerce

PUBLIC VERSION

treated the two companies as a single entity and referred to as "Supermel" throughout the investigation.  *See id.*

On June 10, 2021, Commerce issued a questionnaire to Supermel "to collect certain initial information to determine the extent of {Supermel's} direct involvement in the production of honey and its sourcing of honey from beekeepers that produced and supplied honey during the period of investigation (POI)."  *See* Initial Request for Information (June 10, 2021) (PR 69). In response to the Initial Request for Information, Supermel stated that it "is a producer of subject merchandise" and sources honey from over 1,000 beekeepers in Brazil.  Supermel further explained that all of the beekeeper suppliers are unaffiliated.  Supermel described in detail the production process which includes 1-6 hours of heat treatment, homogenization (involving additional heat treatment), filtration, organic certification, and inspection.  *See* Supermel's Response to the Initial Request for Information (June 17, 2021) (CR 38-39; PR 79).

On July 22, 2021, Commerce requested all interested parties to submit comments on the raw honey cost of production ("COP") reporting methodology.  *See* Antidumping Duty Investigations of Raw Honey from India, Argentina, Brazil, and Ukraine: Request for Comments on the Raw Honey Cost of Production Reporting Methodology (July 22, 2021) (PR 108) ("Request for COP Comments").  The request was made in consideration of "the numerous non-affiliated middlemen and beekeepers involved in the cost of producing raw honey."  *Id.*  In the request, Commerce noted that it has relied on two different methodologies in prior agricultural proceedings.  *See id.*  "… Commerce, in certain cases, has relied on the acquisition costs paid by the exporter/respondent, and, in other cases, selected non-affiliated cost respondents that

supplied the exporter/respondent." *Id.* "For example, in *Individually Quick Frozen Red Raspberries from Chile*, *Certain Preserved Mushrooms from Indonesia*, *Canned Pineapple Fruit from Thailand, Orange Juice from Brazil, Shrimp from India and Shrimp from Thailand,* Commerce used the acquisition prices from non-affiliated suppliers for the agricultural product input <u>because certain processing took place after the exporter received the input product from the non-affiliated supplier</u>." *Id.* (emphasis added).

On July 29, 2021, the Brazilian respondents (i.e., Supermel and Melbras) together submitted their comments on the COP reporting methodology.  *See* Antidumping Duty Investigation of Raw Honey from Brazil: The Brazilian Respondents' Comments on the Raw Honey Cost of Production Reporting Methodology (July 29, 2021) (PR 128) ("Respondents COP Comments").  In that submission, the Brazilian respondents requested that Commerce use the acquisition costs because "producers of the merchandise under consideration (i.e., foreign like product or subject merchandise) in this investigation are the processors of honey, not beekeepers." *Id.* at 3 (emphasis added).  The Brazilian respondents pointed out that the they conduct extensive processing after honey is purchased from beekeepers, which includes blending, heat treatment, homogenization, filtration, dehumidification, packaging, inspection and testing.  *See id.*  They also indicated that "the Brazilian Respondents would face extreme difficulties if the Department required the COP data from the unaffiliated beekeepers" because "{t}here are literally thousands of beekeepers who supply unprocessed honey to the Brazilian Respondents" and "{m}any of the beekeepers are small, family-run businesses that are not required to maintain the COP information in their normal accounting books and records in accordance with the generally accepted accounting principles." *Id.*

7

The Argentinian respondents also requested Commerce to use acquisition costs.  *See Raw Honey from Argentina, Brazil, India, and Ukraine*, Case Nos. A-357-823, A-351-857, A-533-903, and A-823-820: Asociación de Cooperativas Argentinas C.L. and NEXCO S.A.'s Response to Request for Comments on Cost of Production Reporting Methodology (July 29, 2021) (PR 129). In their submission, Asociación de Cooperativas Argentinas C.L. ("ACA") and NEXCO S.A. ("NEXCO") stated that "the significant amount of processing and testing that they conduct before the honey is exported makes this case akin to *Individually Quick Frozen Red Raspberries from Chile*, *Certain Preserved Mushrooms from Indonesia*, *Canned Pineapple Fruit from Thailand*, and *Certain Frozen and Canned Warmwater Shrimp from Thailand*" in which Commerce used the acquisition costs because certain processing took place after the exporter received the input product from the non-affiliated supplier. *See id.* at 3-4.  ACA and NEXCO also pointed out that "{w}hile Petitioners have suggested that those cases are distinguishable because the input product purchased by respondents was not subject merchandise, Petitioners are factually incorrect when they assert here that the input product purchased by ACA and NEXCO is subject merchandise that can be exported." *See id.* at 4.  ACA and NEXCO emphasized that the unprocessed honey could not be exported as it is not compliant with the export market's local requirements and the processing even changes some of the major CONNUM characteristics such as color.  *See id.* at 4-5.

On August 3, 2021, Supermel submitted its COP information based on its acquisition costs.  *See* Supermel's Section D response (August 3, 2021) ("Supermel DQR") (CR 100-140; PR 133-152).  In the Section D response, Supermel provided the company's entire honey purchase data for the Period of Investigation ("POI") covering April 1, 2020, through March 31, 2021.  *See*

*id.* at Exhibit D-5a.  The honey purchase data included detailed information about each transaction such as the name of supplier, purchase date, quantity and value, and detail physical characteristics of the purchased honey.  *See id.*

On August 10, 2021, Commerce issued questionnaires to solicit cost information from two beekeepers that supplied honey to Supermel (hereafter referred to as "Beekeeper 1" and "Beekeeper 2").  *See* Questionnaire for Beekeeper 1 (August 10, 2021) (CR 148; PR 162); *See also* Questionnaire for Beekeeper 1 (August 10, 2021) (CR 149; PR 163).  Beekeeper 1 and Beekeeper 2 respectively supplied 2.5% and 2% of the total honey purchased by Supermel.  *See* Supermel DQR, at Exhibit D-5a

On September 9, 2021, the two beekeepers submitted their responses to Commerce's initial beekeeper questionnaires.  *See* Beekeeper 1 Response (September 9, 2021) ("B1 QR") (CR 174; PR 198) and Beekeeper 2 Response (September 9, 2021) ("B2 QR") (CR 177; PR 201).  Both of them indicated that they are small-scale rural beekeepers without any formal accounting system.  *See B1 QR,* at 2 & 7; *see B2 QR,* at 2 & 8.  They indicated that their entire businesses are operated by family members (i.e., three people for Beekeeper 1 and two people for Beekeeper 2).  *See B1 QR,* at 2; *see B2 QR,* at 2.  They also indicated that they do not prepare financial statements or maintain cost accounting or inventory records.  *See B1 QR,* at 8, 9 & 15; *see B2 QR, at* 8, 9 & 15.  The beekeepers explained that their "labor is almost entirely dedicated to production activities and virtually no time is spent on administrative activities."  *See B1 QR,* at 14; *see B2 QR,* at 14.  Due to the lack of accounting records, the beekeepers responded to

9

the questionnaires based on their estimates of the ordinary expenses associated with honey

production activities.  *See B1 QR,* at 4*; see B2 QR,* at 4.

In its initial response, Beekeeper 1 provided the total quantity and value of honey it sold

to Supermel during the POI.  *See B1 QR,* at 10*.*  The total quantity matched the total quantity

reported by Supermel for its purchase of honey from Beekeeper 1 during the POI.  *See id.*  The

total value reported by Beekeeper 1 was 3% less than the total value of honey purchased by

Supermel.  *See id; see also* Supermel DQR, at Exhibit D-5a.  Beekeeper 2 did not provide the

total value or quantity of honey sold to Supermel.  *See B2 QR,* at 10.

