**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE
_____

|  |  |  |
|---|---|---|
| APIÁRIO DIAMANTE COMERCIAL EXPORTADORA LTDA and APIÁRIO DIAMANTE PRODUÇÃO E COMERCIAL DE MEL LTDA, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 22-00185 |
| UNITED STATES, | ) ) ) | |
| Defendant | ) ) | |
| and | ) ) | |
| AMERICAN HONEY PRODUCERS ASSOCIATION and THE SIOUX HONEY ASSOCIATION, | ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

_____

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL                    REGINALD T. BLADES, JR.
                              Assistant Director
BENJAMIN JUVELIER
Attorney                      KARA M. WESTERCAMP
Office of the Chief Counsel   Trial Attorney
  For Trade Enforcement and Compliance   U.S. Department of Justice
U.S. Department of Commerce   Commercial Litigation Branch
Washington, D.C.              P.O. Box 480
                              Ben Franklin Station

Washington, D.C.  20044
Tel:  (202) 305-7571
Fax: (202) 514-8264
Email: kara.m.westercamp@usdoj.gov

February 10, 2023                    *Attorneys for Defendant United States*

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT PURSUANT TO RULE 56.2 ................................................... 2

    I.    The Administrative Determination Under Review ............................. 2

    II.    The Issues Presented for Review ...................................................... 2

STATEMENT OF FACTS ............................................................................. 3

    I.    Initiation Of Investigation And Preliminary Determination ................ 3

    II.    Administrative Case Briefs ............................................................. 4

    III.    Final Determination ...................................................................... 5

SUMMARY OF THE ARGUMENT .............................................................. 7

ARGUMENT ............................................................................................. 8

    I.    Standard of Review ....................................................................... 8

    II.    Substantial Evidence Supports Commerce's Determination That Supermel Is Not The Producer Of The Subject Merchandise ...................................... 9

        A.    Legal Framework .................................................................. 9

        B.    Substantial Evidence Supports Commerce's Finding That The Unaffiliated Beekeepers Were The Producers Of Subject Merchandise ................... 11

    III.    Substantial Evidence Supports Commerce's Determination To Use An Adverse Inference In Selecting From Among The Facts Otherwise Available On the Record ............................................................................................ 14

        A.    Relevant Legal Framework .................................................... 15

        B.    Substantial Evidence Supports Commerce's Determination To Apply Facts Available Because Information Was Missing From The Record ............................................................................ 18

            1.    Supermel Consistently Failed To Provide The Requested Information .............................................................. 18

    2.  Commerce's Determination That Supermel Had Multiple Discrepancies Found During Verification, Warranting Applying Facts Available, Is Supported by Substantial Evidence .............. 21

  C.  Substantial Evidence Supports Commerce's Determination To Apply Adverse Facts Available Because Supermel Failed To Cooperate To The Best Of Its Ability In Responding To Commerce's Multiple Requests For Information ......................................................................................... 26

CONCLUSION ................................................................................................. 34

**TABLE OF AUTHORITIES**

**CASES**                                                                 **PAGE(S)**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
    802 F.3d 1339 (Fed. Cir. 2015)........................................................... 15

*An Giang Fisheries Import and Export Joint Stock Company v. United States*,
    287 F. Supp. 3d 1361 (Ct. Int'l. Trade 2018)...................................17, 18, 33

*Calcutta Seafoods Pvt. Ltd. v. United States*,
    495 F. Supp. 3d 1318 (Ct. Int'l Trade 2021)...........................................29, 30

*Consolidated Edison Co. v. NLRB*,
    305 U.S. 197 (1938)......................................................................... 8

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966)......................................................................... 8

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007).........................................................27, 28

*Deacero S.A.P.I. de CV v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021).........................................................25, 26

*Essar Steel Ltd. v. United States*,
    721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010).........................................25, 26

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996)............................................................. 8

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)............................................. 9

*Hyundai Elec. & Energy Sys. Co. v. United States*,
    466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020)............................................. 23

*Hyundai Steel Co. v. United States*,
    282 F. Supp. 3d 1332 (2018).............................................................. 23

*Hyundai Steel Co.*,
    279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017).........................................32, 34

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992)......................................................................... 9

*Itochu Bldg. Prods. v. United States*,
    733 F.3d 1140 (Fed. Cir. 2013)................................................................ 28

*Mannesmannrohren-Werke AG v. United States*,
    77 F. Supp. 2d 1302 (Ct. Int'l Trade 1999).............................................. 23

*Maverick Tube Corp. v. United States*,
    857 F.3d 1353 (Fed. Cir. 2017)............................................................22, 32

*Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*,
    753 F.3d 1227 (Fed. Cir. 2014)................................................................ 17

*National Nail Corp. v. United States*,
    390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019)............................................ 22

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)........................................................15, 16, 34

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006).................................................................. 9

*NSK Ltd. v. United States*,
    481 F.3d 1355 (Fed. Cir. 2007)................................................................ 25

*PAM, S.p.A. v. United States*,
    582 F.3d 1336 (Fed. Cir. 2009)................................................................ 16

*Papierfabrik Aug. Koehler AG v. United States*,
    180 F. Supp. 3d 1211 (Ct. Int'l Trade 2016)............................................ 30

*Paul Muller Industrie GmbH & Co. v. United States*,
    502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007)............................................ 28

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990)................................................................ 28

*Shandong Huarong Machinery Co., Ltd. v. United States*,
    435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006)........................................22, 23

*Timken Co. v. United States*,
    699 F. Supp. 300 (Ct. Int'l Trade 1988).................................................... 9

*Torrington Co. v. United States*,
    146 F. Supp. 2d 845 (Ct. Int'l Trade 2001).............................................. 24

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) ............................................................... 8

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
  50 F.4th 98 (Fed. Cir. 2022) ................................................. 33

*Xiping Opeck Food Co. v. United States*,
  222 F. Supp. 3d 1141 (Ct. Int'l Trade 2017) ..................... 17, 33

*Venus Wire Indus. Pvt. Ltd. v. United States*,
  471 F. Supp. 3d 1289 (Ct. Int'l Trade 2020) ................. 10, 11, 12

*Yantai Timken Co., Ltd. v. United States*,
  521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ..................... 23

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) ...................................................... 8

19 U.S.C. 1677m(i) ................................................................. 22

19 U.S.C. §1677e(a) ............................................................ 21, 26

19 U.S.C. §1677e(b)(1) ........................................................... 27

19 U.S.C. §1677m(d) .............................................................. 25

19 U.S.C. § 1677(28) ........................................................... 16, 17

19 U.S.C. § 1677b(a) .............................................................. 10

19 U.S.C. § 1677e .................................................................. 15

19 U.S.C. § 1677e(a)(2)(D) ............................................ 21, 24, 25, 27

19 U.S.C. § 1677e(b) .............................................................. 15

19 U.S.C. § 1677m(c)(1) ....................................................... 28, 29

19 U.S.C. § 1677m(c)(2) ........................................................ 8, 29

19 U.S.C. § 1677m(c)(1) .......................................................... 29

19 U.S.C. § 1677m(c) ............................................................. 27

## REGULATIONS

19 C.F.R. § 351.307.................................................................................................... 23

19 C.F.R. § 351.309(c)(2)........................................................................................... 27

## OTHER AUTHORITIES

*Canned Pineapple Fruit from Thailand*,
    60 Fed. Reg. 29,553 (Dep't of Commerce June 5, 1995) (final LTFV determ.)............. 13

*Fresh and Chilled Atlantic Salmon from Norway*,
    61 Fed. Reg. 65522, 65523 (Dep't of Commerce Dec. 13, 1996) (final admin. review). 14

*Certain Preserved Mushrooms from Indonesia*,
    66 Fed. Reg. 36,754 (Dep't of Commerce July 13, 2001) (final admin. review).......13, 14

*Honey from Argentina*,
    66 Fed. Reg. 50,611 (Dep't of Commerce Oct. 4, 2001) (final admin. review) ........13, 14

*Certain Frozen and Canned Warmwater Shrimp from Thailand*,
    69 Fed. Reg. 47100 (Dep't of Commerce Aug. 4, 2004) (prelim. LTFV determ.).......... 13

