PUBLIC VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE

|  |  |
|---|---|
| APIÁRIO DIAMANTE COMERCIAL EXPORTADORA LTDA AND APIÁRIO DIAMANTE PRODUÇÃO E COMERCIAL DE MEL LTDA, <br><br>        Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>        Defendant, <br><br> and <br><br> AMERICAN HONEY PRODUCERS ASSOCIATION AND THE SIOUX HONEY ASSOCIATION, <br><br>        Defendant-Intervenors. | Court No. 22-00185 |

## DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGEMENT ON THE AGENCY RECORD

**R. ALAN LUBERDA**
**ELIZABETH C. JOHNSON**
**MALIHA KHAN**
**KELLEY DRYE & WARREN LLP**
**3050 K Street, N.W., Suite 400**
**Washington, DC  20007**
**(202) 342-8400**

**Counsel to Defendant-Intervenors**

**March 3, 2023**

PUBLIC VERSION

Table of Contents

Page

I.     STATEMENT PURSUANT TO RULE 56.2 .................................................... 1

II.    ISSUES PRESENTED ON APPEAL AND SUMMARY OF
       ARGUMENT ................................................................................................ 2

III.   STANDARD OF REVIEW ............................................................................ 3

IV.    STATEMENT OF RELEVANT FACTS ....................................................... 3

       A.    Selection of Respondents and Initial Cost of Production
             Questionnaire .................................................................................... 3

       B.    Discrepancies With Beekeeper 1 Cost of Production Data ...................... 5

       C.    Discrepancies With Beekeeper 2 Cost of Production Data ...................... 7

       D.    Supermel's First Supplemental Section D Questionnaire .......................... 9

       E.    Supermel's Second Supplemental Section D Questionnaire ................. 11

       F.    Commerce's Cost Reporting Methodology and Preliminary
             Determination ................................................................................. 14

       G.    Supermel's Failure to Verify Cost Data .................................................. 15

       H.    The Parties' Administrative Case Briefs .................................................. 16

       I.    Commerce's Final Determination ............................................................. 17

V.     ARGUMENT ................................................................................................ 19

       A.    Commerce's Decision to Assign Supermel a Dumping Margin
             Based on Total AFA Was In Accordance with Law and Supported
             By Substantial Evidence ................................................................ 20

             1.    Legal Standard ............................................................................. 20

             2.    Commerce Properly Applied FA to Supermel for Failure to
                   Submit Complete, Reconciled Honey Purchase Data and
                   Failure to Verify Its Cost Information ........................................ 20

PUBLIC VERSION

Table of Contents
(continued)

Page

a.    Failure to Reconcile Costs and Provide Requested
Documentation ................................................................. 21

b.    Failure to Verify Costs .................................................... 23

3.    Commerce Properly Applied Total AFA to Supermel for
Multiple Failures to Provide Requested Information That It
Was Capable of Providing .......................................... 28

B.    The Court Should Decline to Address Supermel's Argument
Regarding the  Producers of the Subject Merchandise ........................... 33

VI.    CONCLUSION ................................................................... 34

PUBLIC VERSION

## TABLE OF AUTHORITIES

Page(s)

### Cases

Borden v. United States,
    4 F. Supp. 2d 1221 (Ct. Int'l Trade 1998) ...............................................................21

Dillinger France S.A. v. United States,
    350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ...........................................................31

Dorbest Ltd. v. United States,
    604 F. 3d 1363 (Fed. Cir. 2010)...............................................................................33

Fujian Mach. And Equip. Imp. & Exp. Corp. v. United States,
    276 F. Supp. 2d 1371 (Ct. Int'l Trade 2003) .............................................. 27-28, 31

Hung Vuong Corp. v. United States,
    483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ....................................................26-27

Hyundai Elec. & Energy Sys. Co. v. United States,
    466 F. Supp. 3d 1303 (Ct. Int'l Trade 2020),
    aff'd, 15 F.4th 1078 (Fed. Cir. 2021)...................................................................20-21

Hyundai Heavy Indus. v. United States,
    399 F. Supp. 3d 1305 (Ct. Int'l Trade 2019),
    aff'd, 819 Fed. Appx. 937 (Fed. Cir. 2020) .................................................23, 26, 27

JTEKT Corp. v. United States,
    768 F. Supp. 2d 1333 (Ct. Int'l Trade 2011) .........................................................33

Mannesmannrohren-Werke AG v. United States,
    120 F. Supp. 2d 1075 (Ct. Int'l Trade 2000) ............................................. 27-28, 31

Nippon Steel Corp. v. United States,
    337 F.3d 1373 (Fed. Cir. 2003)................................................................................21

QVD Food Co. v. United States,
    658 F.3d 1318 (Fed. Cir. 2011)...........................................................................24-25

United States v. L.A. Tucker Truck Lines,
    344 U.S. 33 (1952)...................................................................................................33

Universal Polybag Co. v. United States,
    577 F. Supp. 2d 1284 (Ct. Int'l Trade 2008) ............................................................20

Yantai Timken Co. v. United States,
    521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ...................................................26-27, 29-30

**Statutes and Regulations**

19 U.S.C. § 1677e(a)(2) ............................................................................................... 19-20

19 U.S.C. § 1677e(b)(1) ...................................................................................................20, 27

19 U.S.C. § 1677m(c) ................................................................................................... 31-32

19 U.S.C. § 1677m(c)(1) ....................................................................................................31

19 U.S.C. § 1677m(c)(2) ....................................................................................................32

19 C.F.R. § 351.309(c)(2) ...................................................................................................33

**Administrative Determinations**

Raw Honey From Brazil:
    Preliminary Affirmative Determination of Sales at Less Than Fair Value,
    Postponement of Final Determination, and Extension of Provisional Measures,
    86 Fed. Reg. 66,533 (Dep't Commerce Nov. 23, 2021)
    ("Preliminary Determination") (PR 292) and accompanying Decision
    Memorandum for the Preliminary Determination in the Less-Than-Fair-Value
    Investigation of Raw Honey from Brazil (Dep't Commerce Nov. 17, 2021)
    ("PDM") at 16-17 (PR 288) ...................................................................... 14-15, 22

Raw Honey From Brazil:
    Final Determination of Sales at Less Than Fair Value, 87 Fed. Reg. 22,182
    (Dep't Commerce Apr. 14, 2022) ("Final Determination") (P.R. 358) and
    accompanying Issues and Decision Memorandum for the Final Affirmative
    Determination in the Less-Than-Fair-Value Investigation of Raw Honey from
    Brazil (Dep't Commerce Apr. 7, 2022) ("IDM") (P.R. 354) .......................................... *passim*

Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam:
    Antidumping Duty Orders, 87 Fed. Reg. 35,501
    (Dep't Commerce June 10, 2022) (P.R. 362) ................................................................1

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade and the Court's October 3, 2022 Scheduling Order (ECF No. 20), Defendant-Intervenors, the American Honey Producers Association and the Sioux Honey Association ("Defendant-Intervenors"), file this brief in response to the Motion for Judgment on the Agency Record (ECF No. 22-2) and Memorandum in Support (ECF No. 22) ("Supermel Br.") filed on behalf of Plaintiffs Apiario Diamante Comercial Exportadora Ltda and Apiario Diamante Producao e Comercial de Mel Ltda (collectively, "Supermel" or "Plaintiffs").

## I.   STATEMENT PURSUANT TO RULE 56.2

The administrative determination challenged by Supermel is <u>Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value</u>, 87 Fed. Reg. 22,182 (Dep't Commerce Apr. 14, 2022) ("<u>Final Determination</u>") (PR 358),[1] and the United States Department of Commerce's ("Commerce") accompanying issues and decision memorandum, <u>Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Raw Honey from Brazil</u> (Dep't Commerce Apr. 7, 2022) ("<u>IDM</u>") (PR 354) and order, <u>Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders</u>, 87 Fed. Reg. 35,501 (Dep't Commerce June 10, 2022) ("Order") (PR 362).