On September 15, 2021, Supermel submitted its supplemental Sections A-D

questionnaire response.  In the response, Supermel indicated that the unprocessed honey is

recorded in "stock: raw materials account (41) in Supermel's books."  *See* Supermel's

supplemental A-D response (September 15, 2021) ("Supermel SDQR") (CR 181-201; PR 205), at

3.  Supermel then provided a complete reconciliation of its honey purchase data to account 41

of its trial balances for the POI.  *See id.* at Exhibit SD-12.  Supermel also provided sample

invoices that were obtained by Supermel from the beekeepers at the time of actual honey

purchases.  *See id.* at Exhibit SD-13.  Those invoices were signed by the supplying beekeepers,

demonstrating that they were obtained at the time of delivery.  *See id.*

On October 6, 2021, Supermel indicated to Commerce that it is a small company and, as

such, is experiencing difficulties in meeting the Commerce's requirements in the investigation.

*See* Letter from Crowell & Moring LLP Re Supermel's Supplemental Sections A-C response

(October 6, 2021) (CR 270; PR 224).  Supermel also requested assistance under 19 U.S.C. §

1677m(c)(1), which provides that Commerce "shall take into account any difficulties

experienced by interested parties, particularly small companies, in supplying information

requested by … {Commerce} and shall provide to such interested parties any assistance that is

practicable in supplying such information." *See id.*

On October 20, 2021, Commerce issued the second supplemental Section D

questionnaire to Supermel. *See* 2nd Supp D Questionnaire (October 20, 2021) (CR 274; PR 236).

In that questionnaire, Commerce stated that, "{b}ased on the information provided by the

beekeepers there is a discrepancy between the quantity and value of unprocessed honey you

have reported as procured from the beekeepers." *Id.* at 8 & 9.   Commerce then requested

Supermel to confirm whether the total value and quantity of honey purchased from the

beekeepers by Supermel during the POI are certain figures, which were neither the total

quantity and value reported by Supermel nor the beekeepers. *See id.* at 8 & 9.   Despite the

ambiguity in the question, Supermel responded that those figures are incorrect and provided

the correct figures based on its honey purchase data. *See* Supermel's second supplemental

Section D questionnaire response (November 4, 2021) (CR 286-294; PR 259) ("Supermel

2SDQR"), at 14.   Supermel also provided the complete "journal entries" for all of its raw

material purchases based on the reports generated by the system called SIGE (Sistema

Integrado de Gestao Empresarial), which is used by Supermel for the purposes of recording

business activities. *See* Supermel 2SDQR (CR 286-294; PR 259), at 5.   Additionally, Supermel

submitted the sample screenshots of the SIGE reports. *See id.*

Commerce's October 20, 2020 questionnaire did not describe the nature or level of

"discrepancy" between the quantity and value of honey reported by Supermel and the two

beekeepers.  *See* 2nd Supp D Questionnaire (October 20, 2021) (CR 274; PR 236), at 8 & 9.

Commerce did not specifically refer to the 3% difference in the value of honey reported by

Beekeeper 1.  *See id.*

On October 26, 2021, the two beekeepers responded to Commerce's supplemental

questionnaires.  In the responses, the beekeepers provided the tax invoices they registered

with the Brazilian government for the honey they sold to Supermel during the POI.  *See*

Beekeeper 1 Supplemental Response (October 26, 2021) ("B1 SQR") (CR 277; PR 241), at Exhibit

SUP-1; *see also* Beekeeper 2 Response (October 26, 2021) ("B2 SQR") (CR 278; PR 242), at

Exhibit SUP-1.  The "issue dates" on those tax invoices indicated that they were prepared

before the beekeepers signed the invoices provided to Supermel.  *See id; see also* Supermel

DQR, at Exhibit D-5a.  The tax invoices indicated: (1) the total quantities reported by Beekeeper

1 and Beekeeper 2 match the total quantities reported by Supermel, (2) the total value

reported by Beekeeper 1 is 3% less than the total value of honey purchased by Supermel, and

(3) the total value reported by Beekeeper 2 is 6% less than the total value of honey purchased

by Supermel.  *See id.*

Beekeeper 1 supplied 2.5% of the honey purchased by Supermel.  Therefore, the

discrepancy in Beekeeper 1's reported value (i.e., 3%) represented 0.075% of the total value

reported by Supermel.  Beekeeper 2 supplied 2% of the honey purchased by Supermel.

Therefore, the discrepancy in Beekeeper 2's reported value (i.e., 6%) represented 0.12% of the

PUBLIC VERSION

total value reported by Supermel.  Combined together the discrepancy in value represented 0.2% of the total value of honey purchased by Supermel.

On November 8, 2021, Supermel submitted its second supplemental Sections A-C questionnaire response.  In that response, Supermel indicated that it operates under the Brazilian tax regime for "micro and small businesses."  *See* Supermel's second supplemental Sections A-C questionnaire response (November 8, 2021) ("Supermel 2SACQR") (CR 352-375; PR 270-272), at 18.  Supermel also explained that it records business activities using SIGE and the actual accounting (i.e., entering the total debit and credit amounts in the financial statements) is carried out by an external accountant based on the reports generated by SIGE.  *See* Supermel 2SACQR, at 3-4.

On November 23, 2021, Commerce issued its preliminary determination and found a dumping margin of 29.61 percent for Supermel.  *See Raw Honey From Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 86 Fed. Reg. 66,533 (November 23, 2021) ("Initial PD") (PR 292).  The Initial PD contained a simple mathematical error that constituted a significant ministerial error pursuant to 19 CFR 351.224(g)(1).  *See* Supermel's Ministerial Error Comments (November 23, 2021) (CR 399; PR 293).

On December 17, 2021, Commerce amended the preliminary determination and corrected Supermel's dumping margin to 10.52 percent.  *See* Raw Honey From Brazil: Amended Preliminary Determination of Sales at Less Than Fair Value, 86 Fed. Reg. 71,614 (December 17, 2021) (PR 313).

13

PUBLIC VERSION

In the preliminary determination, Commerce found that "the beekeepers are the actual producers of the subject merchandise." *See* Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Raw Honey from Brazil (November 17, 2021) ("PDM") (PR 288), at 17.  In support of the decision, Commerce stated that "the raw honey purchased by Melbras and Supermel already falls within the scope of the investigation and reflects the essential characteristics of the merchandise under consideration" and that "processing performed by the exporter-respondents is minimal and does not result in significant changes to the subject merchandise." *See* PDM (PR 288), at 16-17.

In the preliminary determination, Commerce also decided to use the respondents' acquisition costs as a "proxy" for the actual COP of the beekeepers because "both sampling and the selection of the largest beekeepers were either unattainable or ineffective options" due to the large number of beekeeper suppliers. *See id.* at 17.  However, Commerce collected cost information from the beekeepers to "assess the reasonableness" on relying on the acquisition costs. *See id.*

For Supermel, Commerce found that it was "reasonable" to rely on Supermel's acquisition costs because the record information demonstrated that "acquisition prices paid by the respondent were higher than the actual COP incurred by its raw honey suppliers." *See id.*

For Melbras, Commerce found that the information provided by the suppliers was "unusable" due to "their reported limited record keeping capabilities." *See id.* at 18. Commerce then decided use Melbras' acquisition costs as facts available ("FA") because the suppliers "acted to the best of their abilities." *See id.*  However, Commerce stated that, all

14

beekeepers are now "on notice that they will be required to submit accurate cost information

that is fully supported by documentary evidence and is verifiable by Commerce officials" and

"{f}ailure to provide such information {in the future administrative reviews} could result in the

application of AFA." *See id.*

On December 20, 2021, Supermel submitted its response to Commerce's In Lieu of

Verification Questionnaire ("Supermel ILVQ") (CR 459-493; PR 325-331).  In the response,

Supermel provided the entire SIGE report for its honey purchases during the POI as well as the

sample invoices for the specific transactions selected by Commerce.  *See* Supermel ILVQ, at 15.