*Individually Quick Frozen Red Raspberries from Chile*,
    70 Fed. Reg. 6,618 (Dep't of Commerce Feb. 8, 2005) (final admin. review),............... 13

*Narrow Woven Ribbons with Woven Selvedge from Taiwan*,
    75 Fed. Reg. 41,804 (Dep't of Commerce July 19, 2010)............................................ 10

*Raw Honey from Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam:*
*Initiation of Less-Than-Fair-Value Investigations*,
    86 Fed. Reg. 26,897 (Dep't of Commerce May 18, 2021. .............................................. 3

*Polyester Textured Yarn from Indonesia*,
    86 Fed. Reg. 58875 (Dep't of Commerce Oct. 25, 2021) (final LTFV determ.)............. 31

*Raw Honey from Brazil*,
    86 Fed. Reg. 66,533 (Dep't of Commerce Nov. 23, 2021) (prelim. LTFV determ.)......... 3

*Raw Honey from Brazil*,
    87 Fed. Reg. 22,182 (Dep't of Commerce Apr. 14, 2022) (final LTFV determ.)
    ..................................................................................................2, 11, 12, 14

SAA, H.R. Doc. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 (1994) .......................... 16

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

_____

|  |  |  |
|---|---|---|
| APIÁRIO DIAMANTE COMERCIAL EXPORTADORA LTDA and APIÁRIO DIAMANTE PRODUÇÃO E COMERCIAL DE MEL LTDA, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 22-00185 |
| UNITED STATES, | ) ) | |
| Defendant | ) ) | |
| and | ) ) | |
| AMERICAN HONEY PRODUCERS ASSOCIATION and THE SIOUX HONEY ASSOCIATION, | ) ) ) | |
| Defendant-Intervenors. | ) ) | |

_____

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' RULE 56.2
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response in opposition to the motion for judgment upon the agency

record filed by plaintiffs Apiário Diamante Comercial Exportadora Ltda and Apiário Diamante

Produção e Comercial de Mel Ltda (collectively, Supermel), Supermel Br., ECF No. 22.

Supermel challenges certain aspects of the final determination of the U.S. Department of

Commerce's (Commerce) antidumping duty investigation covering raw honey from Brazil.  As

we demonstrate below, Commerce's final determination is supported by substantial evidence and

in accordance with law.  Accordingly, we respectfully request that the Court deny plaintiffs'
motion and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.      The Administrative Determination Under Review**

      Plaintiffs challenge certain aspects of Commerce's antidumping duty investigation
covering raw honey from Brazil.  *See Raw Honey from Brazil*, 87 Fed. Reg. 22,182 (Dep't of
Commerce Apr. 14, 2022) (final LTFV determ.) (P.R. 353),[1] and the accompanying Issues and
Decision Memorandum (IDM) (P.R. 354).  The period of investigation is April 1, 2020, through
March 31, 2021.

**II.     The Issues Presented for Review**

1.      Whether substantial evidence supports Commerce's finding that beekeepers, rather than a
processor like Supermel, are the producers of the subject merchandise.

2.      Whether Commerce's application of facts available with an adverse inference to
Supermel, a mandatory respondent, is supported by substantial evidence and otherwise in
accordance with law.

3.      Whether Supermel failed to exhaust its argument that Commerce did not consider its
status as a small business in responding to Commerce's requests for information, when
determining whether Supermel acted to the best of its ability.

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of
the antidumping duty investigation.

## STATEMENT OF FACTS

### I.   Initiation Of Investigation And Preliminary Determination

On May 11, 2021, Commerce initiated an antidumping duty investigation on raw honey

from Brazil.  *See Raw Honey from Argentina, Brazil, India, Ukraine, and the Socialist Republic*

*of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 26,897 (Dep't of

Commerce May 18, 2021) (P.R. 48).  On June 7, 2021, Commerce selected two companies that

represented the largest volume of entries of the subject merchandise into the United States,

Melbras Importadora E Exportadora Agroindustrial Ltda. (Melbras)[2] and Apiário Diamante

Comercial Exportadora Ltda.  Respondent Selection Memo. (P.R. 64, C.R. 37).

On November 17, 2021, Commerce published the preliminary determination of the less-

than-fair-value (LTFV) investigation.  *See Raw Honey from Brazil*, 86 Fed. Reg. 66,533 (Dep't

of Commerce Nov. 23, 2021) (prelim. LTFV determ.) (P.R. 287), and accompanying Preliminary

Decision Memo at 2 (PDM) (P.R. 288).  In the preliminary determination, Commerce

determined that it was appropriate to collapse Apiário Diamante Comercial Exportadora Ltda

and its affiliate, Apiário Diamante Produção e Comercial de Mel Ltda, into a single entity,

termed "Supermel".  *See* PDM at 7-8.  Commerce, in calculating the cost of production of honey,

preliminarily found that Supermel was not the producer of the subject merchandise, because it

purchased raw honey and performed minimal processing on the subject merchandise at the time

of purchase.  *See id.* at 16-17.  Commerce also preliminarily found that the raw honey, as

purchased from the beekeepers, met the "essential characteristics" of the product and was already

within scope prior to the "minimal" processing done by the exporter-respondents.  *Id*.  As a

---

[2]  Because no party challenges any aspect of the antidumping duty margin Commerce
assigned to Melbras, we mainly address the relevant facts related to Supermel.

result, Commerce primarily relied on Supermel's acquisition costs to calculate the cost of production. *Id.* at 17. To determine whether the acquisition costs of Supermel were reasonable as a "proxy for the actual {cost of production} of the raw honey purchase," Commerce "selected the two direct beekeeper suppliers with the lowest sales prices to Supermel." *Id.* After comparing the results, Commerce preliminarily relied on Supermel's reported costs without adjustment. *Id.*

Following the preliminary determination, Commerce issued an in-lieu-of verification questionnaire (ILVQ) to Supermel, in order to verify how Supermel's reported costs tied to its accounting system, to which Supermel timely responded. *See* Supermel ILVQ (Dec. 10, 2021) (P.R. 299, C.R. 403); Supermel ILVQ Resp. (Dec. 20, 2021) (P.R. 325, C.R. 459).

## II.    Administrative Case Briefs

In January 2022, Commerce received administrative case and rebuttal briefs from the domestic party petitioners, Melbras, and Supermel. *See* Petitioners Admin. Case Br. (Jan. 13, 2022) (P.R. 338, C.R. 526); Petitioners Rebuttal Br. (Jan. 27, 2022) (P.R. 347, C.R. 528); Supermel Admin. Case Br. (Jan. 13, 2022) (P.R. 338, C.R. 526); Supermel Rebuttal Br. (Jan. 27, 2022) (Jan. 27, 2022) (P.R. 349, C.R. 530). In their administrative case brief, the petitioners, American Honey Producers Association and Sioux Honey Association, argued that Commerce should base Supermel's final dumping margin on facts available with an adverse inference. *See generally* Petitioners Admin. Case Br. Petitioners argued that Supermel did not cooperate to the best of its ability, failed to provide complete and accurate responses in its initial and supplemental questionnaire responses, and failed to support its reported cost data in its ILVQ response by not providing documentation supporting its overall honey costs, control number (CONNUM)-specific honey costs, and honey inventory quantity and values. *Id.*

In its rebuttal brief, Supermel responded that it had acted to the best of its ability, provided all its raw material costs based on its actual acquisition costs, and provided all the required documentation that Commerce had requested.  Supermel Rebuttal Br. at 2-5, 13-39. Supermel also argued that petitioners failed to identify any deficiencies in its cost reporting that would warrant application of total facts available with an adverse inference, and that the unaffiliated beekeepers' cost information demonstrated the reasonableness of Commerce's preliminary decision to use Supermel's acquisition costs.  *Id.* at 7-12.

### III.   <u>Final Determination</u>

In April 2022, Commerce published the final determination.  *See* IDM.  In the final determination, Commerce explained that after reviewing the parties' comments and reexamining the record, Supermel's margin should be recalculated using facts available with an adverse inference.  *See* IDM at 4.  Specifically, Commerce determined that (1) Supermel failed to cooperate by not acting to the best of its ability in responding to Commerce's request to submit documentation supporting how its honey purchases related to its accounting records, and (2) upon examining records during verification, Supermel had multiple discrepancies between its purchases as reported when compared with the records of the beekeeper-producers.  *Id.* at 12.