---

[1]   Documents in the administrative record are cited by their confidential and/or public record number (<u>i.e.</u>, "(CR___)" and "(PR___)") provided in the Index to the Administrative Record filed with the Court on September 2, 2022 (ECF No. 18).

II.    **ISSUES PRESENTED ON APPEAL AND SUMMARY OF ARGUMENT**

Plaintiffs challenge three aspects of the Final Determination.  Supermel Br. at 22-46.  For the reasons that follow below, each of Plaintiffs' arguments should be rejected by this Court.

1.    **Did Commerce properly apply facts available?**

Yes.  Supermel's challenge to Commerce's application of facts available ("FA") to Supermel fails for several reasons.  Supermel failed to submit complete information in response to Commerce's questionnaires, failed to reconcile its reported honey purchase data with its accounting records and with the data submitted by the two beekeeper suppliers, and failed to verify its reported costs.  By failing to provide supporting documentation regarding its honey purchases, Supermel rendered the remainder of its cost submission unreliable and created gaps in the record warranting application of FA.

2.    **Did Commerce properly apply adverse facts available?**

Yes.  Supermel's repeated failure to provide necessary information despite multiple requests from Commerce and record evidence indicating that Supermel was capable of providing the requested information, demonstrated that Supermel failed to cooperate by not acting to the best of its ability.  As such, an application of facts available with adverse inferences ("AFA") was warranted.

3.    **Did Commerce properly find the beekeeper suppliers to be the producers of subject merchandise?**

Yes.  Supermel's argument that Commerce incorrectly treated the beekeeper suppliers as the producers of the subject merchandise fails for two reasons.  First, because Supermel failed to raise this issue in its affirmative administrative case brief, Supermel failed to exhaust its administrative remedies and, thus, the Court should decline to address this issue.  Second,

because Commerce did not calculate a final dumping margin for Supermel, but rather, relied on AFA to determine a margin, it did not address this argument in its final determination and found the issue to be moot.  Supermel's challenge, therefore, is similarly moot.

## III.   STANDARD OF REVIEW

Defendant-Intervenors incorporate by reference the Defendant's recitation of the applicable standard of review.  See Defendant's Response in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record (ECF No. 24) ("Def. Br.") at 8-9 (citing standard of review).

## IV.   STATEMENT OF RELEVANT FACTS

### A.   Selection of Respondents and Initial Cost of Production Questionnaire

In the underlying investigation, Commerce selected Supermel as one of the mandatory respondents.  See June 7, 2021 Memorandum Less-Than-Fair-Value Investigation of Raw Honey from Brazil: Respondent Selection at 6 (CR 37; PR 64).

On June 9, 2021, Commerce issued its initial antidumping questionnaire to Supermel. See June 9, 2021 Letter to Supermel re: Initial Questionnaire ("Initial Questionnaire") (PR 66). With regard to Supermel's costs of production (Section D of the questionnaire), Commerce instructed Supermel to report the weighted-average control number ("CONNUM") specific cost of the product sold by Supermel in the comparison market.  Id. at D-1.  In this questionnaire, Commerce informed Supermel of the following:

> If you are unable to respond completely to every question in the attached questionnaire by the established deadline, *or are unable to provide all requested supporting documentation by the same date*, *you must notify the official in charge* and submit a request for an extension of the deadline for all or part of the questionnaire response.

> …{F}ailure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

Id. at 3 (emphasis added).

On August 3, 2021, Supermel submitted its response to section D of Commerce's questionnaire.  See Supermel's Aug. 3, 2021 Letter to Commerce re: Supermel's Section D Questionnaire Response ("Supermel Initial DQR") (CR 100-109; PR 133-142).  In its response, Supermel explained that while its "financial statements record raw material and inventory values based on certain percentages of the finished goods revenues," "to account for the actual cost of raw materials, Supermel calculated the costs based on the actual prices of honey paid to beekeepers." Id. at 20.  With regard to its cost reporting methodology, Supermel stated that it "maintained detailed information about the honey it purchases from beekeepers." Id. at 10.  In Exhibit D-5a of its initial section D response, Supermel submitted a "Direct Material Cost Worksheet (Honey)," explaining that "Exhibit D-5a contains both the calculations and source data for purchases of unprocessed honey." Id. at 23 and Exh. D-5a.  Exhibit D-5a is [

] during the period of investigation ("POI"). Id. at Exh. D-5a.

On August 10, 2021, Commerce selected two beekeepers from Supermel's list of unaffiliated suppliers (referred to as "Beekeeper 1" and "Beekeeper 2"),[2] and issued a cost of production questionnaire to each.  See Aug. 10, 2021 Letter to Beekeeper 1 re: Antidumping

---

[2]   [                                        ] ("Beekeeper 1") and [                                   ] ("Beekeeper 2").

<u>Duty Investigation of Raw Honey from Brazil</u> (CR 148; PR 162); Aug. 10, 2021 Letter to

Beekeeper 2 re: <u>Antidumping Duty Investigation of Raw Honey from Brazil</u> (CR 149; PR 163).

### B.    **Discrepancies With Beekeeper 1 Cost of Production Data**

In its September 9, 2021, response, Beekeeper 1 reported total POI sales of unprocessed

honey to Supermel of [          ] kilograms for [                                    ]   <u>See</u>

Beekeeper 1's Sep. 9, 2021 Letter to Commerce re: <u>Beekeeper Questionnaire for</u> [

          ] ("Beekeeper 1 QR") at 10.   (CR 174; PR 198).  These numbers conflicted

with the quantities and values reported in Supermel's response – <u>i.e.</u>, [          ] kilograms for

[                    ]  Specifically, Supermel reported the following purchases from Beekeeper 1:

[

PUBLIC VERSION

]

<u>See</u> <u>Supermel Initial DQR</u> at Exh. D-5a.

On October 14, 2021, Commerce issued a supplemental questionnaire to Beekeeper 1 requesting, among other things, "sample supporting documents (<u>e.g.</u>, invoices, proof of payment, correspondence, etc.) for the reported quantity and value of honey that you have supplied to Supermel during the POI." <u>See</u> Oct. 14, 2021 Letter to Beekeeper 1 re: <u>Less Than Fair Value</u> <u>Investigation of Raw Honey from Brazil</u> at 3 (CR 272; PR 230).  On October 26, 2021, Beekeeper 1 submitted its response and provided copies of [     ] invoices to Supermel, the total quantities and values of which aligned with its reported sales:

[

]

See Beekeeper 1's Oct. 26, 2021 Letter to Commerce re: Section D Supplemental Questionnaire Response for [                         ] ("Beekeeper 1 SQR") at Exh. SUP-1 (CR 277; PR 241).

Beekeeper 1's questionnaire responses created multiple discrepancies in the record:  First, Supermel's reported purchases of [          ] kg of honey for [                ] (see Supermel Initial DQR at Exh. D-5a (CR 100-109; PR 133-142)) conflicted with Beekeeper 1's reported sales of [          ] kg of honey for [             ] See Beekeeper 1 QR at 10 (CR 174; PR 198) and Beekeeper 1 SQR at Exh. SUP-1 (CR 277; PR 241).  Second, Supermel reported [     ] transactions over the POI, whereas Beekeeper 1 reported [     ] transactions.  Id. Third, none of the dates, quantities, or values reported by Supermel match any of the dates, quantities, or values reported by Beekeeper 1 for any of the individual transactions.  Id.