On April 14, 2022, Commerce issued the Final Determination and revised Supermel's

dumping margin to 83.72 percent based on the application of total adverse facts available

("AFA").  *See Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value*, 87

Fed. Reg. 22,182 (April 14, 2022) ("Final Determination") (PR 358).

In the Final Decision Memo, Commerce provided two primary reasons for the

application of total AFA: (1) there are discrepancies between Supermel's honey purchase data

and the unaffiliated beekeeper suppliers' tax invoices, and (2) Supermel did not provide the

"journal entries" for honey purchases as requested by Commerce.  *See* Final Decision Memo (PR

354), at 13 and 15.

## ARGUMENTS

### I.      Introduction

This case involves raw honey, which is defined to include both unprocessed honey and processed honey.  Unprocessed honey refers to honey that has been extracted from the beehive.  Processed honey refers to honey that has been heat-treated, homogenized, filtered[1] and packaged[2] for bulk sales.  Supermel is a producer of the processed honey.  It manufactures processed honey using unprocessed honey supplied by thousands of unaffiliated beekeepers.

At the inception of this investigation, Commerce acknowledged its conflicting practice regarding processors versus producers.  "In prior agricultural proceedings, Commerce, in certain cases, has relied on the acquisition costs paid by the exporter/respondent, and, in other cases, selected non-affiliated cost respondents that supplied the exporter/respondent."  Request for COP Comments (PR 108), at 1-2.   Commerce never decided on this issue until the Preliminary Determination.

At the Preliminary Determination, Commerce determined for the first time that beekeepers, not processors, are the "actual producers of the subject merchandise."  Commerce then stated that, in the future reviews, the beekeepers "will be required to submit accurate cost information that is fully supported by documentary evidence and is verifiable by Commerce officials" and "{f}ailure to provide such information could result in the application of AFA."  *See* PDM (PR 288), at 18.

---

[1] The scope includes filtered honey as long as the filtration level is 25 micron or above.
[2] The scope excludes honey packaged in retail containers of five lbs. or less.

16

PUBLIC VERSION

To that point, Commerce conducted its investigation with Supermel as a "cost respondent."  In the Preliminary Determination, Commerce confirmed its decision to "rely" on Supermel's acquisition costs as a proxy for the beekeepers' COP.  This decision was made based on the finding that Supermel's acquisition costs were higher than the COP reported by the selected beekeepers.

In the Final Determination, Commerce determined that there were discrepancies between Supermel's honey purchases and its suppliers' invoices.  *See Final Decision Memo* (PR 354), 13.  Commerce then applied total AFA to Supermel, claiming that Supermel failed to provide certain information that was requested based on the alleged discrepancies.  This action was arbitrary, capricious, or otherwise not in accordance with law.  This brief will demonstrate that: (1) the alleged discrepancies did not constitute a lawful basis for applying AFA to Supermel; (2) Commerce failed to meet the legal requirements for applying "facts otherwise available; and (3) Commerce failed to show that Supermel failed to act to the best of its ability.

## II.     Summary of Arguments

The alleged discrepancies between Supermel's honey purchases and the unaffiliated beekeeper suppliers' tax invoices did not constitute a lawful basis for applying AFA to Supermel. The alleged discrepancies did not indicate any gap in the cost information submitted by Supermel.  Nor did they indicate Supermel's failure to provide requested information or fully cooperate in the investigation.

In the underlying investigation, Supermel was the mandatory respondent, not the selected beekeepers.  Commerce had no legal authority to request Supermel to "verify" its

PUBLIC VERSION

information against the documents submitted by an unaffiliated beekeeper.  Moreover, Supermel's honey purchase data was, in fact, reliable and verified.  Supermel reconciled and verified the data and did not fail to provide any information including the requested information.   Moreover, Commerce failed to describe the alleged discrepancy associated with the information request.

Commerce also failed to show that Supermel failed to act to the best of its ability. Supermel operates as a "micro and small business" under the Brazilian tax regime.  Accordingly, Supermel was not required to maintain inventory and consumption values for unprocessed honey in its accounting books.  This was explained to Commerce and Supermel requested assistance under 19 U.S.C. § 1677m(c)(1) which provides that Commerce should account reporting difficulties experienced by small businesses.  Commerce failed to consider Supermel's status as a small business in determining whether Supermel acted to the best of ability to provide requested information.

Finally, Commerce conducted an entire investigation of Supermel, a processor, only to later determine that the beekeepers, not the processors, were the producers of subject merchandise.  This belated determination was unlawful, arbitrary, and capricious as Commerce unlawfully applied total AFA to Supermel, a processor, based on information collected independent bee keepers.  Application of AFA against one party based on data provided by another party is unlawful.

### III.     Legal framework

Commerce may be required to use facts not in the administrative record to complete its antidumping investigation or administrative review. In limited circumstances, the statute also permits Commerce—when using such facts—to take the additional step of choosing facts that are adverse to the respondent.  *See Hung Vuong Corporation, et al. v. United States*, Ct. of Int'l. Trade, Slip Op. 20-174 (December 3, 2020), at 12-18.

The application of "adverse facts available" ("AFA") requires a two-step analysis.  In the first step, the statute permits Commerce to apply "facts otherwise available," i.e., facts not in the record, in various defined circumstances. If Commerce applies facts otherwise available, Commerce then proceeds to the next step. In step two, if Commerce determines that a respondent has not cooperated to the best of its ability, it may then apply an adverse inference, i.e., select from among facts that are most unfavorable to the respondent, in applying facts otherwise available.  *See id.* Commerce's determination that facts otherwise available is a necessary, but not sufficient, condition to the application of an adverse inference in selecting among those facts.  *See id.*

### A.     Facts otherwise available

Commerce is required to use "facts otherwise available" in specified situations:

(a) In general. If—

    (1) necessary information is not available on the record, or

    (2) an interested party or any other person—

PUBLIC VERSION

(A) withholds information that has been requested by [              ] . . . under this subtitle,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

[              ] . . . shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

Subsection 1677e(a) has several layers and multiple uses of the disjunctive. Notably, paragraphs (1) and (2) are in the alternative, joined by the word "or," meaning that Commerce must use facts otherwise available if either necessary information is not available or the circumstances in paragraph (2) apply. *See id.*

The first pathway for applying the "facts otherwise available" analysis—paragraph (1) of subsection 1677e(a)—focuses solely on the absence of necessary information, not on the reason why it is missing. If "necessary information is not available on the record," for any reason, Commerce must use facts otherwise available. See 19 U.S.C. § 1677e(a)(1). *See id.*

The alternative pathway for applying "facts otherwise available"—paragraph (2) of subsection 1677e(a)—focuses on the respondent's acts and omissions affecting the administrative record. *See id.*

Finally, Section 1677e(a) provides that Commerce's resorting to "facts otherwise available" is "subject to section 1677m(d) of this title." Section 1677m(d) in turn provides that

when information submissions are noncompliant with Commerce's requirements, Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle." 19 U.S.C. § 1677m(d). Thus, before resorting to "facts otherwise available," Commerce must give notice of a deficiency and an opportunity to cure it. *See id.*

### B.    Adverse inference

The second step in the "adverse facts available" analysis focuses on whether "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce. 19 U.S.C. § 1677e(b)(1). If Commerce finds such a failure to cooperate, the Department "may use an inference that is adverse to the interests of that party in selecting from the facts otherwise available." Id. § 1677e(b)(1)(A)–(B).