Regarding honey costs, Commerce explained that it "agree{s} with the petitioners that Supermel's reported unprocessed honey purchases do not agree with the unaffiliated beekeeper suppliers' sales invoices."  *Id.* at 13.  To wit, despite Commerce's multiple requests that Supermel "provide documentation from its accounting system related to raw honey purchases," Supermel failed to do so.  *Id.* at 13-16.  Instead, Supermel submitted "unsupported" documentation and Commerce found that it could not verify its reported cost data.  *Id.* at 16.  As for CONNUM-specific costs, Commerce explained that similar to the raw honey purchases,

Supermel had submitted unsupported documentation and Commerce could not "rely on Supermel's purchase information as support" because "Supermel failed to tie its purchases to its accounting system." *Id.* at 17. With respect to honey inventory quantities and values, Commerce determined that Supermel sufficiently explained that its documentation complied with Brazilian tax law. *Id.* at 17-18.

Then, Commerce determined that due to the "unexplained and unreconciled differences between the information submitted by Supermel and its beekeeper suppliers as well as the lack of corroborating evidence that tie Supermel's reported purchases to its accounting system," it was necessary to apply facts available. *Id.* at 18. Specifically, Commerce found that "the necessary information to support Supermel's reported purchases of honey as recorded in its normal books and records is not available on the record" and Supermel also "withheld information in its ILVQ{ response} (*i.e.*, screenshots showing that its purchases tie to its accounting system)." *Id.* Thus, Commerce determined that the record "does not contain any useable cost data" and it could not "determine whether any comparable market sales were made at prices below {cost of production}." *Id.*

Further, Commerce determined that it was appropriate to apply an adverse inference because despite multiple opportunities, Supermel failed "to provide documentation tying its honey purchases (*i.e.*, the basis for its reported costs) to its accounting records and system." *Id.* at 19. Indeed, Commerce determined that the various screenshots of Supermel's accounting system demonstrated that it had the "ability to tie its unprocessed honey purchases to its accounting records and submit copies of these records in response to Commerce's repeated requests." *Id.* Specifically, Commerce explained that Supermel failed to provide "any correspondence with the beekeepers that corroborates the quantity and value of Supermel's

6

reported purchases, copies or screenshots of any journal entries Supermel {had} prepared to record the transaction in its accounting system," or even provide "proof of payment concerning the amount Supermel paid to the beekeepers". *Id.* Rather, Supermel provided only "the same screenshots multiple times in spite of Commerce's repeated requests for specific types of documentation." *Id.* Commerce then corroborated the 83.72 percent margin alleged in the petition and used that as the facts available with an adverse inference rate. *Id.* at 20.

## SUMMARY OF THE ARGUMENT

Commerce's final determination is supported by substantial evidence and in accordance with law. First, Commerce properly determined that beekeepers, rather than a processor like Supermel, are the producers of the subject merchandise. Although Supermel purchases and processes raw honey harvested from the hive by unaffiliated beekeepers, Commerce considered Supermel's processing activities to be minimal, such that the activities failed to change the physical nature of the raw honey itself. Thus, it was reasonable for Commerce to use acquisition costs of raw honey as a proxy for cost of production.

Second, in the final determination, Commerce extensively explained its reasoning for why facts available with an adverse inference is warranted. Specifically, Supermel failed to verify its reported purchases of raw honey and did not cooperate to the best of its ability, despite Commerce's repeated requests for information. Despite multiple opportunities to supply corroborating evidence for its honey purchase costs after discrepancies were identified, Supermel failed to tie its cost data to its accounting systems. As such, the necessary information to support and verify Supermel's honey purchases is missing from the record. Therefore, substantial evidence supports Commerce's determination to apply facts available with an adverse inference because it could not reconcile Supermel's unprocessed raw honey purchases.

Finally, Supermel failed to exhaust its argument that Commerce failed to consider its status as a small business in responding to Commerce's requests for information. When it comes to providing assistance to interested parties, Commerce must "take into account any difficulties experienced by interested parties, *particularly small companies*, in supplying information requested . . . in connection with investigation and reviews." 19 U.S.C. § 1677m(c)(2) (emphasis added). However, before Commerce, Supermel argued only that Commerce should consider the unaffiliated *beekeepers'* ability to respond to Commerce's requests for information, and not Supermel's own alleged inability to provide requested information in assessing whether Supermel acted to the best of its ability.

## ARGUMENT

### I.    Standard of Review

This Court sustains "'any determination, finding, or conclusion found' by Commerce unless it is 'unsupported by substantial evidence upon the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing two inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Moreover, "the court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have

made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation and quotation marks omitted). In that vein, "{i}t is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (citation omitted), *aff'd*, 894 F.2d 385 (Fed. Cir. 1990). Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, such as in this case, the agency's conclusions must fall only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

## II.    Substantial Evidence Supports Commerce's Determination That Supermel Is Not The Producer Of The Subject Merchandise

Commerce properly determined that Supermel is not the producer of the subject merchandise exported to the United States during the period of review. *See* PDM at 16-17. Supermel argues that it is the producer because it made "significant changes" and extensive processing to the raw honey after it purchased the raw honey from unaffiliated beekeepers. *See* Supermel Br. at 41-45. Supermel also argues that the cost of production must include the cost of materials and the cost of processing, such that "the producer of a processed good must be the processor, not the supplier of unprocessed materials." *Id.* at 42. These arguments are meritless.

### A.    Legal Framework

To properly determine appropriate antidumping duties for a given product, Commerce must first identify the normal value or, where the normal value cannot be determined, the

constructed value, of the merchandise in the exporting country.  19 U.S.C. § 1677b(a).

Constructed value is calculated from (1) "the cost of materials and fabrication or other

processing of any kind employed in producing the merchandise," (2) "selling, general, and

administrative expenses," and (3) "the cost of all containers and coverings … and all other

expenses incidental to placing the subject merchandise in condition packed ready for shipment to

the United States."  *Id.* § 1677b(e).

For cases in which in-scope inputs of the same country of origin are used in the

production of subject merchandise (*i.e.*, where the substantial transformation test for country of

origin is irrelevant), Commerce uses a test articulated in *Narrow Woven Ribbons from Taiwan* to

identify which entity is responsible for 'producing' the subject merchandise for purposes of

identifying which entity's costs must be used to calculate constructed value.  *Narrow Woven

Ribbons with Woven Selvedge from Taiwan*, 75 Fed. Reg. 41,804 (Dep't of Commerce July 19,

2010), and accompanying IDM at 48-89.  The *Narrow Woven Ribbons* test questions whether (1)

raw materials were added to the product, or (2) processing was performed that changed the

physical nature or characteristics of the product.  *Id.*  The Court has held that this is a reasonable

test to use in situations when "the input and output products are the same class or kind of

merchandise and the country of origin is not at issue."  *Venus Wire Indus. Pvt. Ltd. v. United

States*, 471 F. Supp. 3d 1289, 1298, 1302-03 (Ct. Int'l Trade 2020) (holding that the *Narrow

Woven Ribbons* test is reasonable to determine the producer of subject merchandise when the

inputs are in-scope, all production takes place in the subject country, and the scope covers a

finished product).