**C.**     **Discrepancies With Beekeeper 2 Cost of Production Data**

In Exhibit D-5a of its Section D questionnaire response, Supermel reported [     ] purchases of unprocessed honey during the POI from Beekeeper 2, totaling [             ] kg for [                ]:

[

]

See Supermel Initial DQR at Exh. D-5a (CR 100-109; PR 133-142).  In its October 26, 2021,

response, however, Beekeeper 2 reported total POI sales of unprocessed honey to Supermel of

[            ] kg for [               ]  See Beekeeper 2's Oct. 26, 2021 Letter to Commerce re:

Section D Supplemental Questionnaire Response for [                          ] ("Beekeeper 2

SQR") at Exh. SUP-1 (CR 278; PR 242).  Beekeeper 2 provided copies of [      ] invoices to

Supermel to support its reported POI transactions:

[

]

Id.

        Just as with Beekeeper 1, Beekeeper 2's questionnaire responses created conflicting

information in the record.  First, the quantities and values of the total POI sales did not match.

Whereas Supermel reported purchases of [              ] kg of honey for [                  ] (see

Supermel Initial DQR at Exh. D-5a (CR 100-109; PR 133-142)), Beekeeper 2 reported sales of

[            ] kg of honey for [                    ]  See Beekeeper 2 SQR at Exh. SUP-1 (CR 278; PR

242). Second, none of the dates, quantities, or values reported by Supermel matched any of the dates, quantities, or values reported by Beekeeper 2 for individual transactions. See id.

**D.  Supermel's First Supplemental Section D Questionnaire**

On September 1, 2021, Commerce issued a supplemental section D questionnaire to Supermel. See Sep. 1, 2021 Letter to Supermel re: Less Than Fair Value Investigation of Raw Honey from Brazil ("First Supp DQ") (CR 173; PR 195). Once again, Commerce notified Supermel that if it is "unable to respond," it "must notify the official in charge and submit a request for an extension of the deadline…" and that "failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total" AFA. Id. at 2.

In its supplemental questionnaire, Commerce instructed Supermel to "{d}iscuss how the honey purchased from the independent beekeepers are recorded in your normal books and records," and specifically directed Supermel to: "Provide excerpts from your accounting system that shows how you have recorded the purchases of the honey from the independent beekeepers," via, "e.g., journal entries corroborating the purchases and transfer of the unprocessed honey, invoices, etc." Id. at 2, 4. In its response, Supermel stated that it "records its purchases of honey from beekeepers as debit entries in the raw material stock account (41)," but failed to provide any supporting documentation from its accounting system. See Supermel's Sep. 15, 2021 Letter to Commerce re: Supermel's Section A-D Questionnaire Response ("Supermel First DSQR") at 4 (CR 181-201; PR 205).

When instructed to provide "copies of the source documents (e.g., purchases orders, invoices, inventory records, processing reports and journal entries, etc.) used to generate" four of the beekeeper entries listed in Exhibit D-5a of Supermel's initial section D response (see First Supp DQ at 7 (CR 173; PR 195)), Supermel stated that the "source documentation is provided as

-9-

Exhibit SD-13" and the supporting invoices for those figures were provided in Exhibit SD-11. See Supermel First DSQR at 4 (CR 181-201; PR 205). Exhibit SD-13 contains copies of what appear to be [                                        ] Id. at Exh. SD-13. Exhibit SD-13 does not contain any of the other documents in Commerce's request, e.g., purchase orders, inventory records, processing reports, and journal entries.   Id.   Similarly, Exhibit SD-11 contains [              ] invoices for a [                              ] but does not include copies of purchase orders, inventory records, processing reports, or journal entries for [          ] Id. at Exh. SD-11

Furthermore, because Supermel initially reported that it "tracks detailed information about its purchases of unprocessed honey from beekeepers," (see Supermel Initial DQR at 17 (CR 100-109; PR 133-142)), Commerce instructed Supermel to "{i}llustratively explain how Supermel tracks the detailed information about its purchases of unprocessed honey in its accounting and production control systems." See First Supp DQ at 10 (CR 173; PR 195). Supermel simply responded that it "manually records its honey purchases with details such as quantity, seller, color, region, and date of purchase." Supermel First DSQR at 22 (CR 181-201; PR 205). Supermel failed to provide an illustrative explanation using specific examples or evidence.

Commerce also asked Supermel to "provide the supporting documents (e.g., invoices, purchase orders, journal entry voucher, etc.) for the 2 largest purchases and tie the purchases back to the sample copies of source documents" for September 2020. See First Supp DQ at 10 (CR 173; PR 195). In response, Supermel stated that the "supporting documents for the two largest purchases in September 2020 are provided as Exhibit SD-16." See Supermel First DSQR at 22 (CR 181-201; PR 205). Exhibit SD-16 contained [

-10-

**]** <u>Id.</u> at Exh. SD-16. Supermel did not provide purchase orders or journal entry vouchers, nor did it make any effort to tie the purchases back to the sample copies of source documents.

### E.    <u>Supermel's Second Supplemental Section D Questionnaire</u>

In light of Supermel's deficient supplemental section D response, Commerce issued a *second* supplemental section D questionnaire on October 20, 2021. <u>See</u> Oct. 20, 2021 Letter to Supermel re: <u>Less Than Fair Value Investigation of Raw Honey from Brazil</u> ("Second Supp DQ") (CR 274; PR 236). For a third time, Commerce instructed Supermel that if it is "unable to respond" to Commerce's questionnaire, it "must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response," and that "failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total" AFA. <u>Id.</u> at 1-2.

In its second supplemental questionnaire, Commerce *again* instructed Supermel to "provide *excerpts from your accounting system* that shows how you have recorded the purchases of the honey from the independent beekeepers," and the transfer of unprocessed/processed honey between Apiário Export and Apiário Producao. <u>Id.</u> at 6 (emphasis added). Commerce explicitly instructed Supermel to include "journal entries corroborating the purchases and transfer of the unprocessed honey, invoices etc.)" and "copies of the accounting entries for Apiário Producao purchases of unprocessed honey." <u>Id.</u> In response, Supermel stated that the screenshots of the journal entries used to record honey purchases were provided in Exhibits 2SD-13a and 2SD-13b. <u>See</u> Supermel's Nov. 4, 2021 Letter to Commerce re: <u>Supermel's Section D Second Supplemental Questionnaire Response</u> ("Supermel Second DSQR") at 7 (CR 298-332; PR 265). The screenshots in Exhibits 2SD-13a and 2SD-13b, however, did not reflect any accounting data.

Id. at Exhs. 2SD-13a and 2SD-13b.   The untranslated exhibits contained a [







] Id.  The screenshots did *not* display the

name or number of the account in which these purchases were recorded (i.e., "stock: raw

materials (41)"), nor did they display debits and credits or any account balances.  Id.

When Commerce asked Supermel to provide a sample of the journal entries it prepared

and recorded in the "stock: raw materials" account for one of the honey purchase transactions it

provided in Exhibit D-5a (see Second Supp DQ at 5 (CR 274; PR 236)), Supermel simply

referred Commerce to Exhibit 2SD-13 for a "screenshot showing the sample journal entries . . . ."

See Supermel Second DSQR at 4 (CR 298-332; PR 265).

In its second supplemental section D questionnaire, Commerce also noted the

discrepancies between the reported quantities and values of honey purchased by Supermel from

Beekeepers 1 and 2, and the quantities and values reported by the two beekeepers.  See Second

Supp DQ at 8-9 (CR 274; PR 236).  Commerce asked Supermel to confirm the amounts

purchased from the beekeepers[3] and instructed Supermel to:

---

[3]    The figures Commerce quoted in its question did not exactly match what Supermel reported
for the POI because for both beekeepers, Supermel included an additional purchase transaction
that was dated outside the POI.  For Beekeeper 1, Supermel reported a purchase [
                                               ] See Supermel Initial DQR at Exh. D-5a (CR
100-109; PR 133-142).  The difference between Supermel's reported quantities and values for
honey purchases from Beekeeper 1 and the quantities and values Commerce quoted is
[                                           ] purchase.  For Beekeeper 2, Supermel reported a
purchase on [                                           ] Id.  The difference
between Supermel's reported quantity and value for honey purchases from Beekeeper 2 and the
(cont'd on next page)

> Provide *all relevant supporting documentation* including *correspondence with the beekeepers* that corroborate the quantity and value you have reported, *copies or screen shots of any journal entries* you have prepared to record the transactions and *proof of payment* confirming the amount you have paid.