The "adverse inference" analysis focuses on the respondent's "failure to cooperate to the best of its ability, not its failure to provide requested information." *See Hung Vuong Corporation, et al. v. United States*, Ct. of Int'l. Trade, Slip Op. 20-174 (December 3, 2020), at 17 (citing Nippon Steel, 337 F.3d at 1381). For Commerce to conclude that a respondent failed to cooperate "to the best of its ability" such that an adverse inference is appropriate." *See id.*

First, Commerce must make "an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations." Id. (citing Ta Chen Stainless

Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1336 (Fed. Cir. 2002), Commerce must

reasonably expect an importer to maintain records of an accused antidumping activity).

Second, Commerce must make "a subjective showing that the respondent under

investigation not only has failed to promptly produce the requested information, but further

that the failure to fully respond is the result of the respondent's lack of cooperation in either:

(a) failing to keep and maintain all required records, or (b) failing to put forth its maximum

efforts to investigate and obtain the requested information from its records." An adverse

inference may only be drawn "under circumstances in which it is reasonable to conclude that

less than full cooperation has been shown."  Nippon Steel, 337 F.3d at 1382 (Aug 8, 2003).

IV.     **The alleged discrepancies did not constitute a lawful basis for applying AFA to Supermel**

      A.     **The alleged discrepancies did not indicate any informational gap or Supermel's failure to provide requested information**

The alleged discrepancies between Supermel's honey purchases and the unaffiliated

beekeeper suppliers' tax invoices did not constitute a lawful basis for applying AFA to Supermel.

The legal requirements for applying AFA are clear.  To apply "facts otherwise available," there

must be a gap in the record or a respondent's failure to provide requested information.  See 19

U.S.C. § 1677e(a).  These requirements are a necessary condition for applying adverse

inference. *See Hung Vuong Corporation, et al. v. United States*, Ct. of Int. Trade Slip Op. 20-174

(December 3, 2020), at 12-18. To apply adverse inference, Commerce must show that Supermel

failed to fully cooperate. *See Nippon Steel Corp. v. U.S.*, 337 F.3d at 1382 (Aug 8, 2003).  The

PUBLIC VERSION

alleged discrepancies did not demonstrate any of those legal requirements.  Therefore,

Commerce could not apply total AFA to Supermel based on the alleged discrepancies.  The

absence of a discrepancy between Supermel and bee keeper data is addressed in greater detail

below.

> ### B.     Supermel was not required to "verify" its information against documents submitted by the beekeepers

In the Final Determination, Commerce admitted that it attempted to "verify" Supermel's

honey purchase data against the tax invoices submitted by the unaffiliated beekeepers.  *See*

*Final Decision Memo* (PR 354), 12-17.  According to Commerce, its request for information was

triggered by alleged discrepancies between Supermel's purchase data and data submitted by

independent bee keepers.  *See Final Decision Memo* (PR 354), 12-17.   The request was not

aimed at filling any gap in the information provided by Supermel.  Instead, the request was

aimed at "verifying" Supermel's data against the documents provided by the unaffiliated

beekeepers.

In the underlying investigation, Supermel was the mandatory respondent, not the

unaffiliated beekeepers.  As a mandatory respondent, Supermel was only required to verify its

own information, not the information provided by independent beekeepers.  19 CFR 351.307

provides that Commerce will verify the "accuracy and completeness of <u>submitted factual</u>

<u>information</u>."  *See* 19 CFR 351.307(d) (emphasis added).  Moreover, Supermel's books and

records could only verify its own information, not the information submitted by the unaffiliated

beekeepers.  One of the requirements for applying adverse inference is that Commerce must

make "an objective showing that a reasonable and responsible importer would have known

that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."  Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1336 (Fed. Cir. 2002).  There was no basis to believe that Supermel could reasonably understand or explain why the business records of the two completely unrelated entities (i.e., the beekeepers) do not "agree" with those of Supermel.  Therefore, Commerce's request for information aimed at resolving the discrepancies was unreasonable.

Moreover, Commerce itself acknowledged that it was not reasonable to expect the bee keepers to maintain production cost and accounting records at the level of precision maintained by multination corporations. Bee keepers are sole proprietors operating in rural areas of Brazil, with many simply maintaining bee hives as a supplemental source of income. They are frequently located in areas without reliable internet connection, limited access to electronic communication, no ability to communicate in English and, in many cases, illiterate. In recognizing these limitations, Commerce stated that in the future reviews, the beekeepers "will be required to submit accurate cost information that is fully supported by documentary evidence and is verifiable by Commerce officials" and "{f}ailure to provide such information could result in the application of AFA."  See PDM (PR 288), at 18.  Despite the fully anticipatable short-comings of bee keepers accounting data, in the investigation Commerce proceeded directly to AFA.  Commerce's "warning" was meaningless in Supermel's determination, but it does reinforce that even Commerce recognizes that it would have been unreasonable to expect bee keepers to maintain detail cost information and accounting records in the ordinary course of business. Otherwise, there would be no need for such a warning.

C.    **Commerce already decided to rely on Supermel's acquisition costs.**

In the Final Determination, Commerce applied total AFA to Supermel based on the information in the unaffiliated beekeepers' tax invoices.  However, the beekeepers were not even the "respondents" for the purposes of cost reporting.  In the Preliminary Determination, Commerce already decided to "rely" on Supermel's acquisition costs because Supermel's acquisition costs were higher than the beekeepers' COP.  *See* PDM (PR 288), at 17.

Commerce issued its Preliminary Determination on November 17, 2021.  At the time, the record included both Supermel's honey purchase data and the tax invoices submitted by the beekeepers.  Supermel submitted its honey purchase data on August 3, 2021.  *See* Supermel DQR (CR 100-140; PR 133-152), at Exhibit D-5a.  The beekeepers submitted their tax invoices on October 26, 2022. *See* B1 SQR (CR 277; PR 241), at Exhibit SUP-1; *see also* B2 SQR (CR 278; PR 242), at Exhibit SUP-1.  However, Commerce never raised any issue about the alleged discrepancies at the time it decided to rely on Supermel's acquisition costs.

Moreover, Commerce never solicited information from the beekeepers to test the accuracy of Supermel's honey purchases.  The purpose of soliciting data from the bee keepers was to compare Supermel's acquisition costs to the beekeeper's COP, not their sale prices to Supermel.  *See* PDM (PR 288), at 17.  In the Final Determination, Commerce for the first time referenced the beekeepers' tax invoices to question the accuracy of Supermel's honey purchases.  This was arbitrary, capricious or otherwise not in accordance with law.

### D.     The alleged discrepancies did not demonstrate that Supermel's honey purchase data were unreliable

The alleged discrepancies did not indicate that Supermel's honey purchase data were unreliable because the record did not demonstrate that the beekeepers' tax invoices were more accurate than Supermel's information.  Commerce never reconciled or verified information provided by the beekeepers.

There is no record evidence demonstrating that those tax invoices accurately reflect the actual transactions that took place.  For example, the last POI transactions reported by Supermel and Beekeeper 1 are as follows.

| | Beekeeper 1 Tax Invoice[3] | Supermel Record[4] |
|---|---|---|
| Date | [ | ] |
| Weight | [ | ] |
| Value | [ | ] |

Based on this comparison, the "issue date" for the tax invoice was before the date on which the beekeeper signed the invoice submitted by Supermel.  Therefore, it is possible that details of the transaction may have changed from the time the transaction was anticipated (i.e., when the tax invoice was prepared) to the time the actual transaction took place (i.e., when the beekeeper signed the invoice provided to Supermel).