**B.** **Substantial Evidence Supports Commerce's Finding That The Unaffiliated Beekeepers Were The Producers Of Subject Merchandise**

Supermel argues that it "conducted extensive processing" on the honey after it was acquired from the unaffiliated beekeepers, including "heat treatment, homogenization, filtration, organic certification, and inspection." Supermel Br. at 43 (citing Supermel's Response to the Initial Request for Information at 1-3 (June 17, 2021) (P.R. 79, C.R. 38-39)). Supermel also argues that this processing results in "significant changes to the subject merchandise," including "changing" four of the five product characteristics identified by Commerce during the investigation, *i.e.*, color, organic status, homogenization, straining/filtering, and honey source. *Id.* at 44 (citing Commerce's Letter Re: Product Characteristics at 4 (June 21, 2021) (P.R. 80)). Therefore, it argues that Commerce's findings under the *Narrow Woven Ribbons* test are unsupported by substantial evidence. *See id.*

However, Supermel's argument lacks merit because the scope of this investigation covers "raw honey . . . *as it exists in the beehive* or as obtained by extraction, settling, and skimming, or coarse straining." *Raw Honey from Brazil*, 87 Fed. Reg. at 22,183 (emphasis added). This includes some filtering, but not honey that has "been filtered to a level that results in the removal of most or all of the pollen." *Id*. The scope further includes "all grades, floral sources, and colors" of honey, and whether or not the honey is organic. *Id*. Although Commerce did not address whether Supermel is a producer of the subject merchandise because it applied facts available with an adverse inference and found that argument to be moot, IDM at 21, Commerce *did* address that argument with respect to Melbras. *Id.* at 30-31. For example, neither Supermel nor Melbras is a beekeeper; rather, they are "purchaser{s} and processor{s} of in-scope raw honey. *Id.* at 31. The processing done by both is "minimal" and possesses "the essential characteristics of the final product sold." *Id.*; *see also* PDM at 17. Consequently, Commerce

11

determined that it was "appropriate to use the acquisition cost of honey as a proxy for beekeeper costs as the best available information." IDM at 31; *see also* PDM at 17.

Indeed, Supermel's position as a "purchaser and processor" of honey is similar to that of one of the respondents in *Narrow Woven Ribbon from Taiwan*. *See Narrow Woven Ribbon* IDM at cmt. 20. In that case, the respondent purchased "griege ribbon," a flexible input that can be dyed and stamped for decorative purposes, which it then processed using "combinations of dyeing, leveling, printing, hot stamping, and spooling" to prepare it to sell to the United States. *Id*. While the processing changed the *appearance* of the ribbon and created a polished finished product, it did not change the "essential physical characteristic" of the ribbon because such physical characteristics are already present in the griege ribbon itself as in-scope merchandise. *Id*. Similarly, although Supermel did strain the honey, alter its color and organic status through blending, and homogenize the honey, none of these actions changed the underlying essential nature of the product as "raw honey as it exists in the hive." IDM at 31. Thus, like the griege ribbon from *Narrow Woven Ribbon*, the raw honey Supermel purchased both entered and departed Supermel's facility as in-scope merchandise, making Supermel a processor rather than a producer. *See Raw Honey from Brazil*, 87 Fed. Reg. at 22,183; IDM at 31; PDM at 16-17.

The administrative decisions that Supermel cites as support for its assertion that the further processing it does to the raw honey constitutes sufficient actions for Commerce to use acquisition costs, rather than the costs of the producers of the subject merchandise in calculating the cost of production, *see* Supermel Br. at 43, are inapposite. Although Supermel argues that it changes "four out of the five characteristics" of honey--color, organic status, homogenization, and straining/filtering, with the fifth unchanged element being honey source, *id*. at 44--in the various administration decisions, further processing was *required* to bring the merchandise

acquired from farmers *within* scope.  *See Individually Quick Frozen Red Raspberries from Chile*, 70 Fed. Reg. 6,618 (Dep't of Commerce Feb. 8, 2005) (final admin. review), and accompanying IDM at cmt. 1 (explaining the scope specifically excluded "fresh red raspberries" acquired by the producers); *Certain Preserved Mushrooms from Indonesia*, 66 Fed. Reg. 36,754 (Dep't of Commerce July 13, 2001) (final admin. review) (explaining the scope required "preserving" mushrooms by processing them in a certain manner and explicitly excluded raw or fresh mushrooms acquired by the producers); *Canned Pineapple Fruit from Thailand*, 60 Fed. Reg. 29,553 (Dep't of Commerce June 5, 1995) (final LTFV determ.) (explaining the scope required the pineapple to be further "processed and/or prepared" rather than fresh pineapple); *Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 Fed. Reg. 47100 (Dep't of Commerce Aug. 4, 2004) (prelim. LTFV determ.) (explaining the scope required the shrimp and prawns to be "processed in frozen or canned form" rather than fresh shrimp and prawns).  All of these decisions contrast with the present case, where the honey *as it exists in the hive* enters Supermel's facilities in scope, and none of the processing conducted changes it in a significant way when compared with that required by raspberries (freezing), mushrooms (canning and preserving), pineapple (cooking and canning), or shrimp (freezing, canning/preserving, or otherwise processed).  *See* IDM at 31; PDM at 16-17.  Thus, Supermel's processing does not change whether the honey is in scope or out of scope merchandise, unlike the cited decisions.

In contrast, in *Honey from Argentina* and *Fresh and Chilled Atlantic Salmon from Norway*, Commerce found that the respondents were processors/exporters and determined that the most accurate cost of production would come from reviewing the producers of subject merchandise, that is, beekeepers and farmers, respectively.  *See Honey from Argentina*, 66 Fed. Reg. 50,611 (Dep't of Commerce Oct. 4, 2001) (final admin. review); *Fresh and Chilled Atlantic*

*Salmon from Norway*, 61 Fed. Reg. 65522, 65523 (Dep't of Commerce Dec. 13, 1996) (final

admin. review).  In both cases, the scope of the investigation or review included the merchandise

as it was acquired by the producer, without needing further processing to bring it within scope.

In *Honey from Argentina*, the scope listed covered "natural honey, artificial honey containing

more than 50 percent natural honey by weight . . .  and flavored honey."  *Honey from Argentina*,

66 Fed. Reg. 50,611.

In *Salmon from Norway*, the scope explicitly excluded "processed Atlantic salmon" and

"fillets, steaks, and other cuts" of Atlantic salmon, which would require processing when

compared with the whole fish.  *Salmon from Norway*, 61 Fed. Reg. at 65,522.  The processing

done by the respondents in *Salmon from Norway* included "gutting, cleaning, and packaging" the

fish, or otherwise preparing the fish for sale and shipment.  *Id*.  As with Supermel's processing of

honey, the salmon was "the same merchandise as it is covered by the antidumping duty order,

but at an earlier stage of production"; the merchandise Supermel purchases is the same, and

Supermel engages in minimal additional processing that does not remove the merchandise from

the scope of the order.  IDM at 31; PDM at 16-17.

Thus, substantial evidence exists to show that beekeepers, rather than Supermel, are the

producers of the subject merchandise.  *See Raw Honey from Brazil*, 87 Fed. Reg. at 22,183.

**III.   Substantial Evidence Supports Commerce's Determination To Use An Adverse
Inference In Selecting From Among The Facts Otherwise Available On the Record**

Commerce reasonably determined to select from among the facts otherwise available on

the record when it found that (1) necessary information was missing from the record, (2)

Supermel withheld necessary information, and (3) Commerce could not verify any of Supermel's

reported cost or sales data.  IDM at 12-19.  Commerce also determined that Supermel

significantly impeded the proceeding and did not act to the best of its ability.  *Id.* at 18-19.  As a

14

result, Commerce applied adverse facts available and selected the 83.72 percent margin alleged in the petition to apply to Supermel.[3] *Id.* at 20.  Supermel contests Commerce's determination to use an adverse inference in selecting from among the facts otherwise available, Supermel Br. at 22-40, but fails to demonstrate that Commerce acted unreasonably or was unsupported in its determination.

### A.    Relevant Legal Framework

Commerce must follow a two-step process to apply facts available with an adverse inference.  19 U.S.C. § 1677e.  First, Commerce shall use facts otherwise available to fill gaps in the record (1) if necessary information is not available on the record, or (2) if an interested party withholds information requested by Commerce, fails to provide such information in the form and manner requested, significantly impeded the proceeding, or provides information that cannot be verified.  *Id.* § 1677e(a).  Commerce may select among facts otherwise available when it has received less than the full and complete facts needed to make a determination because a party has failed to provide requested information within the deadline for submission.  *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1355-56 (Fed. Cir. 2015); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

Second, if an interested party fails to cooperate to the best of its ability in responding to Commerce's request for information, Commerce may apply an adverse inference in selecting from among facts otherwise available.  19 U.S.C. § 1677e(b).  An interested party fails to cooperate to "the best of its ability" when it "fails to put forth its maximum effort to provide Commerce with full and complete answers to all inquiries."  *Nippon Steel*, 337 F.3d at 1382.  "While the standard does not require perfection and recognizes that mistakes sometimes occur, it

---

[3] Supermel does not contest the rate selected nor the methodology used to select the rate. *See generally* Supermel Br.

does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* A party is obligated to conduct a reasonable inquiry to investigate the accuracy of information that it submits to Commerce. *See PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). The purpose of the adverse facts available provision is "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA, H.R. Doc. No. 103-316, 870, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199 (1994). When applying an adverse inference, Commerce also considers the extent to which a party may benefit from its own lack of cooperation. *See Nippon Steel*, 337 F.3d at 1382-83.