Id. (emphasis added). In its response, Supermel merely reported the quantities and values for the honey it purchased from the two beekeepers during the POI, and failed to submit any of the requested supporting documentation. See Supermel Second DSQR at 13-14 (CR 298-332; PR 265).

Commerce further noted that Exhibit SD-16, provided by Supermel as supporting documentation for its two largest purchases in September 2020, failed to provide "information for the address, neighborhood, color, flower and whether organic or not." See Second Supp DQ at 9 (CR 274; PR 236). Commerce explicitly instructed Supermel to "{p}rovide corroborating documentation, preferably from the beekeepers, that support the details of these purchases. Provide copies of any journal entries you have made into your accounting system (e.g., screen shot corroborating the weight and value you have reported)." Id. In response, Supermel stated: "The screenshot of the journal entries for those purchases is provided as Exhibit 2SD-27. The journal entries indicate the address, neighborhood, color, and flower source." Supermel Second DSQR at 14 (CR 298-332; PR 265). However, there is no Exhibit SD-27 in that submission. The last exhibit in Supermel's second supplemental section D response, and the last exhibit listed in the Exhibit List for that submission, is Exhibit 2SD-26b. Id. at 16. Supermel did not address this deficiency, nor did it request additional time to submit this missing exhibit.

---

quantity and value Commerce quoted is [                                              ]
purchase.

At no point during the investigation did Supermel reconcile **any** of its reported cost data with its accounting records. All of the documents Supermel provided to corroborate its reported cost data were either charts created for the purpose of the investigation or screenshots from Supermel's integrated business management system (Sistema Integrado de Gestao Empresarial, or "SIGE") that contain no accounting information. See Supermel Second DSQR at 2SD-11a (CR 298-332; PR 265).

**F.    Commerce's Cost Reporting Methodology and Preliminary Determination**

On July 22, 2021, Commerce requested comments from interested parties regarding the cost reporting methodology that Commerce should implement for this proceeding. See July 22, 2021 Letter to All Interested Parties re: Request for Comments on the Raw Honey Cost of Production Reporting Methodology at 1 (PR 108). Commerce explained that in "prior agricultural proceedings, Commerce, in certain cases, has relied on the acquisition costs paid by the exporter/respondent, and in other cases, selected non-affiliated cost respondents that supplied the exporter/respondent." Id.

In its response to this request, Supermel requested that Commerce rely on its acquisition costs of unprocessed honey from the beekeepers. See Respondents' July 29, 2021 Letter to Commerce re: The Brazilian Respondents' Comments on the Raw Honey Cost of Production Reporting Methodology at 2-5 (PR 128). Supermel argued that the producer of the subject merchandise is Supermel, i.e., the processor, not the beekeepers, and that the "appropriate cost of direct materials to be used in the {cost of production, or 'COP'} calculation in this investigation is the processor's cost of acquisition for the unprocessed honey from unaffiliated beekeepers." Id. at 3.

In the <u>Preliminary Determination</u>, Commerce determined that "the beekeepers are the actual producers of the subject merchandise." <u>See Raw Honey From Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures</u>, 86 Fed. Reg. 66,533 (Dep't Commerce Nov. 23, 2021) ("<u>Preliminary Determination</u>") (PR 292) and accompanying preliminary determination memorandum, <u>Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Raw Honey from Brazil</u> (Dep't Commerce Nov. 17, 2021) ("<u>PDM</u>") at 16-17 (PR 288). Nonetheless, Commerce explained that "due to the large number of beekeeper suppliers, both sampling and the selection of the largest beekeepers were either unattainable or ineffective options for obtaining a representative COP for the raw honey purchased by" the respondents. <u>Id.</u> Therefore, Commerce adopted the respondents' proposal to rely on their acquisition costs. <u>Id.</u> In order to determine whether reliance on the acquisition costs as a proxy for the actual cost of production of the raw honey purchased was reasonable, however, Commerce also selected and requested cost information from two direct beekeeper suppliers to Supermel. <u>Id.</u>

### G.   Supermel's Failure to Verify Cost Data

On December 10, 2022, Commerce issued a questionnaire in lieu of verification ("ILVQ") in an attempt to verify Supermel's reported acquisition costs. <u>See</u> Dec. 10, 2021 Letter to Supermel re: <u>Less Than Fair Value Investigation of Raw Honey from Brazil</u> ("ILVQ") (CR 403; PR 299). In that questionnaire, Commerce asked Supermel to demonstrate how the unprocessed raw honey material consumption quantities and values for the largest volume purchases under CONNUM [       ] and CONNUM [       ] in the revised cost of production worksheet at Exhibit 2SD-9 tie to Supermel's inventory records. <u>Id.</u> at 5. Commerce

specifically instructed Supermel to provide "invoices, spread sheets, handwritten journals and screen prints" from its accounting system that support its demonstration.  Id.

In response, Supermel explained that its earlier-submitted Exhibit 2SD-9 reflects "purchase quantities and values, not consumption quantities and values," but it did *not* provide the requested supporting documentation for the purchase quantities.  See Supermel's Dec. 20, 2021 Letter to Commerce re: Supermel's In Lieu of Verification Questionnaire Response ("Supermel ILVQ Resp.") at 14 (CR 459-524; PR 325-331).  Supermel referenced Exhibit VC-11, which is "based on the honey purchase data provided at Exhibit VC-3," Exhibits VC-4.1 and VC-4.2 for Apiario Export's "journal entries," and Exhibits VC-5.1 and VC-5.2 for Apiario Producao's "journal entries."  Id. at 12-15. These exhibits, however, did not contain "journal entries for honey purchases;" rather, they contain copies of Supermel's [

]  Id. at Exhs. VC-4.1, VC-4.2, VC-5.1, and VC-5.2.  This [                          ] purportedly provides a listing of [            ] but is not the "journal entries for honey purchases" and was not reconciled with the accounting journal entries.

### H.    The Parties' Administrative Case Briefs

Defendant-Intervenors incorporate by reference the Defendant's recitation of the facts pertaining to the administrative case briefs filed by parties in the underlying proceeding.  See Def. Br. at 4-5.  With respect to Commerce's decision to treat the beekeepers as the producers of the subject merchandise, Supermel did not address this issue in its affirmative case brief and only briefly mentioned it in its rebuttal brief.  See generally Supermel's Jan. 13, 2022 Letter to Commerce re: Supermel's Case Brief ("Supermel Case Brf.") (PR 338); see also Supermel's Jan.

27, 2022 Letter to Commerce re: Supermel's Rebuttal Case Brief ("Supermel Rebuttal Brf.") at 3-4 (CR 530; PR 349).[4]

## I.     Commerce's Final Determination

In its final determination, Commerce explained that it assigned total AFA to Supermel because "Supermel's failure to reconcile its unprocessed honey purchases and submit documentation tying its unprocessed honey purchases, the most significant component of the reported costs, to its accounting records" prevented Commerce from determining "whether Supermel's reported costs reasonably reflect the cost of producing honey." See IDM at Comment 1 (PR 354). Commerce noted several factors that warranted application of FA.

First, "Supermel's listing of its unprocessed honey purchases and the unaffiliated beekeeper suppliers' invoices show{ed} that the transaction dates, quantities, and values all differ." Id. (internal citation omitted). Although Commerce "alerted Supermel to the discrepancies" and directed Supermel to "provide all relevant supporting documentation," Commerce explained that in response, Supermel merely submitted:

> {A} table that showed the quantity and value of raw honey Supermel reported that it purchased from the unaffiliated beekeeper suppliers. Supermel did not provide copies of correspondence with the beekeepers that would corroborate the quantity and value Supermel reported, copies or screenshots of any journal entries used to record the transactions in Supermel's accounting system, or proof of payment confirming the amount Supermel paid to the beekeepers, nor did Supermel state why it had not submitted or could not submit the required documentation.