For example, there may have been a difference in the estimated weight and the actual weight.  The record indicates that Supermel's record is based on the actual weight that was measured on scale at the time of arrival.  *See* Supermel SDQR (CR 181-201; PR 205), at 10.  Also,

---

[3] *See* B1 SQR (CR 277; PR 241), at Exhibit SUP-1 (Invoice [            ]);
[4] *See* Supermel DQR (CR 100-140; PR 133-152), at Exhibit D-5a (line 2561*).

the value of honey reported by Supermel includes ancillary expenses such as transportation. *See* Supermel 2SDQR (CR 286-294; PR 259), at 5.  Therefore, the alleged discrepancies are explained as different recordkeeping practices between Supermel and the unaffiliated beekeepers. Moreover, the alleged discrepancies take at face value represent only 0.2% of the total value of honey purchased by Supermel and do not indicate that Supermel's entire honey purchase data were unreliable.

### V.       Commerce unlawfully used "facts otherwise available"

#### A.       Supermel reconciled its honey purchase data

In the Final Determination, Commerce found that "the necessary information to support Supermel's reported purchases of honey as recorded in its normal books and records is not available on the record."  *See* Final Decision Memo (PR 354), at 12.  To support this finding, Commerce stated that Supermel failed "to reconcile its unprocessed honey purchases and submit documentation tying its unprocessed honey purchases {…} to its accounting records." *See id.*  These statements are unsupported by substantial evidence.

During the investigation, Supermel provided its entire honey purchase data for the POI. *See* Supermel DQR (CR 100-140; PR 133-152), at Exhibit D-5a.  The honey purchase data included detailed information about each transaction such as the name of supplier, purchase date, quantity and value, and detailed physical characteristics of the purchased honey.  *See id.*

Supermel also indicated that purchased honey was recorded as debit entries in "stock: raw materials account (41) in Supermel's books."  *See* Supermel's supplemental A-D response

(September 15, 2021) ("Supermel SDQR") (CR 181-201; PR 205), at 3.  Supermel then provided a complete reconciliation of its honey purchase data to the debit amounts recorded in account 41 of its trial balances for the POI.  *See id.* at Exhibit SD-12.

The reconciliation at Exhibit SD-12 demonstrated that there is no discrepancy between the reported honey purchase data and Supermel's accounting books:

### Exhibit SD-12, Supermel SDQR (September 15, 2021)

**Raw Material Cost Reconciliation**

**Financial Statements (Stock: Raw Materials Debit)**

| Period | POI | Calculation |
|---|---|---|
| Apiario Export | [        ] | |
| Apiario Producao | [        ] | |
| Total | [        ] | a |

**Raw Material Purchases (Export + Producao)**

| | POI | Calculation |
|---|---|---|
| **Honey** | | |
| Quantity (kg) | [        ] | |
| Value (R$) | [        ] | b |
| **Pollen** | | |
| Quantity (kg) | [        ] | |
| Value (R$) | [        ] | c |
| **Propolis** | | |
| Quantity (kg) | [        ] | |
| Value (R$) | [        ] | d |
| **Beeswax** | | |
| Quantity (kg) | [        ] | |
| Value (R$) | [        ] | e |
| | | |
| **Difference R$** | 0 | g = a - b - c - d - e |
| **Difference % (FS vs Purchase Data)** | 0.0% | h = g / a |

The first two lines of the reconciliation showed the debit amounts recorded in account 41 of Supermel's two companies (i.e., Apiario Export and Apiario Production).  *See* Supermel SDQR (CR 181-201; PR 205), at Exhibit 2SA-5 (Apiario Export Trial Balance for the POI, showing "[                    ]" in the debit field for account 41) and Exhibit 2SA-9 (Apiario Production Trial Balance for the POI, showing "[              ]" in the debit field for account 41).

28

The reconciliation then provided the total quantity and value of the honey reported in the honey purchase data.  *See* Supermel SDQR (CR 181-201; PR 205), at Exhibit 2D-15 (the "CATEGORIES BEEKEEPER'S ENTRIES" sheet).  The honey purchase data at Exhibit SD-15 indicated that the total quantity and value of honey Supermel purchased during the POI was [                    ] kg and R$[                         ] respectively.  The reconciliation also provided the total quantities and values of other raw materials recorded in account 41 – pollen, propolis, and beeswax.

In the final step of the reconciliation, Supermel demonstrated that there is no discrepancy between the total amount recorded in it accounting books and the total value of raw materials reported in the investigation.  Therefore, Commerce's statement that Supermel failed to reconcile its honey purchase data is factually incorrect.  The Court should remand this case based on this reason alone.

Commerce's statement that Supermel failed to submit documentation supporting the reconciliation is also factually incorrect.  Supermel submitted supporting documentation for every number reported in the reconciliation at Exhibit SD-12. In its second supplemental response, Supermel submitted a detail worksheet showing how the reported raw material quantities and values were broken down between Apiario Export and Apiario Production.  *See* Supermel 2SDQR (CR 286-294; PR 259), at Exhibit 2SD-10.

**Exhibit 2SD-10, Supermel 2SDQR (November 4, 2021)**

PUBLIC VERSION

| Raw Material Purchases for POI | | | |
|---|---|---|---|
| | **Apiario Export** | **Apiario Producao** | **Total** |
| **Honey** | | | |
| Quantity (kg) | [ | | ] |
| Value (R$) | [ | | ] |
| **Pollen** | [ | | ] |
| Quantity (kg) | [ | | ] |
| Value (R$) | [ | | ] |
| **Propolis** | [ | | ] |
| Quantity (kg) | [ | | ] |
| Value (R$) | [ | | ] |
| **Beeswax** | [ | | ] |
| Quantity (kg) | [ | | ] |
| Value (R$) | [ | | ] |

The total quantities and values shown in this worksheet were exactly the same as the quantities and values shown in the reconciliation at Exhibit SD-12.  These figures also matched exactly the numbers shown in the supporting documentation.

Supermel submitted supporting documentation for every number provided in the above worksheet.  For the honey purchases, Supermel submitted sample screenshots of its journal entries.  *See id.* at 2SDQR (CR 286-294; PR 259), at Exhibit 2SD-13a (Apiario Export) and Exhibit 2SD-13b (Apiario Production).  For the purchases of pollen, propolis and beeswax, Supermel submitted both purchase data and sample journal screenshots.  *See id.* at Exhibit 2SD-11a (pollen), Exhibit 2SD-11b (propolis), Exhibit 2SD-11c (beeswax purchases by Apiario Export), and Exhibit 1SD-11d (beeswax purchases by Apiario Production).  Additionally, Supermel submitted sample invoices from third parties for the purchases of pollen, propolis, and beeswax.  *See id.*, at Exhibit 2SD-12a (pollen), Exhibit 2SD-12b (propolis), and Exhibit 2SD-12c (beeswax).

For the honey purchases, Supermel even submitted its entire journal entries.  In its response to Commerce's questionnaire in lieu of verification, Supermel submitted the screenshots for the entire 94 pages of the journal entries for honey purchased by Apiario

30

Export.  The screenshots demonstrated that Apiario Export purchased [                ] kg of honey for R$[                ] during the POI.  *See* Supermel ILVQ, at VC-4.1.  Supermel also submitted the screenshots for the entire journal entries for Apiario Production.  The screenshots demonstrated that Apiario Production purchased [                ] kg of honey for R$[                ] during the POI.  *See* Supermel ILVQ (CR 459-493; PR 325-331), at VC-5.1.  These figures matched exactly the numbers reported in Exhibit 2SD-10 of Supermel's second supplemental response.  Therefore, the record evidence clearly demonstrates that Supermel submitted documentation "tying its unprocessed honey purchases {…} to its accounting records."