Finally, "the statute does not contain an intent element." *Id.* at 1383. A failure to adequately inquire can suffice because, "{t}he statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of {the} respondent's ability, regardless of motivation or intent." *Id.* ("inadequate inquiries may suffice."). As the Federal Circuit has explained, the law "requires the respondent to do the maximum it is able to do." *Nippon Steel*, 337 F.3d at 1382.

"For purposes of {§ 1677b}, the term 'exporter or producer' includes both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise." 19 U.S.C. § 1677(28). Cost of production information is therefore necessary to calculate the dumping margin. The SAA explains that "the purpose of {19 U.S.C. § 1677(28)} . . . is to clarify that where different firms perform that production and selling function, Commerce may include the costs, expenses, and profits of each firm in calculating cost of production and constructed value." SAA at 835. The intent of this section is to ensure that Commerce has the authority to capture all costs in

situations when various companies are engaged in the production and sale of the merchandise under consideration. *Id.* Accordingly, Commerce's determination of the identity of the producer directly affects the cost of production and constructed value computations. *Id.*

Finally, when a cooperating party has the ability to induce cooperation from unaffiliated parties, such as in a producer/supplier-exporter relationship, Commerce may rely on policies of reducing opportunity for evasion or of inducement in selecting among the facts available, so long as the application of those policies is reasonable on the particular facts and the predominant interest in accuracy is properly taken into account as well. *Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1233 (Fed. Cir. 2014). For example, the Federal Circuit upheld Commerce's determination that a cooperating respondent with an existing relationship with its supplier (itself an interested party) could have induced the supplier to cooperate with requests for information, and when the cooperating respondent failed to do so, Commerce was justified in determining that the cooperating respondent had failed to cooperate to the best of its ability. *Id.* at 1234-35 ("if {the respondent} and other entities were not willing to export goods produced by {the supplier}, this would potentially induce {the supplier} to cooperate"). This Court also sustains Commerce's use of an adverse inference when a supplier was not sufficiently induced to cooperate on behalf of a cooperating respondent. *See Xiping Opeck Food Co. v. United States*, 222 F. Supp. 3d 1141, 1159 (Ct. Int'l Trade 2017); *An Giang Fisheries Import and Export Joint Stock Company v. United States*, 287 F. Supp. 3d 1361, 1373 (Ct. Int'l. Trade 2018) (analyzing Commerce's decision to apply an adverse inference when a respondent "could have done more" to induce cooperation of a third party).

### B.     Substantial Evidence Supports Commerce's Determination To Apply Facts Available Because Information Was Missing From The Record

Commerce acted reasonably and in accordance with the statute by applying facts available to Supermel because information was missing from the record.  IDM at 12-18. Supermel's various arguments to the contrary are without merit.  *See* Supermel Br. at 27-38.

### 1.     Supermel Consistently Failed To Provide The Requested Information

In its initial questionnaire response, Supermel used the purchase price of unprocessed honey from its unaffiliated supplies as a proxy for the cost of raw materials in reporting its costs to Commerce.  *Id*. (citing Supermel's Section D Questionnaire Resp. at 17, 20 (Aug. 3, 2021) (P.R. 133, C.R. 100)).  In its Section D response, Supermel provided Commerce with a spreadsheet that showed all of its unprocessed honey purchases during the period of investigation, and further elaborated in response to a supplemental questionnaire that this honey is referred to as "stock: raw materials account (41)" in its normal books and records.  *Id*. at 12-13 (citing Supermel's Section D Resp. at Exhibit D-5a (C.R. 110, 112); Supermel's Sections A-D First Supplemental Questionnaire Resp. at 4 (Sept. 15, 2021) (P.R. 205, C.R. 181)).

Prior to the preliminary determination, Commerce also issued supplemental questionnaires to two unaffiliated beekeepers examined as part of identifying the cost of production for raw honey and confirming the amounts listed in Supermel's books and records. *Id*. at 14 (citing Request For Information From Beekeepers (Aug. 11, 2021) (P.R. 162-163, C.R. 148-149)).  Both beekeeper suppliers (referred to as Beekeeper 1 and Beekeeper 2) responded to Commerce's questionnaires and provided information about the quantity, value, and types of honey sold, including specifically the quantity and value of sales to Supermel as corroborated by invoices or other correspondence.  *Id*.  But as Commerce explained in the final determination, "the information provided by both beekeepers contradicted Supermel's reporting."  *Id*.

18

After identifying the discrepancies, Commerce sought other methods of verifying the purchases reported in Supermel's questionnaire responses. *Id*. Specifically, Commerce requested "excerpts from Supermel's accounting system that show how purchases of honey from the beekeeper suppliers were recorded," and Commerce also gave Supermel examples of how it might respond with acceptable documentation (such as journal entries or other supporting documents). *Id*. at 14-15 (citing First Supplemental Section D Questionnaire at 4 (Sept. 1, 2021) (P.R. 195, C.R. 173)). Supermel's response was perfunctory: that Supermel "records its purchases of honey from beekeepers as debit entries in the raw material stock account (41)." Supermel's Sections A-D First Supplemental Questionnaire Response at 4. Supermel did *not* respond to Commerce's request for "excerpts from {its} accounting system," nor did it provide journal entries or invoices as corroborating evidence regarding the purchases from the independent beekeepers. *Id*.

In October 2021, Commerce sent Supermel a second supplemental Section D questionnaire to clear up discrepancies and fill in gaps on the record. Specifically, Commerce asked three questions for the second time: (1) whether Supermel could provide any evidence, such as journal entries, tying unprocessed honey purchases to its accounting system, (2) whether Supermel could provide evidence from its accounting system to explain how it recorded purchases of honey from the independent beekeepers, and (3) how Supermel's purchase database spreadsheet relates to its accounting system. *See* IDM at 15 (citing Supermel's Section D Second Supplemental Questionnaire Resp. (Nov. 4, 2021) (P.R. 265)). Supermel provided functionally the same response for all three questions: a series of screenshots that it claimed represented its accounting system, but that simply showed "a list of honey purchases by date, name of supplier, address of supplier, weight, value, and per-unit price." *Id*.; *see also*

Supermel's Section D Second Supplemental Questionnaire Resp. at Exhibits 13-a and b (C.R. 331).[4]  Supermel again did not include necessary accounting information such as debits, credits, or account balances, nor did it show the name or number of any of Supermel's raw materials accounts.  IDM at 15.

Finally, in December 2021, Commerce again attempted to corroborate Supermel's raw honey acquisition costs through use of its in-lieu-of verification questionnaire.  *See* Supermel ILVQ.  In its responses, Supermel again ignored parts of Commerce's questions, and instead provided data that was similar, but missing key components that were explicitly included on the in-lieu-of verification questionnaire.  *See* IDM at 15-16 (citing ILVQ Resp. at 14-15 and exhibits VC-4, VC-5, VC-13, and VC-14 (C.R. 460-465)[5]).  Specifically, Commerce explained that instead of showing "how the purchases of honey from certain beekeeper suppliers tie to certain CONNUM costs," Supermel referred Commerce to screenshots it had already submitted, showing purchase data, which did not reflect debits, credits, or account balances.  *Id*. at 16. Supermel did not supply information from its accounting system to show how purchases were recorded into inventory.  *Id*.  It further refused to provide copies of spreadsheets or screenprints from its accounting system to support its consumption prices – again, listing only screenshots of spreadsheets showing purchase data.  *Id*.  Therefore, the record remained incomplete as to Supermel's purchase history.

---

[4]  The Second Supplemental Sec. D Questionnaire is an unpaginated PDF file. Exhibits 13a and b are at PDF page 85.