---

[4]     In its rebuttal brief, Supermel stated: "{T}he record evidence still demonstrates that Supermel conducts extensive processing to the purchased honey such as heat treatment, homogenization, filtration, packing, inspection, and testing. Thus, Supermel is the producer of the merchandise under consideration (i.e., honey sold in the U.S. and the comparison markets). Accordingly, the appropriate COP for this investigation is Supermel's acquisition cost plus its processing costs." Id. (internal citations omitted).

Id. (internal citation omitted).

Second, Commerce noted that "{n}otwithstanding the discrepancies between the data reported by Supermel and its suppliers, Commerce has requested that Supermel tie its purchases to its accounting system throughout this investigation." IDM at Comment 1 (PR 354).  In its multiple questionnaires to Supermel, "Commerce provided Supermel with specific examples of acceptable documentation, including journal entries that corroborate Supermel's purchases of honey from the beekeepers."  Id. (internal citation omitted).  However, Supermel "ignored" Commerce's request.  Id. (internal citation omitted).  Instead, Supermel's response merely "explained that it records raw honey purchases from beekeepers as debit entries in the raw material stock account.  Supermel did not provide the requested journal entries or any other supporting documentation, nor did Supermel explain why it did not submit the requested documentation." Id. (internal citation omitted).  Although Supermel claimed to have "provided a screenshot of its 'journal entries,'" "the screenshots do not reflect any accounting data."  Id. (internal citation omitted).

Third, with respect to the ILVQ, Commerce stated that when asked to submit "'copies of spreadsheets, handwritten journals and screenprints from your accounting system as support' for Supermel's reported consumption values," Supermel merely submitted "screenshots of the same type of purchase listings" "that show only purchase data" and do "not show the name or number of Supermel's 'stock: raw materials' account, nor do they reflect debits or credits or account balances." Id. (internal citation omitted).  Commerce also noted:

> Supermel reported that both its *sales* transactions and *cost* transactions are included in its general ledger.  Supermel provided screenshots of supporting general ledger accounts and journal entries from its accounting system in response to the *sales* verification questions.  However, Supermel failed to provide

> similarly requested support related to selected raw honey *purchase* transactions, which, according to Supermel were also included in its general ledger.

Id. (internal citations omitted) (emphasis added).  In summary, Commerce explained:

> Without the requested journal entries, details of specific honey transactions, and supporting invoices requested by Commerce, the information Supermel submitted is unsupported, does not tie to its normal books and records, and is not sufficient to confirm that the reported purchases of raw honey tie to the costs reflected in Supermel's accounting system.  In short, Supermel's reported cost data remain unverified.

IDM at Comment 1 (PR 354).  Moreover, Commerce found that because "Supermel failed to tie its purchases to its accounting system…Commerce cannot rely on Supermel's purchase information as support for its CONNUM-specific costs."  Id.

Finally, Commerce found that despite multiple opportunities to corroborate or reconcile Supermel's cost data, "Supermel failed to act to the best of its ability by not providing the requested documentation from its accounting system to support its reported costs."  Id. Supermel also "withheld information" in its ILVQ response when it failed to provide screenshots tying its unprocessed honey purchases to its accounting system and that "Supermel significantly impeded the proceeding by not substantiating its reported costs…"  Id.  Consequently, Commerce found that "Supermel failed to act to the best of its ability."  Id.

## V.   **ARGUMENT**

In addition to the arguments presented below, Defendant-Intervenors support and incorporate by reference the points made in Defendant's response brief.  See generally Def. Br. Further, consistent with the Court's instructions, Defendant-Intervenors have not repeated arguments presented in the Defendant's response brief.   See Scheduling Order (Oct. 3, 2022) (ECF No. 20).

**A.**  **Commerce's Decision to Assign Supermel a Dumping Margin Based on Total AFA Was In Accordance with Law and Supported By Substantial Evidence**

     **1.**  **Legal Standard**

Section 776(a)(2) of the Tariff Act of 1930, as amended, (the "Act"), requires Commerce to resort to facts available ("FA") if an interested party:

(A)    withholds information that has been requested by Commerce;
(B)    fails to provide such information by the deadlines established, or in the form and manner requested;
(C)    significantly impedes a proceeding; or
(D)    provides information that cannot be verified.

See 19 U.S.C. § 1677e(a)(2).  Furthermore, if Commerce determines "that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  Id. § 1677e(b)(1).  See also Def. Br. at 16-17.

     **2.**  **Commerce Properly Applied FA to Supermel for Failure to Submit Complete, Reconciled Honey Purchase Data and Failure to Verify Its Cost Information**

Supermel failed to submit complete cost of production information in response to Commerce's multiple supplemental questionnaires, failed to reconcile its honey purchase data with its accounting records, and failed to verify its reported costs.  As such, Supermel withheld information requested by Commerce, significantly impeded a proceeding, and provided information that could not be verified.  See IDM at Comment 1 (PR 354) (Commerce "must resort to facts available in accordance with sections 776(a)(1) and 776(a)(2)(A), (C), and (D) of the Act.").  Consequently, Commerce appropriately applied FA to Supermel.  See Def. Br. at 18-20.

a.   <u>**Failure to Reconcile Costs and Provide Requested**</u>
<u>**Documentation**</u>

Commerce's determination that Supermel failed to reconcile its costs, and tie those costs

to its books and records with supporting documentation, was supported by substantial evidence.

Accurate cost reporting is critical to Commerce's calculation of a dumping margin and

respondents are required to reconcile their reported cost data with their books and records to

demonstrate that they have accurately reported their costs.  See <u>Hyundai Elec. & Energy Sys. Co.</u>

<u>v. United States</u>, 466 F. Supp. 3d 1303, 1317-18 (Ct. Int'l Trade 2020) (substantial evidence

supported Commerce's reliance on total FA because the respondent failed to provide requested

information with respect to its cost reconciliation and product-specific costs, and the reported

cost information was so incomplete as to be unverifiable), <u>aff'd</u>, 15 F.4th 1078, 1088 (Fed. Cir.

2021).  Moreover, "{t}he mere failure of a respondent to furnish requested information—for any

reason—requires Commerce to resort to other sources of information to complete the factual

record on which it makes its determination."  <u>Nippon Steel Corp. v. United States</u>, 337 F.3d

1373, 1381 (Fed. Cir. 2003).

Reconciliations are the starting point for verification.  See <u>Myland Indus., Ltd. v. United</u>

<u>States</u>, 31 CIT 1696, 1703-05 (2007).  Absent a confirmable starting point, Commerce has no

basis to conclude that a company's questionnaire responses are accurate and complete, and

Commerce must, therefore, conclude that the responses cannot be verified.   <u>Id.</u> at 1705

("Because of its importance, Commerce has applied total adverse facts available when a proper

cost reconciliation is not provided.") (citations omitted); <u>see also</u> <u>Universal Polybag Co. v.</u>

<u>United States</u>, 577 F. Supp. 2d 1284, 2195 (Ct. Int'l Trade 2008).  Without verifiable cost data,

Commerce may resort to "total" FA, <u>i.e.</u>, base the dumping margin entirely upon the facts

available, because reliable cost data is essential to the validity of the respondent's data as a whole.  See Borden v. United States, 4 F. Supp. 2d 1221, 1246 (Ct. Int'l Trade 1998) (sustaining total FA due to "genuine concerns about the lack of complete data, particularly the reconciliation statement").