### B.    Supermel's honey purchase data were verifiable and verified

In the Final Determination, Commerce found that "Supermel's reported cost data are unreliable because they could not be verified, and, thus, that these cost data cannot be used to compute a final dumping margin for Supermel."  *See* Final Decision Memo (PR 354), at 4.  In support of this finding, Commerce stated that Supermel's honey purchase entries do not "reflect debits and credits" for Supermel's "stock: raw materials" account.  *See id*, at 15.  These statements demonstrate that Commerce failed to make its decision based on the entirety of the record.

During the investigation, Supermel clearly stated that its accounting records do not "reflect the actual value of raw material **<u>consumed</u>**."  *See* Supermel SDQR (CR 181-201; PR 205), at 2-3 (emphasis added).  That is because the Brazilian tax law has a special provision for "companies whose inventory controls are not integrated with accounting."  *See id.*  Based on

31

that provision, Supermel can report any value for its raw material consumption as long as the

cost of sales is equal to "80% of the sales revenue." *See id.* Therefore, Supermel specifically

requested Commerce to determine the actual value of honey consumption based on its honey

<u>purchase</u> data, not its <u>consumption</u> data. *See id.*

Supermel also stated that purchased honey is recorded as debit entries in "stock: raw

materials" account. *See id.* at 3. However, as explained above, the credits recorded in this

account do not reflect the actual value of honey consumed. Instead, they only represent the

numbers required to make the total cost of sales equal to 80% of the total sales revenue. *See*

*id.* Supermel indicated that these credit amounts have been prepared by an "external

accountant." *See* Supermel ILVQ (CR 459-493; PR 325-331), at 11, 13 & 18. Therefore, it is

reasonable for Supermel's ordinary business records to include only information about its

honey purchases which are reported as debit amounts in the "stock: raw materials" account.

This was all well known to Commerce in advance of verification.

In the Final Determination, Commerce failed to consider the above-described facts in

determining whether Supermel's honey purchase data are verifiable. Support by substantial

evidence must be determined on the entirety of the record. *See Siemens Energy, Inc. v. United*

*States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015) (citing *Universal Camera Corp. v. NLRB,* 340 U.S.

474, 488 (1951)). The record evidence demonstrates that Supermel submitted verifiable honey

purchase data. Supermel submitted its entire honey purchase data for the POI and reconciled

the data to its accounting books. *See* Supermel DQR (CR 100-140; PR 133-152), at Exhibit D-5a.

Supermel also verified the data by submitting the screenshots for its entire journal entries. *See*

Supermel ILVQ (CR 459-493; PR 325-331), at Exhibits 4.1, 4.2, 5.1 & 5.2. Additionally, Supermel

submitted sample invoices that are signed by the suppliers which demonstrate that they were

paid by Supermel.  *See* Supermel SDQR (CR 181-201; PR 205), at Exhibit SD-13.  The record

cannot be any clearer.  Therefore, Supermel's honey purchase data was verifiable and verified.


### C.     Supermel did not fail to provide requested information

In the Final Determination, Commerce stated that Supermel failed to provide its "journal

entries" regarding purchases of unprocessed honey.  *Final Decision Memo* (PR 354), at 16.  *See*

*id.*  This statement is unsupported by substantial evidence.


Supermel submitted the entire screenshots for the following journal entries:

| Company | Period | Exhibit No. | No. of Pages |
|---|---|---|---|
| Apiario Export | POI | VC-4.1 | 94 |
| Apiario Export | 2020 | VC-4.2 | 82 |
| Apiario Production | POI | VC-5.1 | 3 |
| Apiario Production | 2020 | VC-5.2 | 3 |

*See* Supermel ILVQ (CR 459-493; PR 325-331).  These journal entries verified Supermel's

reconciliation of its honey purchase data and the debit entries found in Supermel's trial

balances.  Despite this clear evidence, Commerce claimed that Supermel failed to provide

requested "journal entries" because "{t}he screenshots do not show the name or number of

Supermel's "stock: raw materials" account nor do they reflect debits and credits or account

balances."  *See* Final Decision Memo (PR 354), at 16.


Supermel clearly identified the screenshots as its journal entries for honey purchases.

There is no requirement that those screenshots themselves need to show the account name or

number.  Moreover, the screenshots clearly indicated the total values that were reconciled to

the debit entries in Supermel's "stock: raw materials" accounts.  For example, the last page of

Apiario Export's 94-page journal entries clearly indicated the total value of its POI honey

purchases as reconciled to its trial balance.

**Supermel ILVQ, at Exhibit VC-4.1**



*See* Supermel ILVQ (CR 459-493; PR 325-331), at Exhibit VC-4.1 (p. 94).

Commerce failed to consider the entirety of the record in alleging that the journal

entries did not "reflect debits and credits or account balances" for Supermel's "stock: raw

materials" account.  In its questionnaire response, Supermel clearly indicated that its honey

purchases are only reflected in the <u>debit</u> entries in its accounting books.  *See* Supermel SDQR

(CR 181-201; PR 205), at 2-3.  Supermel also indicated that its "inventory controls are not

integrated with accounting." *See id.* at 13.  Supermel further stated that its accounting records

do not "reflect the actual value of raw material **consumed**." *See id.*

Furthermore, the record evidence clearly demonstrates that both the credits and

balances for Supermel's "stock: raw materials" account were determined by an external

accountant pursuant to the Brazilian tax law, not based on Supermel's journal entries.

Supermel explained that it records business activities using a system called SIGE and the actual

accounting (i.e., entering the total debit and credit amounts) is carried out by an external

accountant based on the reports generated by SIGE.  *See* Supermel 2SACQR (CR 352-375; PR

270-272), at 3-4.  The credits and balances represent a cost of sales equal to 80% of the sales

revenues.  *See* SDQR (CR 181-201; PR 205), at 8.  They represent neither the consumption nor

the inventory of unprocessed honey.  In other words, the record was already clear that

Supermel's journal entries do not reflect "credits" (i.e., consumption) and "account balances"

("i.e., inventory values).  Therefore, Supermel did not fail to provide journal entries that

corroborates its reporting of honey purchases.

19 C.F.R. § 351.401(g)(3) provides that [ ]In determining . . . whether an allocation is

calculated on as specific a basis as is feasible, the Secretary will take into account the records

maintained by the party in question in the ordinary course of its business, as well as such

factors as the normal accounting practices in the country and industry in question and the

number of sales made by the party during the period of investigation or review. 19 U.S.C. §

1677b provides as follows:

> Costs shall normally be calculated based on the records of the exporter or
> producer of the merchandise, if such records are kept in accordance with the
> generally accepted accounting principles of the exporting country (or the
> producing country, where appropriate) and reasonably reflect the costs
> associated with the production and sale of the merchandise. The administering
> authority shall consider all available evidence on the proper allocation of costs,
> including that which is made available by the exporter or producer on a timely
> basis, if such allocations have been historically used by the exporter or producer,
> in particular for establishing appropriate amortization and depreciation periods,
> and allowance for capital expenditures and other development costs.

While § 1677b(f)(1)(A) permits Commerce to disregard a respondent's GAAP-compliant

records upon a finding, supported by substantial evidence, that the costs do not reasonably

reflect the costs of production and should not, therefore, be used, there has been no such

showing in this case.