[5]  VC-4 is included in C.R. 460 at 19-64, C.R. 461 in its entirety, C.R. 462 in its entirety, and C.R. 463 at 1-24. VC-5 is included in C.R. 463 at 25-32. VC-13 is included in C.R. 464 at 7-19. VC-14 is included in C.R. 464 at 20-21.

> **2.** **Commerce's Determination That Supermel Had Multiple Discrepancies Found During Verification, Warranting Applying Facts Available, Is Supported by Substantial Evidence**

Commerce's decision to use facts available when there was a lack of corroborating evidence that tied Supermel's reported purchases to its accounting system was reasonable and supported by substantial evidence. *See* IDM at 18. As Commerce summarized in the final determination, "{o}n numerous occasions . . . Commerce requested that Supermel provide documentation from its accounting system related to raw honey purchases," but "{i}n response to all of the { } requests, Supermel simply provided the same listing of honey purchases." *Id.* at 16. This resulted in a gap on the record because there is no reliable record evidence supporting Supermel's reported purchases of raw honey as recorded in its normal books and records. *Id.* at 18. When necessary information is not present on the record, or when an interested party withholds requested information or provides information that cannot be verified, Commerce must use "the facts otherwise available" to reach a determination in an antidumping duty proceeding. 19 U.S.C. §1677e(a).

Supermel argues, however, that (1) it was not required to verify its information when documents provided by the *beekeepers*, not Supermel's own information, showed a discrepancy, (2) Commerce's decision at the preliminary stage to rely on Supermel's acquisition costs made it irrelevant that Supermel verify such acquisition costs when discrepancies later arose, and (3) the discrepancies found did not demonstrate that its acquisition costs were unreliable. *See* Supermel Br. at 23-26. Further, Supermel argues that the use of facts otherwise available was not supported by substantial evidence because (1) Supermel submitted the information necessary to tie its honey purchases to its accounting records, (2) Commerce successfully verified Supermel's

reported cost data, and (3) Supermel provided the specific information requested by Commerce. *See id.* at 27-36.

None of these arguments illustrate that Commerce acted without substantial evidence in determining that Supermel was unable to verify vital information on the record as required by statute. *See* 19 U.S.C. § 1677e(a)(2)(D) (explaining that Commerce "shall" use facts otherwise available if an interested party provides information that cannot be verified). Further, the mere fact that Commerce issued multiple supplemental questionnaires on the same topic has been upheld by the Court as sufficient evidence for showing that a respondent company has "significantly impeded" an investigation. *See Shandong Huarong Machinery Co., Ltd. v. United States*, 435 F. Supp. 2d 1261, 1277 (Ct. Int'l Trade 2006) (stating that the failure of respondent companies to disclose their relationship "until after the issuance of several supplemental questionnaires surely significantly impeded Commerce's investigation by requiring the agency to prolong its review"); *National Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1385 (Ct. Int'l Trade 2019) (holding that Commerce's ability to conduct a review was significantly impeded when the respondent failed to provide the necessary information repeatedly requested by Commerce); *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) ("First, although Commerce's supplemental request required it only to provide the information or explain why it was unable to do so, Borusan did neither. Borusan admits it did not provide the information, and the explanation of its difficulties does not constitute a statement that it was unable to provide the information.").

To begin with, as Supermel itself stated, "Supermel was only required to verify its own information," Supermel Br. at 23, but it failed to do so despite multiple requests for information. *See* IDM at 14-16. Commerce's requests may have been triggered by the information submitted

by the independent beekeepers, but the data that Commerce attempted to verify was *Supermel's* data, in the form of its own purchases of unprocessed honey.  *See id.* at 13-14.  This is precisely the kind of data that Commerce is required by statute to verify.  *See* 19 U.S.C. 1677m(i).  In this case, it is made all the more meaningful by the fact that "Commerce {had} already decided to rely on Supermel's acquisition costs."  Supermel Br. at 25.

While Supermel appears to argue that Commerce's decision to rely on Supermel's acquisition costs at the preliminary decision stage means that Commerce should be prohibited from applying facts available after finding discrepancies during verification, at a later stage in the proceeding.  *Id.* at 23-26.  That approach would defeat the entire purpose of verifying information relied upon during the proceeding and is contrary to years of established precedent. *See, e.g.*, *Hyundai Elec. & Energy Sys. Co. v. United States*, 466 F. Supp. 3d 1303, 1317 (Ct. Int'l Trade 2020), *aff'd*, 15 F.4th 1078 (Fed. Cir. 2021) ("substantial evidence supports Commerce's determination that Hyundai's cost information was so incomplete as to be unverifiable" when it "failed to provide requested cost information in response to the agency's requests, both with respect to its product-specific costs and its cost-reconciliation information"); *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332, 1350 (2018) (explaining that the crux of an unverifiability determination is whether "Commerce, upon reviewing the submission in question, cannot discern which data is meant to be tested"); *Yantai Timken Co., Ltd. v. United States*, 521 F. Supp. 2d 1356, 1369-71 (Ct. Int'l Trade 2007) (holding, in part, that "failing" verification of necessary documentation can be used as support for the application of facts available); *Shandong Huarong Mach. Co.*, 435 F. Supp. 2d at 1295 ("By failing to submit answers to Commerce's supplemental questionnaires, Huarong effectively prohibited the agency from verifying the data contained in the initial response."); *Mannesmannrohren-Werke AG v.*

23

*United States*, 77 F. Supp. 2d 1302, 1322 (Ct. Int'l Trade 1999) (sustaining Commerce's

application of facts available because the respondent was "unable to recreate or explain

at verification the method by which it arrived at its results"); *see also* 19 C.F.R. § 351.307

(establishing regulations for the process used by Commerce to verify information during

antidumping duty proceedings).

In this case, the discrepancies that Commerce identified on the record between

Supermel's cost data and the information submitted by the unaffiliated beekeepers illustrate

exactly why Commerce conducts verification:  to support and to corroborate conflicting data on

the record and to come to the most accurate conclusions possible in making determinations of

sales at less than fair value.  *See Torrington Co. v. United States*, 146 F. Supp. 2d 845, 897 (Ct.

Int'l Trade 2001) (explaining that although "verification is a spot check and is not intended to be

an exhaustive examination of the respondent's business," it does allow Commerce to ensure the

validity of the submitted data, which, in turn, leads to more accurate rate calculations).  In other

words, failing to corroborate data on the record through the process of verifying it in response to

Commerce's requests for information constitutes a lawful basis for resorting to facts available,

19 U.S.C. § 1677e(a)(2)(D), and Supermel identifies no contrary authority.

Undeterred, Supermel maintains that it did not fail to verify its reported cost data, and

instead reconciled its purchases of raw honey and submitted the requested documents to

Commerce in both supplemental questionnaires and the in-lieu-of verification questionnaire

response.  *See* Supermel Br. at 27-36.  These arguments serve to merely re-state information that

is already on the record without demonstrating that Commerce's *further* requests for information

were unreasonable and do not undermine Commerce's determination that resorting to facts

available was necessary.  *See* IDM at 8-12 (summarizing Supermel's arguments prior to the

publication of the final determination).  Although Supermel claims that the evidence that
"reconciled the data to its accounting books" consisted primarily of its purchase database,
Supermel Br. at 32 (citing Supermel's Section D Resp. at Exhibit D-5a), Commerce considered
this evidence extensively in its decision-making and found that evidence to be lacking in record
support.  *See* IDM at 12-16.

       For example, the holes in that submission are what inspired the multiple supplemental
questionnaires and communications with the unaffiliated beekeepers that brought to light
discrepancies between Supermel's purchases as recorded and the beekeepers' data.  *Id*.
Supermel's "journal entries" submitted first in response to Commerce's second supplemental
Section D questionnaire and again in response to the in-lieu-of verification questionnaire,
likewise failed to provide sufficient evidence on the record to support its costs as reported.  *Id*. at
15-16.  As Commerce explained in the final determination, it requested the journal entries as
some sort of proof that Supermel's accounting system accurately reflected the data represented in
its purchase database; however, the submitted screenshots failed to include such basic accounting
data as the name of the account subject to the inquiry (*i.e.*, "stock: raw materials"), debits,
credits, or account balances.  *Id*. (citing Supermel's Second Section D Questionnaire Resp. at
Exhibit 13-a and 13-b; Supermel's ILVQ Resp. at Exhibits VC-4 and VC-5).  Despite
Supermel's assertion that "the record cannot be any clearer," Supermel Br. at 33, *none* of the
data submitted in response to Commerce's explicit inquiries on the supplemental questionnaires
or the in-lieu-of verification questionnaire answered the questions or responded in the form and
manner that Commerce had requested.  *See* IDM at 15-16.