Here, Commerce identified numerous examples of gaps or discrepancies in the record that Supermel failed to fill or reconcile.  See Def. Br. at 18-26.  Moreover, Supermel attempts to explain away the discrepancies between Beekeepers 1 and 2's sales invoices and Supermel's reported acquisition cost data as being a result of "different recordkeeping practices between Supermel and the unaffiliated beekeepers."  Id. at 26-27.  Specifically, Supermel claims that "the value of honey reported by Supermel includes ancillary expenses such as transportation" and that these freight charges make up for the unreconciled differences.  Id. at 27.  However, as Commerce found in its Final Determination, this explanation was:

> {Q}uestionable as it implies that Supermel was responsible for hiring and paying the third-party freight companies while the documents on the record, such as Beekeeper 2's Questionnaire Response, shows that Beekeeper 2 bore the responsibility for all the logistics for the honey transported to Supermel during the POI. In addition, this explanation still does not address the differences in Supermel's reported quantities of honey purchased from the unaffiliated beekeepers compared to the beekeeper-reported quantities sold to Supermel.

IDM at Comment 1 (PR 354).  In its Complaint, Supermel completely ignored Commerce's explanation with respect to this issue.  See Def. Br. at 26-27.[5]

---

[5]    Supermel argues the "alleged discrepancies take {sic} at face value represent only 0.2% of the total value of honey purchased by Supermel and do not indicate that Supermel's entire honey purchase data were unreliable."  See Supermel Brf. at 27.  This argument should be rejected. None of Supermel's reported honey purchase data reconciles with the data submitted by Supermel's beekeeper suppliers.  As Commerce explained in its Preliminary Determination, it selected "the largest raw honey suppliers" to the respondents as a representative sample.  See
(cont'd on next page)

Supermel argues it reconciled its honey purchase data and submitted documentation tying these purchases to its accounting records (see Supermel Br. at 27-31), but fails to cite a single document it provided that actually tied any of its purchase data to its *accounting* system. Id. Instead, all of the documents Supermel provided to corroborate its reported cost data were either charts created for the purpose of the investigation or screenshots from Supermel's integrated business management system (SIGE) that contain no accounting information. See Supermel Second DSQR at 2SD-11a (CR 298-332; PR 265). In other words, Supermel could not provide a direct documentary link between its reported honey purchases, "the most significant component of the reported costs" (see IDM at Comment 1 (PR 354)) and its books and records, thus rendering its cost data unusable. Commerce's determination that Supermel failed to "tie its purchases to its accounting system" (id.), is therefore supported by substantial evidence and supports Commerce's use of facts available. See Hyundai Heavy Indus. v. United States, 399 F. Supp. 3d 1305, 1312 (Ct. Int'l Trade 2019) ("At a minimum, HHI's failure to document its accounting entries provides substantial evidence for Commerce's finding {that HHI failed to act to the best of its ability.}"), aff'd, 819 Fed. Appx. 937 (Fed. Cir. 2020).

### b.   Failure to Verify Costs

Commerce's determination that it was unable to verify Supermel's costs was supported by substantial evidence. See IDM at Comment 1 (PR 354); see also Def. Br. at 21-26. Supermel incorrectly claims that Commerce "attempted to 'verify' Supermel's honey purchase data against the tax invoices submitted by the unaffiliated beekeepers." See Supermel Br. at 23. Instead,

---

PDM at 17 (PR 288). Commerce's determination that Supermel's honey purchase data are unreliable because none of the data reconcile with the honey purchase data submitted by its two largest suppliers was reasonable.

Commerce used the beekeepers' reported costs solely to ascertain whether Supermel's acquisition costs of unprocessed honey were a reasonable proxy for the beekeepers' costs of production. See IDM at Comment 1 (PR 354). Once that information was on the record, Commerce reasonably reviewed it and observed several inconsistencies. Commerce then requested Supermel – as well as its beekeeper suppliers – to provide documentation supporting their reported costs ("invoices, spread sheets, handwritten journals and screen prints" from its accounting system) and to clarify certain reporting. ILVQ at 5 (CR 403; PR 299). While the beekeepers did provide some supporting documentation (i.e., copies of invoices), Supermel failed to provide any of the requested supporting documentation whatsoever. IDM at Comment 1 (PR 354). Regardless of what the beekeepers reported, Supermel was also required to reconcile its reported costs to its accounting books and records. Supermel's duty would not have changed even if the beekeepers had reported nothing.

In its attempt to argue that its honey purchase data "were verifiable and verified," Supermel directs Commerce to its earlier explanation of a Brazilian tax law provision that allows "'companies whose inventory controls are not integrated with accounting'" to "report any value for its raw material consumption as long as the cost of sales is equal to '80% of the sales revenue.'" See Supermel Brf. at 31-32. Supermel's argument is a red herring and should be rejected. The issue here is that Supermel never actually reported any debit or credit business records from its raw materials account for Commerce to review that would allow it to determine if there was a problem with debit or credit figures. There are no journal entries on the record pertaining to Supermel's raw materials accounts. The information that Supermel has repeatedly

claimed to be journal entries is simply a list of purchases that shows no accounting information.[6]
Supermel was the party responsible for developing the record based on Commerce's request for
data. QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("{T}he burden of
creating an adequate record lies with {interested parties} and not with Commerce.") (quoting
Tianjin Mach. Imp. & Exp. Corp. v. United States, 806 F. Supp 1008, 1014 (Ct. Int'l Trade
1992)).

Moreover, Supermel's argument that there is no requirement that the screenshots of
journal entries need to show the account name or number (see Supermel Br. at 33) is meritless.
The purpose of requesting a copy of a journal entry is to see how the purchase is recorded in
Supermel's accounting system. Without account names or numbers, Commerce is unable to see
where in the accounting system, i.e., under what account, the entry is recorded. A journal entry
is the foundation for the accounting records for any business. A journal entry contains the date,
the amount to be credited and debited, and the names and numbers of the accounts affected. It is
crucial that this information be accurate because a company will use the journal entries to
generate its general ledger and financial reports.

Contrary to Supermel's assertion, the information contained in Exhibits VC-4.1, VC-4.2,
VC-5.1, and VC-5.2 of Supermel's ILVQ response does not indicate which of Supermel's

---

[6]   Supermel claims that Exhibits VC-4.1, VC-4.2, VC-5.1, and VC-5.2 from its ILVQ response
are the "journal entries for honey purchases." See Supermel Br. at 32. These exhibits are
actually just copies of Supermel's [                      ] that were never reconciled to
Supermel's accounting system. See Supermel ILVQ Resp. at Exhs. VC-4.1, VC-4.2, VC-5.1,
and VC-5.2. Similarly, Supermel also points to Exhibit SD-13 from its first supplemental
section D questionnaire response. Supermel states that in Exhibit SD-13, it "submitted sample
invoices that are signed by the suppliers which demonstrate that they were paid by Supermel."
See Supermel Br. at 33. Exhibit SD-13 contains untranslated copies of what appear to be [
             ] that Supermel never tied to its accounting records. See Supermel First
DSQR at Exh. SD-13 (CR 181-201; PR 205).

accounts were affected by the listed transactions and how the accounts were affected.  For

example, the first transaction listed in Exhibit VC-4.1 provides the [


                                                                    ]  See

Supermel First DSQR at Exh. SD-13 (CR 181-201; PR 205).  Nowhere in the exhibit does it say,

however, where in Supermel's accounting records this purchase was recorded.  Commerce has

no way of knowing which of Supermel's accounts was debited and credited for this transaction

and how Supermel records its purchases of unprocessed honey from the beekeeper suppliers in

its accounting records.

     This Court has previously sustained (and the Federal Circuit Court of Appeals affirmed)

Commerce's application of facts available for similar failures to provide requested information.