### D.      Commerce failed to describe the alleged discrepancies

19 U.S.C. 1677m(d) provides that when information submissions are noncompliant with

Commerce's requirements, Commerce "shall promptly inform the person submitting the

response of the nature of the deficiency and shall, to the extent practicable, provide that

person with an opportunity to remedy or explain the deficiency in light of the time limits

established for the completion of investigations or reviews under this subtitle." 19 U.S.C. §

1677m(d).  In the underlying investigation, Commerce failed to meet this requirement.

On October 20, 2020, Commerce issued its second supplemental Section D

questionnaire to Supermel.  *See* 2nd Supp D Questionnaire (October 20, 2021) (CR 274; PR 236).

In that questionnaire, Commerce stated that "there is a discrepancy between the quantity and

value of unprocessed honey … {Supermel has} reported as procured from the beekeepers."  *Id.*

36

at 8.  Commerce then requested Supermel to confirm whether it purchased the following

amounts of honey from the selected beekeepers.

### Commerce's 2nd Supp D QR - Q&V Cited by Commerce

| Quantity | Value | Supplier |
|---|---|---|
| [         ] kg | R$[        ] | Beekeeper 1 |
| [         ] kg | R$[        ] | Beekeeper 2 |

*Id.* at 8.  Commerce also requested Supermel to provide supporting documents to corroborate

the above figures.  However, these figures could not be found on the record.  Based on its

honey purchase data, Supermel's POI purchases were as follows.

### Supermel Honey Purchase Data (POI)

| Quantity | Value | Supplier |
|---|---|---|
| [         ] kg | R$[        ] | Beekeeper 1 |
| [         ] kg | R$[        ] | Beekeeper 2 |

*See* Supermel DQR (CR 100-140; PR 133-152), at Exhibit D-5a.  The figures provided by

Commerce also did not match the unaffiliated beekeepers' data.  At the time, only Beekeeper 1

reported the total quantity and value of honey sold to Supermel during the POI.  Based on this

response, Beekeeper 1's POI sales to Supermel were as follows.

### Beekeeper 1 Initial Response – Sales to Supermel

| Quantity | Value | Supplier |
|---|---|---|
| [         ] kg | R$[        ] | Beekeeper 1 |

37

*See B1 QR (CR 174; PR 198),* at 10.  Based on these numbers, there was no discrepancy between

the total quantities reported by Supermel and Beekeeper 1 (i.e., [     ] MT).  The total values

reported by Supermel and Beekeeper 1 were different by only 3 percent, which was clearly not

the "discrepancy" identified by Commerce.  Therefore, Supermel's response to Commerce's

question was simply providing the correct comparison back to Commerce.

As shown above, Commerce's question in the second supplemental Section D

questionnaire was indicative of its error in reviewing the record evidence.  Considering this

apparent error (and the ambiguity caused by the error), Supermel's response was both

reasonable and complete.  However, in the Final Determination, Commerce incorrectly

described the facts as follow.

> We agree with the petitioners that Supermel's reported
> unprocessed honey purchases do not agree with the unaffiliated
> beekeeper suppliers' sales invoices. A comparison of Supermel's
> listing of its unprocessed honey purchases and the unaffiliated
> beekeeper suppliers' invoices shows that the transaction dates,
> quantities, and values all differ.
>
> Because of the discrepancies between the quantities and values
> of honey reported by Supermel and the unaffiliated beekeeper
> suppliers, Commerce issued a second supplemental section D
> questionnaire to Supermel. Commerce alerted Supermel to the
> discrepancies and asked Supermel to confirm the quantities and
> values of its purchases. Commerce also directed Supermel to
> provide all relevant supporting documentation, including any
> correspondence with the beekeepers that corroborates the
> quantity and value of the purchases Supermel reported, copies or
> screenshots of any journal entries Supermel prepared to record
> the transactions, and proof of payment confirming the amount
> Supermel paid to the beekeepers.

Final Decision Memo, at 13 (footnotes omitted; emphasis added).  These statements are factually incorrect.  The alleged discrepancies did not exist at the time Commerce issued the second supplemental Section D questionnaire.  Commerce issued the second supplemental Section D questionnaire on October 20, 2022.  *See* 2nd Supp D Questionnaire (October 20, 2021) (CR 274; PR 236).  At the time, the two beekeepers have not yet submitted their invoices.  The beekeepers submitted their invoices on October 26, 2022. *See* Beekeeper 1 Supplemental Response (October 26, 2021) ("B1 SQR") (CR 277; PR 241), at Exhibit SUP-1; *see also* Beekeeper 2 Response (October 26, 2021) ("B2 SQR") (CR 278; PR 242), at Exhibit SUP-1.

In the second supplemental Section D questionnaire, Commerce did not describe any discrepancy between "Supermel's listing of its unprocessed honey purchases and the unaffiliated beekeeper suppliers' invoices."  Commerce described a "discrepancy" based on certain total quantity and value figures that were clearly erroneous.  Commerce did not, and could not, "alert" Supermel to any discrepancies regarding individual transactions because those discrepancies did not exist on the record at the time of issuing the questionnaire.  Commerce did not issue any Section D questionnaire after the second supplemental questionnaire.  Therefore, the record clearly demonstrates that Commerce failed to describe the alleged deficiency.

### VI.    Supermel did not fail to act to the best of its ability

As demonstrated above, Commerce failed to meet the legal requirements for "facts otherwise available" which is a necessary condition for applying adverse inference.  However,

PUBLIC VERSION

even assuming *arguendo* that those requirements have been met, Commerce's application of adverse inference was unlawful because it failed to demonstrate that Supermel failed to act to the best of ability.

"When determining whether a respondent has complied to the 'best of its ability,' Commerce "assess{es} whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  Nippon Steel Corp. v. U.S., 337 F.3d at 1382 (Fed. Cir. 2003).  This finding requires both an objective and subjective showing.  *See id.*

On the objective standard, Commerce failed to consider the following factors in determining whether Supermel acted to the best of its ability.  Supermel operated under the Brazilian tax regime for "micro and small businesses."  *See* Supermel's second supplemental Sections A-C questionnaire response (November 8, 2021) ("Supermel 2SACQR") (CR 352-375; PR 270-272) at 18.  As such, Supermel was not required to maintain inventory or consumption values for raw materials in its accounting books.  *See* SDQR (CR 181-201; PR 205), at 13.   As a small business entity, Supermel recorded its business activities in a separate recordkeeping system (i.e., SIGE) and the actual accounting (i.e., entering the total debit and credit amounts in the financial statements) was carried out by an external accountant based on the reports generated by SIGE.  *See* Supermel 2SACQR, at 3-4.

On the subjective standard, Commerce failed to consider the following factors. Supermel is a small company and, as such, was experiencing difficulties in meeting the

Commerce's requirements in the investigation.  *See* Letter from Crowell & Moring LLP Re

Supermel's Supplemental Sections A-C response (October 6, 2021) (CR 270; PR 224).   Supermel

requested assistance under 19 U.S.C. § 1677m(c)(1), which provides that Commerce "shall take

into account any difficulties experienced by interested parties, particularly small companies, in

supplying information requested by … {Commerce} and shall provide to such interested parties

any assistance that is practicable in supplying such information."  *See id.*  Commerce failed to

clearly describe the alleged discrepancies which triggered the information request.

Commerce's information request was unreasonable considering the entirety of the record

including the fact that Supermel's accounting books did not reflect the inventory and

consumption values of unprocessed honey.


Based on these factors, the record evidence demonstrates that Supermel put for its

maximum effort to fully cooperate in the underlying investigation.  Therefore, Commerce's

finding that that Supermel failed to act to the best of its ability was unlawful and unsupported

by substantial evidence.