       Lastly, Supermel argues that Commerce failed to comply with 19 U.S.C. §1677m(d), in
that Commerce allegedly did not explain the deficiencies or allow it to remedy the deficiencies.

*See* Supermel Br. at 36-39 This argument misses the mark.  Commerce's obligations under §1677m(d) can be satisfied when it issues a supplemental questionnaire "specifically pointing out and requesting clarification" of a respondent's deficient responses.  *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007); *see also Deacero S.A.P.I. de CV v. United States*, 996 F.3d 1283, 1290 (Fed. Cir. 2021) (affirming that a second supplemental questionnaire, asking for the same information, served as notice pursuant to § 1677m(d)); *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1289-99 (Ct. Int'l Trade 2010) (explaining that Commerce sent a new supplemental questionnaire asking again for the same information as notice satisfying § 1677m(d), and Essar did not provide the requested information in response).

    In this case, Commerce informed Supermel of the "nature of the deficiency" by issuing not one, but *two* supplemental questionnaires on the topic of verifying its cost information with respect to purchases from the beekeepers, including specific reference to acceptable types of documentation that Commerce deemed appropriate to remedy the missing information.  *See* IDM at 14-16.  Therefore, Commerce has satisfied its obligations under §1677m(d) and was not statutorily prevented from applying facts available to correct deficiencies in the record.

    Thus, Commerce's decision to apply facts available when considering Supermel's failure to reconcile its unprocessed honey purchases and tie those purchases to its accounting records is supported by substantial evidence and in accordance with law.  *See id.*; *Deacero*, 996 F.3d at 1290; 19 U.S.C. § 1677e(a).

    **C.**    **Substantial Evidence Supports Commerce's Determination To Apply Adverse Facts Available Because Supermel Failed To Cooperate To The Best Of Its Ability In Responding To Commerce's Multiple Requests For Information**

    Commerce's decision to use an adverse inference in selecting from among the facts otherwise available when Supermel failed to cooperate by not acting to the best of its ability in

providing documentation in response to Commerce's questionnaires is supported by substantial evidence. *See* IDM at 19. Supermel's various arguments in opposition are meritless. *See* Supermel Br. at 22-26, 39-40.

As Commerce explained in the final determination, Supermel had "multiple opportunities" to remedy the gaps that Commerce identified in the record by tying its honey purchases to its accounting records and systems. IDM at 19. It failed to do so, and it did not provide the corroborating evidence that Commerce requested in the form or manner indicated, despite having the ability to do so. *Id*. When a respondent fails to act "to the best of its ability to comply with a request for information," then Commerce may determine it has failed to cooperate and may "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. §1677e(b)(1).

Supermel argues that it acted to the best of its ability because its status as a "micro and small business" means that it was "not required to maintain inventory or consumption values in its accounting books." *See* Supermel Br. at 40. It also *now* argues that Commerce failed to consider its status as a "small company" and to provide it with additional requested assistance, as required under 19 U.S.C. § 1677m(c). *Id*. at 40-41.

As an initial matter, Supermel failed to make the specific argument before Commerce that Commerce did not provide adequate assistance to it pursuant to § 1677m(c). Rather, in its rebuttal brief, Supermel argued only that Commerce failed to acknowledge the difficulties that the unaffiliated *beekeepers* had with responding to Commerce's requests for information, *not* any alleged difficulty by Supermel in responding to the Section D questionnaire. Supermel Rebuttal Br. at 8-9, 13.

By failing to raise this argument before Commerce, Supermel failed to exhaust its

administrative remedies and is precluded from now making this argument. *See* 19 C.F.R. § 351.309(c)(2) (stating that a party's case brief to Commerce "must present all arguments that continue in the submitter's view to be relevant to {Commerce's} . . . final results."); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (recognizing that the exhaustion requirement protects administrative agency authority and promotes judicial efficiency). Indeed, the Federal Circuit has held that a party's obligation to exhaust its administrative remedies in proceedings before Commerce applies both to broad issues and arguments related to those issues. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (disagreeing with contention that courts can consider new arguments so long as the general issue was raised at the agency level); *Paul Muller Industrie GmbH & Co. v. United States,* 502 F. Supp. 2d 1271, 1275 (Ct. Int'l Trade 2007) (holding that when a party raises a general issue but fails to incorporate a specific argument among other arguments that relate to the same issue, it fails to exhaust administrative remedies with respect to that argument). Exceptions to the exhaustion requirement are limited,[6] as such the Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal BV*, 502 F.3d at 1379. In any event, Supermel's argument with respect to § 1677m(c) is without merit.

If a party is having difficulty in responding Commerce's requests for information, 19 U.S.C. § 1677m(c)(1) provides that it may notify Commerce that it is "unable to submit the information requested in the requested form and manner, together with a full explanation and

---

[6] None of the exceptions to the exhaustion requirement are applicable in this case. The exceptions include futility, pure question of law, lack of timely access to the confidential record, no administrative procedure to exhaust, or new interpretation from an intervening judicial decision. *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013).

suggested alternative forms in which such party is able to submit the information{.}" Commerce is then required to "consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party." *Id.* When it comes to providing assistance to interested parties, Commerce must "take into account any difficulties experienced by interested parties, *particularly small companies*, in supplying information requested . . . in connection with investigation and reviews." *Id.* § 1677m(c)(2) (emphasis added). Commerce must then "provide to such interested parties any assistance that is practicable in supplying such information." *Id.*

In the cover letter to its supplemental sections A-C response, Supermel explained that it "is a small company, and has been having difficulties in meeting {Commerce's} requirements, and requests that its difficulties are taken into account, particularly as a small company, in the terms of article 19 U.S.C. § 1677m(c)(1) and 1677m(c)(2)." Supermel's Supplemental Sections A-C Resp., Cover Letter at 2 (Oct. 6, 2021) (C.R. 270, P.R. 224). Supermel further "asks that Commerce provide assistance for Supermel to supply outstanding information, considering Supermel's specific circumstances." *Id.*

However, this request does not mean that Supermel may ignore specific requests from Commerce. It simply means that Commerce must "take into account any difficulties experienced by interested parties, particularly small companies, in supplying information" during the course of an investigation or administrative review. 19 U.S.C. § 1677m(c)(2). But Supermel did *not* notify Commerce in advance, or in any of its responses to the *separate* Section D questionnaire, supplemental section D questionnaires, or in-lieu-of verification questionnaire response, that it was having difficulty supplying the information requested to reconcile its *costs* as reported to the information supplied by the independent beekeepers or to its accounting system. *See* IDM at 18-

29

19.  Rather, it repeatedly stated that the information it provided was sufficient, and that it had responded appropriately to Commerce's requests despite Commerce's repeated questioning on the same topic.  *Id.*