In Hyundai Heavy Industries, the Court sustained Commerce's application of AFA to a

respondent who failed to comply with Commerce's request for "clear documentation

demonstrating that payment was received … (including each recording in {HHI's} accounting

system regarding the sale and payment of the subject merchandise)" for all of the respondent's

U.S. sales.  399 F. Supp. 3d at 1310 (citation omitted), aff'd, 2020 U.S. App. LEXIS 28,400

(Fed. Cir. Sept. 8, 2020).  The respondent further failed to provide requested invoices and

"source documents supporting the allocation of trucking expenses shown in the screen prints" of

its accounting system.  Id.  The court held:

> At a minimum, HHI's failure to document its accounting entries
> provides substantial evidence for Commerce's finding.  There was
> no ambiguity in Commerce's request for "recording{s} in your
> accounting system regarding the sale{s} and payment{s} of the
> subject merchandise for both HHI and Hyundai USA (for U.S.
> sales))."…Nevertheless, HHI failed to provide those documents
> and failed to explain why it was not providing the

> documents…Moreover, HHI's ability to provide supporting documentation for some commission expenses indicates that additional documents existed but HHI failed to provide them. Under these circumstances, "it is reasonable to conclude that" HHI demonstrated "less than full cooperation."

See Hyundai Heavy Indus., 399 F. Supp. 3d at 1312-113.  In this case, Commerce made a clear request for accounting records to which Supermel did not adequately respond.

The court has also previously rejected a respondent's "secondhand 'summary reports' purporting to reflect information in original source documents," as part of its verification, because these reports were not the "original records" requested.  See Hung Vuong Corp. v. United States, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) (quoting Thyssen Stahl AG v. AK Steel Corp., No. 97-1509, 1998 U.S. App. LEXIS 17064, 1998 WL 455076, at *5 (Fed. Cir. July 27, 1998)); see also Yantai Timken Co. v. United States, 521 F. Supp. 2d 1356, 1370 (Ct. Int'l Trade 2007).  It is Commerce, not the respondent, that determines what records must be supplied for the record.  See Hyundai Heavy Indus., 399 F. Supp. 3d 1305, 1313 & n.11 (finding that selective reporting by a respondent is not permitted as "It is Commerce, not the respondents, that decides what information must be provided.") (citations omitted).

Similarly here, the court should reject Supermel's conclusory claim that its honey purchase data "were verifiable and verified."  See Supermel Brf. at 31-32. Without source documentation to verify Supermel's reported costs, Commerce appropriately determined it could not verify these costs, and accordingly was required to apply facts available.  Supermel's submitted screenshots do not display any information that could be used to tie its reported data (i.e., honey purchases) to its accounting records.  Moreover, the fact that Supermel was able to provide screenshots of its general ledger (see IDM at Comment 1 (PR 354)) indicates that Supermel was capable of providing accurate screenshots of its journal entries pertaining to

purchases of unprocessed honey, but Supermel failed to do so.  Commerce's application of FA to Supermel was, therefore, in accordance with law and supported by substantial evidence.

### 3.    Commerce Properly Applied Total AFA to Supermel for Multiple Failures to Provide Requested Information That It Was Capable of Providing

In selecting from among facts otherwise available, the statute permits Commerce to "use an inference that is adverse to the interests" of a party that it finds "has failed to cooperate by not acting to the best of its ability to comply with the request for information."  See 19 U.S.C. § 1677e(b)(1); Def. Br. at 26-34.  See also Fujian Mach. And Equip. Imp. & Exp. Corp. v. United States, 276 F. Supp. 2d 1371, 1378-79 (Ct. Int'l Trade 2003) (sustaining Commerce's use of AFA based on record evidence of "multiple failures" to provide requested information the respondent was able to provide); Mannesmannrohren-Werke AG v. United States, 120 F. Supp. 2d 1075, 1081-83 (Ct. Int'l Trade 2000) (sustaining Commerce's use of AFA when the respondent simply repeated deficient information following Commerce's requests for clarification in two supplemental questionnaires).

Commerce asked Supermel *four times* to reconcile its reported honey purchases with its accounting books and records (i.e., in the initial questionnaire, two subsequent supplemental questionnaires, and the ILVQ).  See Initial Questionnaire at D-11 (PR 66); First Supp DQ at 4 (CR 173; PR 195); Second Supp DQ at 6 (CR 274; PR 236); ILVQ at 5-7 (CR 403; PR 299).  In its initial response, Supermel stated that it "accounted for the direct material cost based on the actual price of honey paid to beekeepers plus the cost of transporting the honey to Supermel's facility" and provided no supporting documentation.  See Supermel Initial DQR at 18 (CR 100-109; PR 133-142).  In its second and third responses, Supermel merely repeated that "records its purchases of honey from beekeepers as debit entries in the raw material stock account (41)," but

neither supplied journal entries from this account (41) nor provided any other supporting documentation tying its reported honey purchases to its accounting records. <u>See</u> Supermel First DSQR at 4 (CR 181-201; PR 205); Supermel Second DSQR at 7 (CR 298-332; PR 265). In its ILVQ response, Supermel referred Commerce to the *same* screenshots Commerce had repeatedly found to be deficient. <u>See</u> Supermel ILVQ Resp. at 15 and 22 and Exhs. VC-4.1, VC-4.2, VC-5.1, VC-5.2, VC-13, and VC-14 (CR 459-524; PR 325-331).

Commerce also asked Supermel *twice* to "provide the supporting documents (e.g., invoices, purchase orders, journal entry voucher, etc.) for the 2 largest purchases and tie the purchases back to the sample copies of source documents" for September 2020. <u>See</u> First Supp DQ at 10 (CR 173; PR 195); <u>see also</u> Second Supp DQ at 9 (CR 274; PR 236). Supermel failed to provide this information both times. <u>See</u> Supermel First DSQR at 22 (CR 181-201; PR 205); Supermel Second DSQR at 14 (CR 298-332; PR 265).

Commerce asked Supermel *twice* to reconcile the beekeeper data with its own data. <u>See</u> Second Supp DQ at 8 (CR 274; PR 236); ILVQ at 5 (CR 403; PR 299). In response, Supermel merely repeated the previously-reported deficient information without any supporting documentation. <u>See</u> Supermel Second DSQR at 13-14 (CR 298-332; PR 265); Supermel ILVQ Resp. at 16 (CR 459-524; PR 325-331).

Supermel's conduct during the investigation merits the application of adverse inferences because Supermel failed to cooperate to the best of its ability when responding to Commerce's inquiries. As the record demonstrates, there is no reason why Supermel was unable to provide documentation tying its honey purchases to its accounting records and reconciling its purchases with the beekeeper data. In the <u>Final Determination</u>, Commerce noted that "Supermel provided screenshots of supporting general ledger accounts and journal entries from its accounting system

in response to the sales verification questions." <u>See</u> <u>IDM</u> at Comment 1 (PR 354).  If Supermel was capable of generating screenshots of its general ledger accounts and journal entries in response to certain *sales* verification questions, it should have been able to generate screenshots of its raw materials sub-ledger account where it purportedly recorded its honey *purchases*. However, Supermel failed to provide this information for its honey purchases and never explained why it was unable to provide the information.  <u>Id.</u>

In <u>Yantai Timken</u>, the court affirmed Commerce's AFA determination where the respondent "supplied information regarding rebates and commissions that could not be verified and further failed to provide source documents requested by Commerce."  521 F. Supp. 2d at 1375.  The court noted that Commerce had advised the respondent "that it must provide 'complete supporting documentation for each pre-selected sales transaction and each verification procedure,'" and that required documentation would include "selected invoices and copies of pages from sub-ledgers tracing the reported per unit cost back to the general ledger accounts and source documents."  <u>Id.</u>  The respondent failed to provide these documents to Commerce during verification.  The court concluded:

> Plaintiffs do not allege that they did not possess the requested documents. . . Worksheets provided by Yantai purporting to show that it made no payments were not tied to internal accounting documents. . . The record further indicates that Yantai did not propose any other means for Commerce to verify its rebates and commissions.
>
> . . .
>
> Commerce therefore reasonably determined that Yantai failed to cooperate to the best of its ability.