**V.      Supermel is a producer of the subject merchandise**

In the underlying investigation, Commerce determined that beekeepers are the

producers of the subject merchandise.  *See* PDM (PR 288), at 16-17.  However, due to the large

number of beekeeper suppliers, Commerce decided to use Supermel's acquisition costs as "a

proxy for the actual COP of the raw honey purchased."  *See id.*  Commerce then applied total

AFA to Supermel based on the alleged discrepancies between the information provided by

41

Supermel and two of its unaffiliated beekeeper suppliers.  *See* Final Decision Memo (PR 354), 12-17.  This was unlawful because substantial evidence did not support that the beekeepers are the producers of the subject merchandise.

Section 773(b)(1) of the Act provides that Commerce may determine below-cost sales if it "has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for normal value have been made at prices which represent less than the <u>cost of production of that product.</u>"  19 U.S.C. § 1677b(b)(l) (emphasis added).  Section 773(b)(3)(A) further provides that the cost of production shall be equal to the sum of "<u>the cost of materials</u> and <u>fabrication or other processing</u> of any kind employed in <u>producing the foreign like product</u>;" selling, general and administrative expenses; and the packaging expenses.  See 19 U.S.C. § 1677b(b)(3)(A) (emphasis added).  Therefore, the COP reported by a "producer" must include both the cost of materials and <u>the cost of processing</u>.  Accordingly, the producer of a processed good must be the processor, not the supplier of unprocessed materials.

In the Preliminary Determination, Commerce found that beekeepers are the producers of the subject merchandise because "the raw honey purchased by Melbras and Supermel already falls within the scope of the investigation and reflects the essential characteristics of the merchandise under consideration."  *See* PDM (PR 288), at 16-17.  However, the statute does not require the raw materials be outside the scope of the investigation.  The only requirement is that the reported COP includes both the cost of materials and the cost of processing the materials.  Supermel's reported COP included both.

PUBLIC VERSION

Moreover, Supermel performed extensive processing to convert unprocessed honey into the merchandise under consideration ("MUC").  Thus, the record evidence does not support Commerce's finding that "the processing performed by the exporter-respondents is minimal and does not result in significant changes to the subject merchandise."  *See* PDM (PR 288), at 17.

The record demonstrates that both Supermel and Melbras conducted extensive processing after honey is purchased from the unaffiliated beekeepers.  Supermel indicated that it conducted extensive processing which included 1-6 hours of heat treatment, homogenization (involving additional heat treatment), filtration, organic certification, and inspection.  *See Supermel's Response to the Initial Request for Information (June 17, 2021) (CR 38-39; PR 79),* at 1-3. Melbras also indicated that it conducted multistep processing which included blending, heat treatment, filtration, homogenization, decantation, dehumidification, packaging, inspection and testing.[5]  *See* Melbras's Response to the Department's Initial Request for Information (June 22, 2021) (CR 40; PR 81), at 1-35.

The processing conducted by the Brazilian respondents makes this case akin to *Individually Quick Frozen ("IQF") Red Raspberries from Chile, Certain Preserved Mushrooms from Indonesia, Canned Pineapple Fruit from Thailand,* and *Certain Frozen and Canned Warmwater Shrimp from Thailand.* [6]  In each of those cases, Commerce used the acquisition

---

[5] *See* Melbras's Response to the Department's Initial Request for Information (June 22, 2021).
[6] *See* Notice of Final Results of Antidumping Duty Administrative Review: Individually Quick Frozen Red Raspberries From Chile, 70 Fed. Reg. 6,618 (Feb. 8, 2005) and accompanying Issues and Decision Memorandum at Comment 1; Certain Preserved Mushrooms From Indonesia: Final Results of Antidumping Administrative Review, 66 Fed. Reg. 36,754 (July 13, 2001); Final Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit from Thailand, 60 Fed. Reg. 29,553 (June 5, 1995); Notice of Preliminary Determination of Sales at Less Than Fair

prices paid by the respondent because certain processing took place after the respondent received the input product from the non-affiliated supplier.  *See* Request for COP Comments (PR 108), at 1-2.  The same is true in this case.  In particular, the operations performed by Supermel are similar to those performed by the respondents in *Individually Quick Frozen ("IQF") Red Raspberries from Chile*, which included "cleaning, washing, inspecting, sorting, culling, freezing, and packing."  *See* Individually Quick Frozen Red Raspberries from Chile, Investigations Nos. 701-TA-416 and 731-TA-948 (Preliminary), USITC Pub. No. 3441 (July 2001), at 4.

The processing performed by the Brazilian respondents also resulted in significant changes to the subject merchandise.  In the underlying examination, the subject merchandise was described with five product characteristics - color, organic, homogenization, staining/filtering, honey source.  *See* Commerce's Letter Re Product Characteristics (June 21, 2021) (PR 80), at 4 (Fields 3.1 through 3.5 for the construction of the CONNUM).  The record evidence demonstrates that the processing conducted by Supermel changed at least four of the five characteristics.  The blending process changed the color by mixing unprocessed honey of different colors.  *See* Supermel SDQR (CR 181-201; PR 205), at 10.  The processing also changed the organic status.  For example,"{a} mixture of organic honey and non-organic honey becomes non-organic honey."  *See id.*  Processed honey is homogenized and filtered while unprocessed honey is not.  *See id*, at Exhibit SD-6.

The record evidence also demonstrates that the Supermel conducted extensive testing before the honey was exported to the United States and the comparison market.  *See*

---

Value, Postponement of Final Determination, and Negative Critical Circumstances Determination: Certain Frozen and Canned Warmwater Shrimp From Thailand, 69 Fed. Reg. 47,100, (Aug. 4, 2004) at 47,107.

PUBLIC VERSION

Supermel's supplemental Sections A-C response (October 6, 2021) (CR 238-270; PR 224-226), at 17 & 18.  The record also indicates that unprocessed honey cannot be exported without the appropriate testing.  *See e.g.,* ACA and NEXCO Comments on COP Reporting Methodology (PR 129), at 4.  Therefore, Supermel also made a "significant change" that is not reflected in the physical characteristics.

Finally, Commerce was unlawful in stating that all beekeepers are now "on notice that they will be required to submit accurate cost information that is fully supported by documentary evidence and is verifiable by Commerce officials" and "{f}ailure to provide such information {in the future administrative reviews} could result in the application of AFA."  To apply AFA to an otherwise cooperative respondent based on an unaffiliated supplier's failure to comply, Commerce "must link {the cooperative respondent} to its supplier's failures, as a matter of fact."  *See* Tianjin Magnesium Intern. Co., Ltd. v. United States, Court No. 09-00535, Slip Op. 11-17, at 7 (Ct. Int'l Trade Feb. 11, 2011) (emphasis added).  Therefore, Commerce should not be permitted in the future administrative reviews to rely on this statement from the investigation to apply AFA to an otherwise cooperative processor-respondent based on an unaffiliated beekeeper supplier's failure to provide requested cost information.

PUBLIC VERSION

## CONCLUSION

For the reason discussed in this brief, we respectfully request that the Court remand the

case to Commerce consistent with the arguments made in this brief.


Respectfully submitted,


Daniel J. Cannistra
Pierce J. Lee

Crowell & Moring
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Tel: (202) 624-2902
Email: dcannistra@crowell.com

*Counsel for Plaintiff Hangzhou
Ailong Metal Products Co., Ltd.*

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 11911 words, including text, footnotes, headings,

and exhibits and excluding the table of contents, table of authorities, and counsel's signature

block.

Daniel Cannistra