Although Commerce has an obligation to provide additional assistance and consideration to small companies in its investigations, that does not extend to situations when such assistance is requested only as a last-minute attempt to support an argument that that the company has provided sufficient information despite substantial evidence to the contrary.  *See Calcutta Seafoods Pvt. Ltd. v. United States*, 495 F. Supp. 3d 1318, 1334 (Ct. Int'l Trade 2021).  Further, Commerce fulfilled the requirement to provide additional assistance by explicitly stating (a) why it needed more data ("to show how the unprocessed honey purchases tied to Supermel's accounting system"), and (b) what types of data would suffice ("{c}opies of spreadsheets, handwritten journals, and screenprints *from your accounting system* as support.").  IDM at 15 (citing Second Supplemental Section D Questionnaire at 5; ILVQ at 5.c) (emphasis added).  This is more guidance than was given, for instance, in *Calcutta Seafoods*.  495 F. Supp. 3d at 1333-1335 (describing Commerce's efforts as insufficient when it only (a) repeated the same question on multiple questionnaires, (b) provided additional extensions of time to the respondent company; and (c) stated that the respondent company can use "a reasonable method if unable to otherwise answer").  Unlike in *Calcutta Seafoods*, Supermel did not further communicate with Commerce about its alleged difficulties with respect to the cost information, making only the one unrelated request in responding to the Sections A-C questionnaire.  *Compare* Supermel's Supplemental Sections A-C Resp., Cover Letter at 2, *with Calcutta Seafoods*, 495 F. Supp. 3d at 1330–31 (explaining that the respondent "stayed in constant contact with Commerce, attempted to provide the requested information, explained the information that it had, and offered to

cooperate with Commerce further, including by providing all data and consenting to on-site verification of its replies.").  Still further, section 1677m(c)(2) does *not* state that Commerce must treat small companies with kid gloves and continue to issue supplemental questionnaires until deficiencies are resolved:  that would undermine the very purpose of Commerce's ability to apply adverse facts available to un-cooperative respondents and allow "a party to game the system and not provide truthful information when it is required to do so."  *Papierfabrik Aug. Koehler AG v. United States*, 180 F. Supp. 3d 1211, 1224 (Ct. Int'l Trade 2016), *aff'd sub nom. Papierfabrik Aug. Koehler SE v. United States*, 710 F. App'x 889 (Fed. Cir. 2018).

Indeed, Commerce reviewed a similarly situated company in *Polyester Textured Yarn from Indonesia* with a similar outcome.  *See Polyester Textured Yarn from Indonesia*, 86 Fed. Reg. 58875 (Dep't of Commerce Oct. 25, 2021) (final LTFV determ.), and accompanying IDM at cmt. 1.  In that case, Commerce requested specific pieces of documentation to support reported per-unit cost data from its normal books and records, including listing types of documentation that would be acceptable (such as examples from the accounting software used or screenshots from financial and accounting systems).  *Id*.  Instead, the respondent company provided summary excel worksheets created in response to the investigation and argued that those summary worksheets were the entirety of its cost reporting and reconciled to its financial records.  *Id*.  Commerce determined that the respondent's "failure to provide support for the cost {of its inputs} render the reported per-unit costs both unsupported and unverifiable," and that because the respondent failed to cooperate by not acting to the best of its ability, an adverse inference in selecting from facts available was warranted.  *Id*.  In this case, Commerce likewise requested examples from Supermel's accounting systems to corroborate data already on the record.  *See* IDM at 19.  Supermel, like the respondent in *Polyester Textured Yarn from*

*Indonesia*, instead provided summary excel worksheets and provided the same worksheets and screenshots in response to multiple requests for information on the same subject. *Id.*

It is also a red herring that Supermel refers to acting to the best of its ability despite its limitations with inventory records and consumption values, Supermel Br. at 40, because Commerce specifically determined that Supermel was *not* required to provide any additional records under Brazilian tax law, and it "has not determined that the use of {adverse facts available} is warranted because of the lack of inventory records." IDM at 18. Rather, Commerce explained that it was applying facts available with an adverse inference because "Supermel failed to tie its purchases to its accounting system," making "Supermel's cost data { } unsupported and unverified." *Id.*

As Commerce explained in the final determination, "{b}ased on Supermel's statements regarding the recording of purchases in its accounting system and the general ledger screenprints provided in response to the sales {in-lieu-of verification questionnaire}, {Commerce} f{ound} it reasonable to conclude that Supermel had the *ability* to tie its unprocessed honey purchases to its accounting records and submit copies of those records in response to Commerce's repeated requests." *Id.* at 19 (emphasis added). Supermel also failed to provide any beekeeper correspondence "that corroborates the quantity and value of Supermel's reported purchases, copies or screenshots of any journal entries Supermel prepared to record the transactions in its accounting system, or proof of payments confirming the amount Supermel paid to the beekeepers." *Id.* Thus, substantial evidence supports Commerce's determination that Supermel did not act to the best of its ability when it submitted the same screenshots multiple times, without any explanation of its inability to provide the requested information. *Id.*; *see Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1363 (Ct. Int'l Trade 2017) ("Without further

32

explanation of its alleged inability to acquire the requested information, Hyundai cannot be said to have put forth its "maximum efforts" in responding to Commerce's request."); *Maverick Tube Corp.*, 857 F.3d at 1361 (affirming Commerce's application of adverse facts available because the respondent "never indicated that it was unable to provide the relevant information").

Finally, Supermel argues that it is "unlawful" for Commerce to require beekeepers to submit accurate cost information in future reviews and to apply facts available with an adverse inference "to an otherwise cooperative processor-respondent based on an unaffiliated beekeeper supplier's failure to provide requested cost information." Supermel Br. at 45.  It is telling that in its rebuttal brief before Commerce, Supermel claimed only that it "made its maximum efforts to induce the beekeepers to cooperate" with Commerce, without explaining what *any* of those alleged efforts were.  Supermel Rebuttal Br. at 10.  Nor does Supermel explain in its brief before this Court to what lengths, if any, it went to induce the beekeepers to cooperate.  *See* Supermel Br. at 45.   Regardless, this Court sustains Commerce's use of an adverse inference when a supplier is not sufficiently induced to cooperate on behalf of a cooperating respondent.  *See Xiping Opeck Food Co.*, 222 F. Supp. 3d at 1159; *An Giang Fisheries*, 287 F. Supp. 3d at 1373.

And although Supermel complains that Commerce allegedly put beekeepers on "notice" of the requirement that they must submit accurate and verifiable cost information in future administrative reviews or suffer the possible application of facts available with an adverse inference, Supermel Br. at 45, Supermel has not identified any authority that prevents Commerce from expecting and insisting on cooperation from producers of covered merchandise of the requirement to submit accurate cost information in future administrative reviews.  Indeed, Commerce routinely provides notice that it expects and will insist on cooperation.  *See, e.g.*, *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 108 (Fed. Cir. 2022)

33

("Commerce's requests for CONNUM-specific data should not have come as a surprise," because Commerce gave notice of the requirement); *An Giang Fisheries*, 287 F. Supp. 3d at 1370 ("Given the advance notice afforded to respondents, the court cannot find that Commerce's request for CONNUM-specific reporting, here, was unreasonable or a practice reversal.").

At bottom, the "best of its ability" standard means that a respondent must do "the maximum it is able to do." *Nippon Steel*, 337 F. 3d at 1382. No matter the size of the company, repeatedly responding to the same question with the same answer that failed to satisfy the previous request for information is not "the maximum" effort that a respondent can put forth. *See* IDM at 19. Thus, substantial evidence supports Commerce's determination to use an adverse inference in applying facts otherwise available to Supermel. *Id.*; *Hyundai Steel*, 279 F. Supp. 3d at 1363 (explaining a "respondent's submission of substitute information" does not "constitute{} its 'maximum efforts' to comply where the respondent has not offered an adequate explanation for its inability to comply with Commerce's primary request for information.").

## CONCLUSION

For the reasons above, we respectfully request the Court to deny plaintiffs' motion for judgment on the agency record and to enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

34

OF COUNSEL:

BENJAMIN JUVELIER
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

February 10, 2023

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Email: kara.m.westercamp@usdoj.gov

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 10,000 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Kara M. Westercamp</u>
KARA M. WESTERCAMP
Trial Attorney

36

## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE
_____

| | |
|---|---|
| APIÁRIO DIAMANTE COMERCIAL EXPORTADORA LTDA and APIÁRIO DIAMANTE PRODUÇÃO E COMERCIAL DE MEL LTDA, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| UNITED STATES, | ) ) ) |
| Defendant | ) ) |
| and | ) ) |
| AMERICAN HONEY PRODUCERS ASSOCIATION and THE SIOUX HONEY ASSOCIATION, | ) ) ) ) |
| Defendant-Intervenors. | ) ) |

Court No. 22-00185

_____)

### PROPOSED ORDER

Upon consideration of the plaintiffs' motion for judgment upon the agency record,

defendant's response, and all other pertinent papers, it is hereby

ORDERED that the plaintiffs' motion is denied; and it is further

ORDERED that judgment is entered for the United States.


DATE: _____         _____

New York, New York          TIMOTHY C. STANCEU, SENIOR JUDGE