<u>Id.</u> at 1376.

Just like in <u>Yantai Timken</u>, here too Commerce was left only with Supermel's unsupported claims of having provided its entire honey purchase data for the POI and reconciled the data to its accounting records. Despite its claims, every time Supermel was asked to reconcile or corroborate its responses, Supermel either ignored the request completely or provided information that it falsely claimed to be responsive to Commerce's inquiry. <u>See</u> <u>IDM</u> at Comment 1 (PR 354).

Supermel argues that because it "operated under the Brazilian tax regime for 'micro and small businesses,'" it "was not required to maintain inventory or consumption values for raw materials in its accounting books." <u>See</u> Supermel Br. at 40. Supermel explains further that it "recorded its business activities in a separate recordkeeping system (i.e., SIGE) and the actual accounting (i.e., entering the total debit and credit amounts in the financial statements) was carried out by an external accountant based on the reports generated by SIGE." <u>Id.</u> Even if this is true, it does not explain why Supermel's reported honey purchase data does not match the beekeepers' records when, by its own admission, the honey purchase data was based on actual prices paid to the beekeepers. <u>See</u> Supermel Initial DQR at 20 (CR 100-109; PR 133-142). Moreover, this also does not explain why Supermel failed to provide copies of *any* payment records for these purchases.

By neglecting to provide complete and accurate responses to each of Commerce's questionnaires, Supermel failed to comply with Commerce's request for information to the best of its ability. Commerce's use of AFA in assigning Supermel a dumping margin was in accordance with law and supported by substantial evidence because the record demonstrates that Supermel repeatedly failed to provide requested information that it was capable of providing and instead, simply repeated deficient information following Commerce's multiple requests for

information.  See Fujian Mach. & Equip., 276 F. Supp. 2d at 1378-79; Mannesmannrohren-Werke AG, 120 F. Supp. 2d at 1081-83.

Supermel also argues that Commerce failed to provide requested assistance under 19 U.S.C. § 1677m(c)(1).  Id. at 41.  This argument fails.  See Def's Br. at 27-31.  This court has held that "under section 1677m(c)(1) respondents are required to alert Commerce to their difficulties, provide an alternative option, and seek assistance."  See Dillinger France S.A. v. United States, 350 F. Supp. 3d 1349, 1363-64 (Ct. Int'l Trade 2018) (holding that the respondent did not meet all of the criteria under 19 U.S.C. § 1677m(c) despite the fact that it notified Commerce of its difficulties reporting the requested information, but failed to offer any alternative form of information that Commerce could use instead).  Supermel alerted Commerce to difficulties in responding to questionnaires in three of its submissions and stated the following:

> Supermel notes that it has been responding to the Department's questionnaires to the best of its ability, and providing thorough answers that reflect the possibilities and limits established under Brazilian regulation. Despite its best efforts, Supermel is a small company, and has been having difficulties in meeting the Department's requirements, and requests that its difficulties are taken into account, particularly as a small company, in the terms of article 19 U.S.C. § 1677m(c)(1) and 1677m(c)(2). Supermel asks that Commerce provide assistance for Supermel to supply outstanding information, considering Supermel's specific circumstances.

See Supermel's Oct. 6, 2021 Letter to Commerce re: Supermel's Sections A-C Supplemental Questionnaire Response at pdf pg. 2 (CR 238-270; PR 224-226); Supermel Second DSQR at pdf pg. 2 (CR 298-332; PR 265); Supermel's Nov. 8, 2021 Letter to Commerce re: Supermel's Second Sections A-C Supplemental Questionnaire Response at pdf pg. 2 (CR 352-375; PR 270-272).  Supermel did not provide a full explanation of the alleged difficulties or "provide an alternative option" for supplying the requested information.  Indeed, the issue here is not just that

Supermel failed to provide all the information requested, but also that Supermel repeatedly provided *inconsistent* information and failed to provide supporting documentation that it should reasonably have in possession, e.g., information about raw material purchases and payment records that might have been used to resolve those inconsistencies. Because Supermel failed to properly notify Commerce of its need for assistance and to offer an alternative, Commerce was under no obligation to provide additional assistance pursuant to 19 U.S.C. § 1677m(c)(2).

Because Commerce determined that necessary information was missing from the record and Supermel did not cooperate to the best of its ability to provide the missing information, substantial evidence supports Commerce's application of total AFA.

**B.    The Court Should Decline to Address Supermel's Argument Regarding the Producers of the Subject Merchandise**

Finally, Supermel argues that Commerce incorrectly determined that the beekeepers were the producers of the subject merchandise in the underlying investigation. See Supermel Br. at 41-45. Supermel's argument fails for two reasons. First, because Supermel did not raise this issue in its affirmative case brief and only briefly mentioned this in its rebuttal brief, Supermel failed to exhaust its administrative remedies and, thus, the Court should decline to address this issue. See generally Supermel's Case Brf. (CR 526; PR 338); Supermel's Rebuttal Brf. at 3-4 (CR 530; PR 349). Commerce's regulations clearly state that an interested party's case brief "must present *all* arguments" that continue, in that party's view, to be relevant to Commerce's final determination. See 19 C.F.R. § 351.309(c)(2) (emphasis added). This requirement serves an important purpose: "{S}imple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against

objection made at the time appropriate under its practice." See <u>United States v. L.A. Tucker Truck Lines</u>, 344 U.S. 33, 37 (1952); <u>see also</u> <u>Dorbest Ltd. v. United States</u>, 604 F. 3d 1363, 1375 (Fed. Cir. 2010) (holding that failure to raise an issue in a case brief constituted failure to exhaust administrative remedies); <u>JTEKT Corp. v, United States</u>, 768 F. Supp. 2d 1333, 1354 (Ct. Int'l Trade 2011) (declining to address issues not raised in respondent's case brief, finding that respondent failed to exhaust administrative remedies). Supermel's affirmative case brief made no mention of this argument; thus, Supermel is now precluded from raising this issue on appeal.

Second, because Commerce did not calculate a final dumping margin for Supermel, but rather relied on AFA to determine a margin, Commerce did not address this argument in its final determination and found the issue to be moot. See <u>IDM</u> at Comments 1 and 3 (PR 354). Supermel does not challenge the mootness of this argument. Moreover, Commerce in fact attempted to verify *Supermel's acquisition costs* because they were used as a proxy for the beekeepers' cost of production. Thus, Commerce's treatment of Supermel as the producer would not change Commerce's ultimate determination that Supermel failed to verify its own costs. For these reasons, the Court should decline to address this issue.

## VI.   <u>CONCLUSION</u>

For the reasons discussed above, Defendant-Intervenors respectfully urge this Court to: (1) find that Commerce's application of total AFA in determining Supermel's dumping margin in the <u>Final Determination</u> is supported by substantial evidence and is in accordance with law; and that (2) Commerce's treatment of the beekeepers, not Supermel, as the producers of the subject merchandise is also supported by substantial evidence and is in accordance with law.

Consequently, Defendant-Intervenors request the Court to sustain the <u>Final Determination</u> in its entirety.

Respectfully submitted,

R. ALAN LUBERDA
ELIZABETH C. JOHNSON
MALIHA KHAN
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated: March 3, 2023

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE
## WITH COURT OF INTERNATIONAL TRADE
## STANDARD CHAMBERS PROCEDURES

Pursuant to this Court's Order dated October 3, 2022 (ECF No. 20), setting the word limitation to the response brief of Defendant-Intervenors, the American Honey Producers Association and the Sioux Honey Association ("Defendant-Intervenors") to 10,000 words, counsel for Defendant-Intervenors certifies that this Response Brief contains 9,709 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

Respectfully submitted,

R. ALAN LUBERDA
ELIZABETH C. JOHNSON
MALIHA KHAN
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated: March 3, 2023