Slip Op. 24-64

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **APIÁRIO DIAMANTE COMERCIAL EXPORTADORA LTDA. AND APIÁRIO DIAMANTE PRODUÇÃO E COMERCIAL DE MEL LTDA.,** | |
| Plaintiffs, | |
| v. | |
| **UNITED STATES,** | **Before:  Timothy C. Stanceu, Judge** |
| Defendant, | **Court No. 22-00185** |
| and | |
| **AMERICAN HONEY PRODUCERS ASSOCIATION AND THE SIOUX HONEY ASSOCIATION,** | |
| Defendant-Intervenors. | |

**OPINION AND ORDER**

[Remanding an affirmative agency determination concluding an antidumping duty investigation of raw honey]

Dated: May 30, 2024

*Pierce J. Lee* and *Daniel J. Cannistra*, Crowell & Moring LLP, of Washington, D.C., for plaintiffs Apiário Diamante Comercial Exportadora Ltda. and Apiário Diamante Produção e Comercial de Mel Ltda.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the

brief was *Benjamin Juvelier*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

    *R. Alan Luberda, Elizabeth C. Johnson,* and *Maliha Khan*, Kelley Drye & Warren LLP, of Washington D.C., for defendant-intervenors American Honey Producers Association and the Sioux Honey Association.

    Stanceu, Judge: Plaintiffs contest an affirmative "less-than-fair-value"

determination ("Final Determination") that the International Trade Administration, U.S.

Department of Commerce ("Commerce" or the "Department") issued to conclude an

antidumping duty investigation on imported raw honey from several countries.  *Raw*

*Honey From Brazil: Final Determination of Sales at Less Than Fair Value,* 87 Fed. Reg. 22,182

(Int'l Trade Admin. April 14, 2022) P.R. 358 ("*Final Determination*").[1]

    In the Final Determination, Commerce assigned plaintiffs an estimated dumping

margin of 83.72% *ad valorem*.  Concluding that Commerce based this rate on findings

unsupported by substantial evidence on the record of the investigation, the court

remands the decision to Commerce for reconsideration.

## I. Background

### A. The Parties

    Plaintiffs Apiário Diamante Comercial Exportadora Ltda. ("Apiário Export") and

Apiário Diamante Produção E Comercial De Mel Ltda. ("Apiário Produção")

---

[1] Citations to documents from the Joint Appendix (Apr. 18, 2023), ECF Nos. 30 (conf.), 31 (public) (supplemented by ECF Nos. 33 (conf.), 34 (public) filed on Nov. 16, 2023) are referenced herein as "P.R. __" for public versions.  All information disclosed in this Opinion and Order is public information.

(collectively, "Apiário," operating jointly under the trade name "Supermel") were treated as a single entity in the investigation. *Memorandum Re Less-Than-Fair-Value Investigation of Raw Honey from Brazil: Preliminary Affiliation and Single Entity Memorandum for Apiário Diamante Comercial Exportadora Ltda and Apiário Diamante Produção e Comercial de Mel Ltda* (Int'l Trade Admin. Nov. 17, 2021), P.R. 285. Apiário Export primarily exported honey to foreign markets and Apiário Produção sold exclusively into the domestic Brazilian market. Defendant is the United States. Defendant-intervenors, domestic producers of raw honey and the petitioners in the investigation, are the American Honey Producers Association and the Sioux Honey Association ("Petitioners").

## B.  Administrative Proceedings

The Final Determination resulted from an antidumping duty petition ("the Petition") filed in April of 2021. *Petition for the Imposition of Antidumping Duties Against Imports of Raw Honey from Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam* (Apr. 20, 2021), P.R. 1–17.

On May 18, 2021, Commerce initiated the antidumping duty investigation, which applied to imports of raw honey (the "subject merchandise") from several countries over a time period (the "period of investigation" or "POI") of April 1, 2020 through March 31, 2021. *Raw Honey from Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 26,897 (Int'l Trade

Admin. May 18, 2021), P.R. 53.  Commerce selected Supermel and another Brazilian

company, Melbras lmportadora E Exportadora Agroindustrial Ltda. ("Melbras") (not a

party to this case), as the two "mandatory respondents" from Brazil, i.e., the

respondents Commerce would investigate individually and assign individual estimated

dumping margins.  *Department Memorandum to James Maeder re: Less-Than-Fair-Value*

*Investigation of Raw Honey From Brazil: Respondent Selection* (Int'l Trade Admin. June 7,

2021), P.R. 64.

In its preliminary less-than-fair-value determination, which incorporated by

reference a preliminary issues and decision memorandum ("Preliminary I&D

Memorandum"), Commerce used Supermel's reported data to calculate a preliminary

estimated dumping margin of 29.61%.  *Raw Honey From Brazil: Preliminary Affirmative*

*Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and*

*Extension of Provisional Measures*, 86 Fed. Reg. 66,533, 66,534 (Int'l Trade Admin. Nov. 23,

2021), P.R. 292; *Decision Memorandum for the Preliminary Determination in the Less-Than-*

*Fair-Value Investigation of Raw Honey from Brazil* at 21, 17 (Int'l Trade Admin. Nov. 17,

2021), P.R. 288 ("*Prelim. I&D Mem.*").

Shortly after issuing its preliminary determination, Commerce determined that it

had made ministerial errors within the meaning of 19 CFR 351.224(f) in its preliminary

margin calculation and issued an amended preliminary determination that reduced

Supermel's estimated dumping margin to 10.52%.  *Raw Honey From Brazil: Amended*

*Preliminary Affirmative Determination of Sales at Less Than Fair Value,* 86 Fed. Reg. 71,614

(Int'l Trade Admin. Dec. 17, 2021).

On April 14, 2022, Commerce issued the Final Determination, which

incorporated by reference a "Final Issues and Decision Memorandum" ("Final I&D

Memorandum"). *Issues and Decision Memorandum for the Final Affirmative Determination*

*in the Less-Than-Fair-Value Investigation of Raw Honey from Brazil* (Int'l Trade Admin.

Apr. 7, 2022), P.R. 354 ("*Final I&D Mem.*").  Concluding that Supermel withheld

information and impeded the investigation by failing to respond to various

questionnaires with information necessary to allow it to verify "cost-of-production"

("COP") data that Commerce used to calculate the 10.52% amended preliminary

estimated dumping margin, Commerce assigned Supermel an estimated dumping

margin of 83.72% in the Final Determination.  *Final I&D Mem.* at 12; *Final Determination*

at 22,183.  Commerce assigned Melbras an estimated dumping margin of 7.89%.  *Final*

*Determination* at 22,183.

Following an affirmative injury determination by the U.S. International Trade

Commission, Commerce issued an antidumping order on raw honey from Argentina,

Brazil, India, and the Socialist Republic of Vietnam.  *Raw Honey From Argentina, Brazil,*

*India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501

(Int'l Trade Admin. June 10, 2022) P.R. 362.[2]

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises subject matter jurisdiction under section 201 of the Customs

Courts Act of 1980, 28 U.S.C. § 1581(c), which grants this Court exclusive jurisdiction

over civil actions brought under section 516A of the Tariff Act of 1930 ("Tariff Act"), *as*

*amended*, 19 U.S.C. § 1516a, and 28 U.S.C. § 1581(c).[3]  Among the decisions that may be

contested according to Section 516A are final affirmative determinations of sales at less

than fair value.  *Id*. §§ 1516a(a)(2)(B)(i), 1673d.

In reviewing an agency determination, the court must set aside any

determination, finding, or conclusion found "to be unsupported by substantial evidence

---

[2] The scope of the antidumping duty order is as follows:

   The product covered by these orders is raw honey.  Raw honey is honey as it exists in the beehive or as obtained by extraction, settling and skimming, or coarse straining.  Raw honey has not been filtered to a level that results in the removal of most or all of the pollen, e.g., a level that removes pollen to below 25 microns.  The subject products include all grades, floral sources and colors of raw honey and also include organic raw honey.

   Excluded from the scope is any honey that is packaged for retail sale (e.g., in bottles or other retail containers of five (5) lbs. or less).

*Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501, 35,504 (Int'l Trade Admin. June 10, 2022) P.R. 362.

[3] Citations to the United States Code are to the 2018 edition.

on the record, or otherwise not in accordance with law." *Id*. § 1516a(b)(1)(B)(i).

Substantial evidence refers to "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d

1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## B. Antidumping Duties under the Tariff Act

The Tariff Act provides for an "antidumping duty" to be assessed on imported

merchandise if Commerce determines that the merchandise is being sold at less than

fair value and the International Trade Commission determines that an industry in the

United States is materially injured or is threatened with material injury by reason of that

merchandise or by reason of sales (or likelihood of sales) of that merchandise for

importation.  19 U.S.C. § 1673.  The statute provides that the antidumping duty shall

equal the "amount by which the normal value exceeds the export price (or the

constructed export price) for the merchandise." *Id*.  In the ordinary instance, "[t]he

normal value of the subject merchandise shall be the price . . . at which the foreign like

product is first sold . . . for consumption in the exporting country, in the usual

commercial quantities and in the ordinary course of trade." *Id*. §§ 1677b(a)(1)(A), (B)(i).

*See id*. § 1677(16) (defining "foreign like product" in terms related to comparability to

the subject merchandise).

If Commerce determines that sales of the foreign like product in the market of

the exporting country are "insufficient to permit a proper comparison with the sales of

the subject merchandise to the United States," Commerce may compare the U.S. sales of

the subject merchandise to sales of the foreign like product in a third country.  *Id*.

§ 1677b(a)(1)(B), (C).  A small portion of the honey produced by Apiário Export and all

of that produced by Apiário Produção was sold into the domestic Brazilian market.

*Supermel's Section D Second Supplemental Questionnaire Response* at 4 (Nov. 4, 2021), P.R.

265 ("*Second Supplemental Questionnaire Response*").  Commerce considered those

combined sales to be insufficient to use the Brazilian market as the "comparison"

market.  *Prelim I&D Mem.* at 13.  Therefore, in the investigation at issue, Commerce

chose Australia as the third country comparison market.  *Id*.

### C.  "Cost of Production" in the Normal Value Calculation

"In determining . . . whether subject merchandise is being, or is likely to be, sold

at less than fair value, a fair comparison shall be made between the export price or

constructed export price and normal value."  19 U.S.C. § 1677b(a).  When determining

normal value, Commerce may disregard sales that are not made in the "ordinary course

of trade."  *Id*. § 1677b(a)(1)(B)(i).  The statute defines "ordinary course of trade" to

exclude sales made below the cost of production.  *Id*. §§ 1677(15)(A), 1677b(b)(1)(B)

(referring to sales at prices that do not permit recovery of all costs within a reasonable

period of time).  Cost of production includes an exporter's or producer's material costs,

amounts for selling and general expenses, and the cost of containers.  *Id*. § 1677b(b)(3).

The statute provides that "[c]osts shall normally be calculated based on the records of

the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise." *Id*. § 1677b(f)(1)(A).

### D.  Verification

Information submitted during an antidumping duty investigation is subject to verification by Commerce.  19 U.S.C. § 1677m(i)(1).  The Department's regulations describe verification as a procedure "to verify the accuracy and completeness of submitted factual information."  19 C.F.R. § 351.307(d).  During verification, "the Department will request access to all files, records, and personnel which the Secretary [of Commerce] considers relevant to factual information submitted of . . . [p]roducers, exporters, or importers."  *Id*.

Commerce ordinarily conducts on-site verifications of submitted information. Due to the constraints posed by the COVID-19 pandemic that was ongoing throughout the investigation at issue in this case, Commerce did not follow its ordinary procedure. After the preliminary phase of the investigation, Commerce sent Supermel an "In Lieu of Verification Questionnaire" that addressed information placed on the record by Supermel's questionnaire responses.  *Letter from the Department to Supermel re: Questionnaire in Lieu of Verification* (Int'l Trade Admin. Dec. 10, 2021), P.R. 299 ("*In Lieu of Verification Questionnaire*").  In its response to this questionnaire, Supermel clarified

some of its responses to previous questionnaires and provided additional supporting

documentation. *Letter from Supermel to the Department re: Antidumping Duty Investigation*

*of Raw Honey from Brazil: Supermel's In Lieu of Verification Questionnaire Response* (Dec. 20,

2021) (P.R. 325-331) ("*In Lieu of Verification Questionnaire Response*").

### E. Supermel's Claim in this Litigation

The estimated rate ultimately assigned to Supermel in the Final Determination

was not a weighted average estimated dumping margin calculated from Supermel's

sales during the POI. The 83.72% estimated dumping rate Commerce applied to

Supermel in the Final Determination, after calculating a 10.52% preliminary estimated

rate in the Amended Preliminary Determination, resulted from the Department's

invoking the "facts otherwise available" provision of section 776(a) of the Tariff Act,

19 U.S.C. § 1677e(a), and the "adverse inference" provision of section 776(b) of the Tariff

Act, 19 U.S.C. § 1677e(b).[4] The Department's principal rationale in doing so was that

Supermel impeded the investigation by withholding information necessary to allow it

to verify Supermel's reported data on the cost of production of the raw honey it

exported to the comparison market (i.e., Australia).

Before the court is Supermel's motion for judgment on the agency record,

brought according to USCIT Rule 56.2. Supermel claims that Commerce unlawfully

---

[4] The term "adverse facts available" ("AFA") is sometimes used to refer to the combined use of these two provisions.

invoked 19 U.S.C. § 1677e(a) ("facts otherwise available") and (b) ("adverse inference")

in assigning Supermel the 83.72% estimated dumping margin.  Pl.'s Mem. in Supp. of

Rule 56.2 Mot. for J. on the Agency R. 3 (Dec. 7, 2022), ECF Nos. 22 (conf.), 23 (public)

("Pl.'s Br.").  Supermel argues that the factual determinations upon which Commerce

invoked these provisions are not supported by substantial evidence on the

administrative record of the investigation.  Specifically, Supermel argues that it

"submitted verifiable honey purchase data."  *Id*. at 32 (citing its responses to the

Department's questionnaires).  Supermel also asserts that to the extent its submissions

were deficient, Commerce failed to provide "an opportunity to remedy or explain the

deficiency" as required by 19 U.S.C. § 1677m(d).  *Id*. at 21.[5]

### F.  The Derivation of the 10.52% Rate in the Preliminary Determination

Supermel reported in its questionnaire responses that it purchased raw honey

from more than a thousand individual, unaffiliated beekeepers in Brazil and performed

further processing on that honey to produce raw honey products for its export sales.

The processing included "1-6 hours of heat treatment, homogenization (involving

---

[5] Additionally, Supermel contests the Department's decision to treat the
beekeeper suppliers, rather than Supermel, as the producers of the subject merchandise,
arguing that this formed the basis for the application of facts otherwise available with
an adverse inference under 19 U.S.C. § 1677e to Supermel.  Pl.'s Mem. in Supp. of Rule
56.2 Mot. for J. on the Agency R. 41—42 (Dec. 7, 2022), ECF Nos. 22 (conf.), 23 (public).
Because the court concludes that certain of the Department's findings for applying
19 U.S.C. § 1677e lacked required support in the record evidence, the court does not
reach the question of whether Commerce improperly designated the beekeepers as the
"producers."

additional heat treatment), filtration, organic certification, and inspection." Pl.'s Br. 16,

6 (citing *Supermel's Response to the Initial Request for Information* (June 17, 2021), P.R. 79).

At the onset of the investigation, considering "the numerous nonaffiliated

middlemen and beekeepers involved in the cost of producing raw honey," Commerce

sought input from the parties on methods of determining the cost of raw honey

production. *Letter from the Department to All Interested Parties Re: Antidumping Duty*

*Investigations of Raw Honey from India, Argentina, Brazil, and Ukraine: Request for Comments*

*on the Raw Honey Cost of Production Reporting Methodology* at 1 (July 22, 2021), P.R. 108;

*Prelim. I&D Mem.* at 16—17. After receiving comments from the parties, Commerce

"selected and requested cost information from two direct beekeeper suppliers to

Supermel with the aim of determining whether reliance on Melbras['s] and Supermel's

acquisition costs as a proxy for the actual COP of the raw honey purchased was

reasonable." *Prelim. I&D Mem.* at 17.

Between June and October of 2021, Commerce issued a series of questionnaires

to Supermel and two beekeepers that Supermel identified as its largest suppliers,

referred to in the submissions as "Beekeeper 1 and Beekeeper 2" (collectively, "the

beekeeper suppliers") for whose identity Supermel claims business proprietary

treatment. Supermel and both beekeeper suppliers timely responded to those

questionnaires. As did Supermel, the beekeepers reported their sales prices and their

costs of production.

Commerce explained in the Final I&D Memorandum that "[i]n the Preliminary

Determination, we relied on the respondents' honey acquisition costs as a proxy for the

cost of producing raw honey.  We relied on Supermel's reported cost information and

applied its acquisition costs plus Supermel's own processing costs as a reasonable proxy

for the total cost of production (COP) because the acquisition prices Supermel paid

were higher than the honey producers' reported COP."  *Final I&D Mem.* at 4.

In arriving at the amended preliminary margin of 10.54% for Supermel,

Commerce removed from Supermel's comparison market sales database certain sales it

determined to have been made below the cost of production.  *Prelim. I&D Mem.* at 19

("We found that, for certain products, more than 20 percent of Melbras['s] and

Supermel's comparison sales during the POI were at prices less than the COP and, in

addition, such sales did not provide for the recovery of costs within a reasonable period

of time.").

### G.  The Department's Application of 19 U.S.C. § 1677e on Findings that Supermel Withheld Information, Impeded the Investigation, and Provided Cost-of-Production Data that Could Not Be Verified

Commerce decided that it could not use any of Supermel's reported data on the

cost of production of the foreign like product as sold in the third country market of

Australia, finding as a fact that it lacked the information necessary to verify the cost of

production data that Supermel submitted.[6]  Substituting "facts otherwise available" for

Supermel's entire comparison market sales database, Commerce further concluded that

Supermel withheld information, impeded the investigation, and failed to cooperate by

not acting to the best of its ability in responding to certain of its questionnaires.

Commerce assigned Supermel a rate of 83.72% as an adverse inference, using a rate it

determined from the Petition.  *Final Determination* at 22,183.

This case presents, first, the issue of whether substantial record evidence

supported the findings that the record lacked sufficient information for verification of

some or all of Supermel's reported cost of production data, that Supermel withheld

information, and that Supermel impeded the Department's investigation.  If it did not,

then Commerce was not authorized by the Tariff Act to substitute facts otherwise

available for that cost information.  If, on the other hand, one or more of these findings

are valid, the issue is whether Commerce permissibly applied an adverse inference in

selecting from among facts otherwise available.

**1. Misplaced Reliance on Differences between the Information Submitted by Supermel and its Two Largest Beekeeper Suppliers**

Commerce based its application of 19 U.S.C. § 1677e(a) in part on a factual

finding that there were "unexplained and unreconciled differences between the

---

[6] Commerce is directed to use "the facts otherwise available" if a party provides requested information "but the information cannot be verified as provided in section 1677m(i) of this title."  19 U.S.C. § 1677e(a)(2)(D).

information submitted by Supermel and its beekeeper suppliers." *Final I&D Mem.* at 18.

As discussed below, the Department's finding of "unexplained and unreconciled

differences" lends no support to the use of facts otherwise available under § 1677e(a).

Commerce found that "both Supermel and the beekeepers provided conflicting

information regarding the quantity and value of honey reported, which further

supports our finding that Supermel's reported costs cannot be verified." *Id.* at 16—17.

This finding is contradicted by the record evidence in two respects.  First, the

discrepancies were insignificant in the context of the cost of production data Supermel

provided and, therefore, could not have precluded verification of those data.  Second,

these discrepancies, which pertained to the quantities and values of purchases from the

two largest beekeepers who supplied Supermel raw honey, must be viewed along with

the record evidence consisting of the two beekeepers' own admissions that their "labor

is almost entirely dedicated to production activities and virtually no time is spent on

administrative activities."[7]  *Antidumping Duty Investigation of Raw Honey From Brazil:*

*Beekeeper Questionnaire for [Beekeeper 1]* at 14 (Sept. 9, 2021), P.R. 198 ("*Beekeeper 1 Initial*

*Questionnaire Response"*).  Accordingly, the record does not support a finding that the

---

[7] Both beekeepers invoked 19 U.S.C. § 1677m(c), requesting that their difficulties be "taken into account, particularly as a small company."  *Antidumping Duty Investigation of Raw Honey From Brazil: Section D Supplemental Questionnaire for [Beekeeper 1]* at 2 (Oct. 26, 2021), P.R. 241 *Antidumping Duty Investigation of Raw Honey From Brazil: Section D Supplemental Questionnaire for [Beekeeper 2]* at 2 (Oct. 26, 2021), P.R. 242.

beekeepers' records, which understandably may have been less than perfect, called

Supermel's reported costs into question. The beekeepers' questionnaire responses,

considered in the context of the evidence about the nature of the beekeepers' businesses,

did not support a finding or inference that Supermel under-reported its own honey

acquisition costs.

Commerce collected information from Supermel's two largest beekeeper

suppliers, Beekeeper 1 and Beekeeper 2, with the stated aim of determining whether

reliance on "Supermel's acquisition costs as a proxy for the actual COP of the raw

honey purchased was reasonable." *Prelim. I&D Mem.* at 17. Beekeepers 1 and 2

provided 2.5% and 2% of Supermel's total honey, respectively. Pl.'s Br. 9 (citing

*Supermel's Section D Questionnaire Response* at Ex. D-5a (Aug. 3, 2021), P.R. 133—152

("*Supermel's Initial Questionnaire Response*")).

In his response, Beekeeper 1 (Supermel's largest supplier of honey) noted that

while he operates under a trade name, "there is no incorporated company. All the

operations are conducted by me and my family." *Beekeeper 1 Initial Questionnaire

Response* at 2. Because Beekeeper 1's business was not incorporated, he did not file a

corporate tax return. *Id.* at 9. Instead, Beekeeper 1 provided tax returns for himself, his

wife, and his child. Beekeeper 2 informed Commerce that he operated with no formal

accounting or inventory system and noted that "I have no incorporated company. All

the operations are conducted by me and my wife." *Antidumping Duty Investigation of*

*Raw Honey From Brazil: Beekeeper Questionnaire for [Beekeeper 2]* at 2 (Sept. 9, 2021), P.R.

201 (*"Beekeeper 2 Initial Questionnaire Response"*).  Like Beekeeper 1, Beekeeper 2 was able

to provide detailed information about the physical processes by which he harvests

honey but was unable to answer the Department's questions that required a formal

inventory or accounting system.

     In his initial questionnaire response, responding to the Department's request for

"a schedule for FY 2020 listing major honey customers with quantity and value by types

of honey sold[,]" Beekeeper 1 provided his records of the total quantity and value of his

sales to Supermel during the POI.  *Beekeeper 1 Initial Questionnaire Response* at 10.  The

total quantity was within 1% of the total quantity reported by Supermel for purchases

made from Beekeeper 1 during the POI, and the total value was 3% less than the total

value reported by Supermel.  Pl.'s Br. 10 (citing *Beekeeper 1 Initial Questionnaire Response*

at 10).  Beekeeper 2 did not provide quantity or value figures in response to the same

question, instead reiterating that he does not keep detailed business records.  *Beekeeper 2*

*Initial Questionnaire Response* at 10.

     Tax invoices provided by Beekeeper 1 in response to the supplemental

questionnaire showed the same minor discrepancies as to the quantity and value of the

sales to Supermel.  *Antidumping Duty Investigation of Raw Honey From Brazil: Section D*

*Supplemental Questionnaire for [Beekeeper 1]* at Ex. SUP-1 (Oct. 26, 2021), P.R. 241

("*Beekeeper 1 Supplemental Questionnaire Response*").  Tax invoices provided by

Beekeeper 2 showed that the total quantity reported matched Supermel's reported data

within 0.02%, but they listed values that were 6% less than the total value reported by

Supermel for purchases made from him during the POI.  *Antidumping Duty Investigation*

*of Raw Honey From Brazil: Section D Supplemental Questionnaire for [Beekeeper 2]* at SUP-1

(Oct. 26, 2021), P.R. 242. ("*Beekeeper 2 Supplemental Questionnaire Response*").  Viewed

cumulatively, these discrepancies were less than 5% as to the total transactions between

Supermel and the two parties and were spread over multiple transactions.

In blaming Supermel for what it described as "discrepancies" between the

beekeepers' and Supermel's data pertaining to Supermel's acquisition costs, Commerce

did *not* find as a fact that Supermel failed to maintain COP data in accordance with

Brazilian accounting requirements.  *See* 19 U.S.C. § 1677b(f)(1)(A) (directing that "[c]osts

shall normally be calculated based on the records of the exporter or producer of the

merchandise, if such records are kept in accordance with the generally accepted

accounting principles of the exporting country (or the producing country, where

appropriate) and reasonably reflect the costs associated with the production and sale of

the merchandise.").  Although Supermel operated under the Brazilian tax regime for

"micro and small businesses," (and, like the beekeepers, invoked 19 U.S.C. § 1677m(c)),

it was incorporated as a business and operated during the POI under tax and

accounting requirements provided for under Brazilian law.  *Id.*, Pl.'s Br. 13.  Supermel 's

responses to Commerce were based, necessarily, on its production costs as shown in the

business records it kept in the ordinary course of business.  Commerce attached

unwarranted significance to the fact that the values of the purchases from the two

sampled beekeepers as shown in records or tax returns of those beekeepers did not

agree exactly with the records of acquisition costs maintained by Supermel.

Supermel suggested that one source of the discrepancy may be that the "issue

dates" on the tax invoices provided by the Beekeepers came before the date on which

the beekeepers signed the invoices provided by Supermel, which could indicate that

negotiation occurred and shifted prices in the days immediately preceding the

finalization of the transactions.  Pl.'s Br. at 26 (citing *Beekeeper 1 Supplemental*

*Questionnaire Response* at SUP-1)  Commerce rejected an explanation provided by

Supermel that "third-party freight charges" account for the difference by pointing out

that that explanation merely raises another discrepancy between information provided

by Supermel and the beekeepers as to which party pays the freight charges.  *Final I&D*

*Mem.* at 13—14.  Commerce found that "this explanation still does not address the

differences in Supermel's reported quantities of honey purchased from the unaffiliated

beekeepers compared to the beekeeper reported quantities sold to Supermel[,]" an

apparent reference to the discrepancy of reported quantity of less than 1% for Beekeeper

1 and .02% for Beekeeper 2.  *Id.* at 14.

The court need not dwell on the possible reasons for the minor discrepancies

between the data reported by Supermel and by its suppliers, who admit to spending

"virtually no time" on administration and recordkeeping.  *Beekeeper 1 Initial Questionnaire Response* at 14.  Only in the most literal and technical sense was Commerce correct in finding that "the information provided by both beekeepers contradicted Supermel's reporting."  *Final I&D Mem.* at 14; *see also Final I&D Mem.* at 13 ("We agree with the petitioners that Supermel's reported unprocessed honey purchases do not agree with the unaffiliated beekeeper suppliers' sales invoices.").  Contrary to the Department's finding and inference, the record evidence showed that Supermel's data and the data of Beekeepers 1 and 2 were relatively consistent.

In conclusion, the evidence on the administrative record, viewed as a whole, does not support the Department's reliance on what it termed "unexplained and unreconciled differences between the information submitted by Supermel and its beekeeper suppliers," *Final I&D Mem.* at 18, for invoking 19 U.S.C. § 1677e(a)(2)(D) and setting aside Supermel's cost-of-production data and, ultimately, its entire comparison market database, as unverifiable.

### 2.  Failure to Identify Deficient Responses to Question 25 of the Second Supplemental Questionnaire as Required by 19 U.S.C. § 1677m(d)

Supermel argues that Commerce failed to identify alleged deficiencies in questionnaire responses and failed to provide an opportunity to remedy or explain those deficiencies, as required by 19 U.S.C. § 1677m(d).[8]  Pl.'s Br. 20—21.  With respect

---

    [8] 19 U.S.C. § 1677m(d) provides in relevant part that:
(continued . . .)

to a question in the Second Supplemental Questionnaire, "Question 25," the court

agrees. *Second Supplemental Questionnaire Response* at 13—14.

For its application of 19 U.S.C. § 1677e, Commerce relied in part on Supermel's

response to Question 25. *Final I&D Mem.* at 13. Commerce found that despite its

request for such documentation, "Supermel did not provide copies of correspondence

with the beekeepers that would corroborate the quantity and value Supermel reported,

copies or screenshots of any journal entries used to record the transactions in

Supermel's accounting system, or proof of payment confirming the amount Supermel

paid to the beekeepers" and that Supermel failed to "state why it had not submitted or

could not submit the required documentation." *Id.* The question was as follows:

> Commerce selected two beekeepers ([Beekeeper 1] and [Beekeeper 2])
> whom you have purchased honey from during the POI. Based on the
> information provided by the beekeepers there is a discrepancy between
> the quantity and value of unprocessed honey you have reported as

---

If the administering authority or the Commission (as the case may be)
determines that a response to a request for information under this subtitle
does not comply with the request, the administering authority or the
Commission (as the case may be) shall promptly inform the person
submitting the response of the nature of the deficiency and shall, to the
extent practicable, provide that person with an opportunity to remedy or
explain the deficiency in light of the time limits established for the
completion of investigations or reviews under this subtitle. If that person
submits further information in response to such a deficiency and either—
(1) the administering authority or the Commission (as the case may be)
finds that such response is not satisfactory, or (2) such response is not
submitted within the applicable time limits, then the administering
authority or the Commission (as the case may be) may, subject to
subsection (e), disregard all or part of the original and subsequent
responses.

procured from the beekeepers.  Confirm that you have purchased
[quantity] kg and R$ [value] of honey from [Beekeeper 1] and [quantity]
kg and R$ [value] from [Beekeeper 2].  Provide all relevant supporting
documentation including correspondence with the beekeepers that
corroborate the quantity and value you have reported, copies or
screenshots of any journal entries you have prepared to record the
transactions and proof of payment confirming the amount you have paid.

*Letter from the Department to Supermel re: Less Than Fair Value Investigation of Raw Honey*

*From Brazil* at 8—9 (Oct. 20, 2021), P.R. 236 ("*Second Supplemental Questionnaire*").  This

question solicited four things from Supermel.  The first was a confirmation of the

quantities and values of purchases from Beekeepers 1 and 2.  The latter three were

subcategories of the request for "all relevant supporting documentation," which

included (1) "correspondence with the beekeepers that corroborate the quantity and

value you have reported;" (2) "copies or screenshots of any journal entries you have

prepared to record the transactions"; and (3) "proof of payment confirming the amount

you have paid." *Id.*

In response to Question 25, Supermel provided a table representing the

quantities and values it purchased from the beekeepers, thereby responding only to the

"confirmation of the quantities and values" part of the question.  Because Supermel did

not provide the supporting documentation in its response to Question 25, that response

was deficient.

Supermel argues that "Commerce only described the discrepancies for the first

time in the Final Determination" and thereby failed to notify Supermel of the deficiency

and afford an opportunity to cure as required by 19 U.S.C. § 1677m(d).  Pl.'s Reply

Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R. 23 (April 4, 2023), ECF No. 29.

Defendant argues that "Commerce's obligations under § 1677m(d) can be satisfied

when it issues a supplemental questionnaire 'specifically pointing out and requesting

clarification' of a respondent's deficient responses."  Def.'s Resp. In Opp'n to Pls.' Mot.

for J. Upon the Admin. R. 26 (Feb. 10, 2023), ECF No. 24 ("Def.'s Resp.") (quoting *NSK

Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)).  Defendant points to the

"*two* supplemental questionnaires on the topic of verifying its cost information with

respect to purchases from the beekeepers, including specific reference to acceptable

types of documentation that Commerce deemed appropriate to remedy the missing

information."  Def.'s Resp. 26 (citing *Final I&D Mem.* at 14—16).

The government's argument is unavailing.  Defendant is correct that one or more

supplemental questionnaires can fulfill the Department's obligation to provide an

opportunity to remedy deficient submissions pursuant to 19 U.S.C. § 1677m(d).  Def.'s

Resp. 26 (quoting *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)).  But

this requires that a subsequent questionnaire have given the submitter actual notice of

the deficiency or reiterated the initial request.  The Department's In Lieu of Verification

Questionnaire, the only questionnaire Commerce issued following the Second

Supplemental Questionnaire, did not notify Supermel that Commerce had determined

that Supermel's response to Question 25 of the Second Supplemental Questionnaire was

deficient.  Commerce had the opportunity to do so in the In Lieu of Verification

Questionnaire but in fact did not bring the deficiency to Supermel's attention prior to

identifying it in the Final Issues and Decision Memorandum.  Nor did Commerce issue

a second request for the "correspondence with the beekeepers" or "proof of payment" it

requested in Question 25.

    Defendant cites a large portion of the Final I&D Memorandum in arguing that

Commerce met its obligations under § 1677m(d) by issuing multiple supplemental

questionnaires referring to "acceptable types of documentation." Def.'s Resp. 26 (citing

*Final I&D Mem.* at 14—16).  The cited portion of the Final I&D Memorandum does not

support defendant's argument because none of the questions it identifies from the In

Lieu of Verification Questionnaire actually reiterated the requests it made in Question

25 for correspondence with Beekeepers 1 and 2 and proof of payment.

    The court notes that, as an incidental matter, Supermel later provided, in

response to a request by Commerce, "screenshots of any journal entries" that

corroborated, *inter alia*, the purchases of raw honey from Beekeepers 1 and 2.  This

question appeared in the In Lieu of Verification Questionnaire cited in the Final I&D

Memorandum, question 5.a., but did not relate specifically to Beekeepers 1 and 2.  *In

Lieu of Verification Questionnaire* at 12, Ex. VC-4.1.  Instead, it pertained to "inventory

movement schedules," which were documents provided by Supermel relating to honey

inventory.  A portion of that question included a request for "copies of spreadsheets,

handwritten journals and screen prints from your accounting system as support."

Commerce further requested that Supermel "[d]emonstrate how the POI . . .  inventory

values reflected on the inventory movement schedules at exhibit 2SD-14 of the 2SDQR

tie to Apiario Diamante Comercial Exportadora Ltda's (Apiario Export.) and Apiario

Diamante Producao's (Apiario Prod.) POI trial balances." *In Lieu of Verification*

*Questionnaire* at 6.  In responding, Supermel provided Commerce a complete set of its

journal entries for raw material purchases during the POI, including all of the journal

entries that recorded transactions between Supermel and Beekeepers 1 and 2.  *In Lieu of*

*Verification Questionnaire Response* at 12, VC-4.1.

In conclusion, the deficiencies in Supermel's responses to Question 25, viewed

according to the record evidence on the whole, did not provide an adequate basis for

the Department's invoking 19 U.S.C. §1677e.

### 3.  Question 3(a)(iii) of the First Supplemental Questionnaire

Question 3(a)(iii) of the First Supplemental Questionnaire ("Question 3.a.iii")

directed Supermel to:

> Provide excerpts from your accounting system that shows [*sic*] how
> you have recorded the purchases of the honey from the
> independent beekeepers, the transfer of the unprocessed honey
> from Apiário Export. to Apiário Prod. and the transfer of the
> processed honey from Apiário Prod. back to Apiário Export. (e.g.,
> journal entries corroborating the purchases and transfer of the
> unprocessed honey, invoices etc.).

*Letter from the Department to Supermel re: Less Than Fair Value Investigation of Raw Honey*

*From Brazil* at 4 (Sept. 1, 2021), P.R. 195 ("*First Supplemental Questionnaire*").  Supermel

provided this narrative response:

> Apiário Export records its purchases of honey from beekeepers as debit
> entries in the raw material stock account (41).  Apiário Export does not sell
> the unprocessed honey to Apiário Producao.  There has not been any
> transfer of unprocessed honey from Apiário Export to Apiário Prod. and
> the processed honey from Apiário Prod. back to Apiário Export.

*Supermel's Section A- D Supplemental Questionnaire Response* at 4 (Sept. 15, 2021), P.R. 205

("*First Supplemental Questionnaire Response*").  Thus, Supermel described how it recorded

the purchases from beekeepers in its accounting system and clarified for Commerce that

the supposed transfers of honey between the companies did not occur.  But it did not

provide, in response to Question 3.a.iii, "excerpts" from its accounting system.

Commerce found as facts that "Supermel did not provide the requested journal

entries or any other supporting documents, nor did Supermel explain why it did not

submit the requested documentation" and "Supermel ignored Commerce's request."

*Final I&D Mem.* at 15.  These findings are correct when viewed solely as to the response

to Question 3.a.iii, but they are unsupported by the record considered on the whole.

On the previous page of the questionnaire, in subpart a.i. of the same question and in

response to a request that it "[d]iscuss how the honey purchased from the independent

beekeepers are recorded in your normal books and records," Supermel referred to, and

provided as exhibits, excerpts from its accounting system as it listed the steps it took

after it "manually record[ed] its honey purchases" from the beekeepers:

> Honey purchased for international sales is recorded as debit entries in the "stock: raw materials" account (41) in Apiario Export's books.  Honey purchased for domestic sales is recorded in entries in the "stock: raw materials" account (41) in Apiario Producao's books.  *The reconciliation of the raw material purchase cost is provided as Exhibit SD-12*.  As shown in the reconciliation, Supermel's raw material accounts also capture purchases of pollen, propolis and beeswax.[9]  Pollen and propolis are used as the raw materials for the domestic products sold by Apiario Producao.  Beeswax is provided to beekeepers to support their production activities . . . In the *revised COP data provided as Exhibits SD-1a (monthly), Exhibit SD-1b (quarterly) and Exhibit 1c (POI)*, Supermel included the cost of beeswax in the reported [variable overhead costs].  *The revised processing cost calculation is provided as Exhibit SD-3*.

*First Supplemental Questionnaire Response* at 3 (emphasis added).  Supermel did not write

"see response in previous subpart," or words to that effect or otherwise indicate that it

already had provided responsive documentation.  Nevertheless, its answer to subpart

a.i directed Commerce to the exhibits responsive to the request for documentation that

Commerce included in subpart a.iii, which Supermel provided voluntarily in addition

to the information specifically requested in subpart a.i.  The record, therefore, is

inconsistent with the Department's findings that it had not been provided the requested

---

9 The raw material purchases that Apiário Export made during the POI were of honey and beeswax.  Honey was processed and sold whereas the beeswax was "provided to beekeepers to support their production activities."  Both categories of raw material purchases were recorded in the "stock: raw materials account (41)" of Apiário Export's accounting system.  Supermel considered the beeswax purchased during the POI to be a variable overhead cost.  *Supermel's Section A- D Supplemental Questionnaire Response* at 3 (Sept. 15, 2021), P.R. 205 ("*First Supplemental Questionnaire Response*").

information and that its request that Supermel "demonstrate how the purchase

database ties to Supermel's accounting system" had been "ignored."  Supermel

reasonably could have presumed the Department's familiarity with its response to

subpart a.i.  Moreover, as discussed later in this Opinion and Order, Supermel informed

Commerce repeatedly during the investigation that all raw honey purchases, recorded

on a complete set of documents that Supermel provided Commerce in screenshots,

were entered in a specific cost account in Apiario Export's accounting system.

### 4. Question 18 of the First Supplemental Questionnaire

After discussing Question 3.a.iii, Commerce stated in its Final I&D

Memorandum that it "also requested in the same First Supplemental Section D

Questionnaire that Supermel demonstrate how the purchase database ties to Supermel's

accounting system.  Supermel ignored Commerce's request." *Final I&D Mem* at 15.  For

this finding, Commerce cited page 18 of the First Supplemental Section D

Questionnaire.

The only question on page 18 pertinent to this issue was question 18(c) of that

Questionnaire ("Question 18(c)").[10]  That question asked Supermel to provide the

following:

---

[10] This document was not initially included in the Joint Appendix for this case,
requiring the court to request additional record documentation from the parties.  The
incomplete status of the Joint Appendix delayed the court's review of the relevant
record evidence.

a. Discuss how Supermel's accounting system normally captures
production costs by product.

b. Explain how the product-specific costs recorded in your accounting
system compare to the weighted-average CONNUM specific costs
reported for COP and CV.

c. Supermel stated on page 10 that the honey purchase database is
sufficiently detailed to track all production characteristics identified in this
investigation.  Provide sample copies of the honey purchase database
which shows all the production characteristics normally captured in your
ordinary course of business and demonstrate how the database ties to
your accounting system.

*First Supplemental Questionnaire* at 8.  In response to this three-part question, Supermel

stated that its "accounting system does not capture production costs by product.  Since

there is no difference in production process for honey based on product characteristics,

Supermel allocated its total processing cost over all of its production quantity during

the POR [*sic*].  Supermel reported the same per-unit processing costs for all of its

CONNUMs."  *First Supplemental Questionnaire Response* at 18.

Question 18 is redundant with other requests in the same questionnaire, for

which Commerce requested and received such a description and sample documentation

from Supermel's purchase database.  One such instance was on the previous page, in

response to the preceding question, question 17, and others occurred in questions 3.a.i

and 3.a.iii, discussed above.  *First Supplemental Questionnaire Response* at 3—4, 17, 22, 25,

Ex. SD-15.  Contrary to the Department's finding, *Final I&D Mem.* at 18, that such

information was "withheld," the record contains complete purchase databases covering

all purchases of honey and beeswax made by Apiário Export during the POI.  *See Second*

*Supplemental Questionnaire* at 2SD-11c; *In Lieu of Verification Questionnaire Response* at

Ex. VC-4.1.

### 5.  Question 10 of the Second Supplemental Questionnaire

Commerce identified Supermel's response to question 10 of the Second

Supplemental Questionnaire ("Question 10") as part of its basis for applying facts

otherwise available with an adverse inference.  Question 10, which referred to question

3.a.iii of the First Supplemental Questionnaire, was as follows:

> As requested at question 3.a.iii of SDQ, provide excerpts from your
> accounting system that shows [*sic*] how you have recorded the purchases
> of the honey from the independent beekeepers, the transfer of the
> unprocessed honey from Apiário Export to Apiário Producao and the
> transfer of the processed honey from Apiário Producao back to Apiário
> Export (e.g., journal entries corroborating the purchases and transfer of
> the unprocessed honey, invoices etc.).  In addition, provide copies of the
> accounting entries for Apiário Producao purchases of unprocessed honey.

*Second Supplemental Questionnaire* at 6—7.  In response, Supermel stated as follows:

> The screenshots of the journal entries used to record honey
> purchases made by Apiario Export and Apiario Producao are
> provided as Exhibit 2SD-13a and Exhibit 2SD-13b.  Because this is a
> tolling operation. [*sic*] the transfer of the unprocessed honey for toll
> processing is not recorded as a sale.  Once the processing is
> finished, Apiario Producao issues an invoice for processing fees to
> Apiario Export.  The sample invoices for toll processing fees are
> provided at Exhibit 2SD-17c.

*Second Supplemental Questionnaire* at 7.  Throughout its analysis, Commerce

characterized as deficient the documents provided by Supermel in response to requests

for "journal entries." *Final I&D Mem.* 14—16.  Commerce described in this way its

objections to the screenshots of documents Supermel identified as "journal entries" in

the submissions:

> As noted by the petitioners, the screenshots do not reflect any
> accounting data.  Instead, the screenshots simply show a list of
> honey purchases by date, name of supplier, address of supplier,
> weight, value and per-unit price.  The screenshots do not show the
> name or number of Supermel's "stock: raw materials" account nor
> do they reflect debits and credits or account balances.

*Final I&D Mem.* at 15.  The "screenshots" to which Commerce referred contained

individual information for each of more than two thousand purchases of unprocessed

honey that Supermel made during the POI.  Supermel explained repeatedly in the

investigation that each of its raw honey and beeswax purchases reflected in those

journal entries is recorded as a debit in the "stock: raw materials (41)" account in the

accounting records maintained by Apiário Export, *First Supplemental Questionnaire*

*Response* at 2—4, Ex. SD-6; *Second Supplemental Questionnaire* at 4, and provided a visual

aid in the form of a flowchart on that process.  *Initial Questionnaire Response* at Ex. D-3.

The record evidence refutes the Department's finding that the screenshots "do not

reflect any accounting data."  The amounts paid for the individual raw honey purchases

are the very data that were recorded in "stock: raw materials (41)," which refers to a

specific cost account in Supermel's accounting system.

     The Department's finding that the "screenshots do not show the name or number

of Supermel's "stock: raw materials" account is true with respect to the individual

screenshots, but Supermel provided these screenshots of records that were in the form in which Supermel maintained them.  At the urging of the petitioners, Commerce objected that these individual records of purchase transactions did not reference the "stock: raw materials" account, but that objection is meritless in light of Supermel's informing Commerce that *all* of these purchases were recorded as "debits" in the same account, i.e., the "stock: raw materials (41)" account of Apiário Export.

In accordance with instructions from Commerce, Supermel provided a "trial balance" that contained accounting information pertaining to the POI.  *First Supplemental Questionnaire Response* at Ex. 2SA-5.  Supermel described the trial balance as "exactly the same as the financial statements but more detailed."  *Initial Questionnaire Response* at 22.  Also at the Department's request, Supermel provided "a worksheet reconciling all items on the fiscal year income statement (e.g., revenues, cost of sales, selling and administrative expenses, and non-operating expenses) in the audited financial statements to the total costs in the financial accounting system (i.e., the summary trial balance)."  *Initial Questionnaire Response* at 20—21, Ex. D-11.  Contrary to the Department's objections, the record shows that the trial balance presented information from Supermel's "financial accounting system" that related directly to the individual purchases from the beekeepers.  *Id.*, *First Supplemental Questionnaire Response* at Ex. 2SA-5.

The court has examined the evidence consisting of the trial balance and compared it to the evidence consisting of screenshots of individual records of the more than two thousand individual raw honey purchases Supermel made during the POI. The court notes that these records are essentially in agreement. When the total value of the beeswax transactions provided at exhibit 2SD-11c to the Second Supplemental Questionnaire and the total value of the honey transactions provided at exhibit VC-4.1 to the In Lieu of Verification Questionnaire are combined, the total figure is within 99.9999% of the total for line 41, "stock: raw materials" in Apiário Export's trial balance provided at Ex. 2SA-5 to the First Supplemental Questionnaire. Thus, the cost data on the "journal entries" provided by Supermel substantially equal the cost data on the "stock: raw materials" line on Supermel's trial balance.

Like the government, defendant-intervenor characterizes the "journal entries" as inadequate, arguing that they "contain no accounting information" and are not responsive to a request for "journal entries for honey purchases." Def.-Int.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. 14, 16 (Mar. 6, 2023), ECF Nos. 26 (conf.), 27 (public). Neither defendant-intervenor nor the government explained how writing "debit stock: raw materials account" atop the journal entries would have converted what they maintain are deficient submissions into responsive ones. Nor do they explain the purported inadequacy of Supermel's narrative description of how the transactions listed in the "journal entries" tie to its accounting records, i.e., that they are all recorded

as debit entries in the "stock: raw materials" account of Apiário Export's trial balance.

This narrative description is supported by the record evidence that the total of the

values Supermel recorded for each transaction is nearly identical to the value reported

in the debit "stock: raw materials" account of Apiario Export's accounting records.  The

record shows that Commerce, at the instigation of the petitioners, based its use of

19 U.S.C. § 1677e in part on business records that were submitted in the form in which

they were maintained.

  The Department's characterization of the journal entries provided by Supermel

as inadequate appears to have developed at some point after it issued the In Lieu of

Verification Questionnaire but before the promulgation of the Final Determination.

During the investigation, Commerce did not identify the journal entries as inadequate

for recording Supermel's purchase data or unresponsive to a request for journal entries.

Commerce never defined or described "journal entries" in its requests for them.  Absent

such a definition, Supermel apparently presumed, quite reasonably, that its journal

entry screenshots, coupled with its descriptions of how those entries were recorded into

a specific cost account within its accounting records, were responsive to the

Department's request for journal entries or demonstrations of how the purchase data

they reflect "tie" to their accounting records.  See, *inter alia*: *First Supplemental*

*Questionnaire* at 4, 7, 10; *Second Supplemental Questionnaire* at 5, 6, 8, 9.  For this reason as

well, the Department's *ex post facto* finding of "deficiencies" in Supermel's journal

entries is unsupported by the record evidence.[11]

### 6. Question 7(b) in the Second Supplemental Questionnaire

Commerce stated in the Final I&D Memorandum that it "asked Supermel to

select any honey purchase transaction from its purchase database spreadsheet

submitted in Exhibit D-5a to demonstrate how Supermel prepared and recorded the

raw honey purchases in the stock raw materials general ledger account."  *Final I&D*

*Mem.* at 15.  Commerce further stated that "[i]n response, Supermel provided

screenshots similar to the ones described above that only list Supermel's unprocessed

honey purchases."  *Id.*  Here also, Commerce found these screenshots deficient because

---

[11] Commerce characterized the journal entries provided in response to requests
for Supermel's sales information as responsive while rejecting the journal entries
provided for cost information, stating that "Supermel provided screenshots of
supporting general ledger accounts and journal entries from its accounting system in
response to the sales verification questions.  However, Supermel failed to provide
similarly requested support related to selected raw honey purchase transactions." *Issues
and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-
Value Investigation of Raw Honey from Brazil* at 16 (Int'l Trade Admin. Apr. 7, 2022), P.R.
354 ("*Final I&D Mem.*") (citing *Supermel's In Lieu of Verification Questionnaire Response* at
Exs. VE-3.9—VE-8.9 (Dec. 20, 2021), P.R. 325-331 ("*In Lieu of Verification Questionnaire
Response*")).  The sales journal entries provided by Supermel and cited favorably by
Commerce match the form of the cost journal entries that Commerce rejected.  *In Lieu of
Verification Questionnaire Response* at Ex. VE-3.10, VE-4.11, VE-5.11.  The record does
support a finding that the sales information provided by Supermel was more detailed
than the purchase information.  Regardless, that finding does not establish that the
purchase information was not tied to the accounting system.

they "do not show the name or number of Supermel's 'stock: raw materials' account,

nor do they reflect debits and credits or account balances."  *Id.*

The Department's analysis of this question and response presents two

unsupported findings, one relating the Department's question and the other related to

Supermel's response.  Question 7(b) in the Second Supplemental Questionnaire was as

follows:

> Using one of the honey purchase transactions you have provided at
> exhibit D-5a of the [Initial Questionnaire Response], provide a sample of
> the journal entries you have prepared and recorded in the "stock: raw
> materials" account for honey procured for domestic sales.

*Second Supplemental Questionnaire Response* at 4.  Contrary to the Department's

characterization of question 7(b) in the Final I&D Memorandum, the question does not

ask Supermel to "demonstrate how [it] prepared and recorded the raw honey purchases

in the stock raw materials general ledger account."  *Final I&D Mem.* at 15.  The

information solicited by the question is a "sample of the journal entries you have

prepared and recorded" drawn from "one of the honey purchase transactions you have

provided as exhibit D-5a of the [Initial Questionnaire Response]," related to domestic

sales.[12]

---

[12] As the court has pointed out, the "verification" issue Commerce raised in this
case pertained only to cost-of-production information relating to sales made in the
comparison market of Australia, Commerce having concluded that the domestic
Brazilian market sales were insufficient for use as a comparison market.  It is not clear
why Commerce based its resort to 19 U.S.C. § 1677e in part on information relating to
(continued . . .)

The second unsupported finding in the Department's discussion of Question 7(b) in the second supplemental questionnaire was that Supermel failed to respond adequately. In response to this question, Supermel provided sample journal entries from both Apiário Export and Apiário Produção. The deficiency that Commerce identifies in Supermel's response to this question is the same that it identified in Question 10, discussed above: "The screenshots do not show the name or number of Supermel's 'stock: raw materials' account, nor do they reflect debits and credits or account balances." *Final I&D Mem.* at 15. The finding that Supermel's journal entry screenshots were unresponsive to the Department's request for "journal entries" is equally unsupported in each of Supermel's responses that Commerce identified as deficient in that regard.[13]

---

domestic sales in Brazil. Regardless, the substantive basis for Department's objection to Supermel's response to its request pertaining to records of domestic sales is not apparent to the court. Supermel told Commerce that "Apiário Export and Apiário Producao have separate accounting systems. They do not share the same books or records" and that "[h]oney purchased for international sales is recorded as debit entries in the 'stock: raw materials' account (41) in Apiario Export's books. Honey purchased for domestic sales is recorded in entries in the 'stock: raw materials' account (41) in Apiario Producao's books." *First Supplemental Questionnaire Response* at 3, 5. Supermel's questionnaire response related the raw honey purchases for honey produced for the domestic market, and the purchases for honey produced for the comparison market, to the respective, separate accounting systems of the two companies.

[13] In addition to the questions discussed here, Commerce based its application of facts otherwise available and an adverse inference on the same journal entries Supermel provided in response to question 21 of the Second Supplemental Questionnaire and (continued . . .)

### 7. The Department's Finding that It Could Not Rely on the CONNUM-Specific Costs Reported by Supermel

Commerce requested data on Supermel's U.S. sales and comparison market sales that were organized according to "CONNUM" (or "control number"), an identifier for a product, or a group of products, with a unique and specifically-defined set of physical characteristics. Here, "Commerce identified five criteria for the physical characteristics of the subject merchandise: (1) color; (2) organic versus non-organic; (3) homogenization; (4) straining/filtering; and (5) honey source." *Prelim. I&D Mem.* at 11. Using information from its purchase database and processing details, Supermel reported "CONNUM-specific" costs for different types of honey it had sold to the U.S. and comparison markets based on those physical characteristics. *Initial Questionnaire Response* at 17, Ex. D-5a.

Commerce found that "because we find that Supermel failed to tie its purchases to its accounting system, we find that Commerce cannot rely on Supermel's purchase information as support for its CONNUM-specific costs." *Final I&D Mem.* at 17. Because the Department's finding that Supermel "failed to tie its purchases to its accounting system" is invalidated by the evidentiary record when viewed as a whole, so too is the

---

question 5 of the In Lieu of Verification Questionnaire, which Commerce, without evidentiary foundation, characterized as "deficient." *Final I&D Mem.* at 15—16 (citing *Supermel's Section D Second Supplemental Questionnaire Response* at 12 (Nov. 4, 2021), P.R. 265; *In Lieu of Verification Questionnaire Response* at 10—16.

finding that Commerce "cannot rely on Supermel's purchase information as support for its CONNUM-specific costs." *Id*.

### 8. The Department's Unsupported Findings for Applying 19 U.S.C. § 1677e(a)

As the court noted, rather than assign Supermel a weighted average dumping margin calculated from Supermel's sales during the POI as it did in the preliminary stage of the investigation, Commerce ultimately applied subsections (a) and (b) of 19 U.S.C. § 1677e.  This statutory provision directs Commerce to invoke "facts otherwise available" when "necessary information is not available on the record" or when any of four conditions specified in subparagraph (a)(2) is met.  The four conditions apply to situations where an interested party:

> (A) withholds information that has been requested by the administering authority . . . under this subtitle,
> (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,
> (C) significantly impedes a proceeding under this subtitle, or
> (D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title.

19 U.S.C. § 1677e(a)(2).  Where a respondent meets any of these four conditions, the statute provides that Commerce shall, subject to § 1677m(d), "use the facts otherwise available in reaching the applicable determination." 19 U.S.C. § 1677e(a).

In the Final Determination, Commerce concluded that condition (A) of 19 U.S.C. § 1677e(a), regarding the withholding of information, had been satisfied because Supermel "withheld information in its ILVQ [In Lieu of Verification Questionnaire]

Response (i.e., screenshots showing that its purchases tie to its accounting system);" as well as (C), concerning significantly impeding a proceeding, which Commerce claims Supermel did "by not substantiating its reported costs, an integral part of Commerce's margin analysis;" and (D), with respect to information that was provided but cannot be verified because "Supermel's purchase information as reflected in its accounting system could not be verified because Supermel failed to provide that information in its ILVQ Response." *Final I&D Mem.* at 18.

Though ostensibly based upon three separate subsections of 19 U.S.C. § 1677e(a), each of the reasons Commerce states for its application of that statutory provision rests upon the Department's rejection of Supermel's reported cost information for its raw honey acquisitions from the numerous beekeepers. Commerce based each of these determinations principally on its finding that Supermel failed to "tie" these data on raw honey acquisitions to its accounting system.

Commerce made no finding that it could not rely upon Supermel's cost data for the processing it performed on the raw honey it purchased. To combine with those data on processing costs for the calculation of cost of production, Commerce had been provided: (1) a complete database of all purchases of raw honey and beeswax Supermel made from its many unaffiliated beekeepers during the POI, (2) total values for those two categories of purchases that when added together were substantially equal to the total value recorded in Supermel's accounting system, and (3) a breakdown of costs by

CONNUM and an explanation that "Supermel reported the same per-unit processing

costs for all of its CONNUMs." *First Supplemental Questionnaire Response* at 18. Still,

Commerce relied upon a finding that Supermel "failed to tie" its raw honey acquisition

costs to its accounting system in developing its CONNUM-specific costs of production

and thus (1) withheld information, (2) impeded the investigation, and (3) provided

information that could not be verified. Based on its own examination of the

questionnaire responses and included exhibits, the court concludes that these findings

are not supported by substantial evidence on the record of the antidumping duty

investigation.

As the court has explained, the principal information that Commerce found

Supermel to have withheld was provided in full by the complete set of journal entries

for raw honey purchases from the beekeepers and the related responses disclosing the

placement of all of the recorded costs in the "stock: raw materials (41)" cost account

maintained in the accounting system of Apiário Export. *See Initial Questionnaire*

*Response* at Ex. D-3; *First Supplemental Questionnaire Response* at 2—4, Exs. SD-6, 2SA-5,

*Second Supplemental Questionnaire Response* at 4, 2SD-11c; *In Lieu of Verification*

*Questionnaire Response* at VC-4.1. The only requested information Supermel did not

provide, which was the "correspondence" with the beekeepers related to raw honey

purchases from Beekeepers 1 and 2 and proof of payment to those beekeepers, was not

again requested or identified as deficient, as required by 19 U.S.C. § 1677m(d). Thus,

the record viewed in the entirety does not contain substantial evidence to support the

finding that resort to 19 U.S.C. § 1677e was warranted by Supermel's having withheld

requested information.  The ancillary findings that "Supermel significantly impeded the

proceeding by not substantiating its reported costs" and that "Supermel's purchase

information as reflected in its accounting system could not be verified because

Supermel failed to provide that information in its ILVQ Response," *Final I&D Mem.*

at 18, are, for the same reason, lacking evidentiary support in the administrative record.

### H.  The Department's Potential Application of 19 U.S.C. § 1677e in Future Proceedings

Supermel claims that Commerce acted unlawfully when it stated in the

Preliminary Issues & Decision Memorandum that "all beekeepers are now 'on notice

that they will be required to submit accurate cost information that is fully supported by

documentary evidence and is verifiable by Commerce officials' and '[f]ailure to provide

such information [in the future administrative reviews] could result in the application

of AFA.'"  Pl.'s Br. 45 (quoting *Prelim. I&D Mem.* at 18).  Supermel asks the Court to

disallow Commerce "in the future administrative reviews to rely on this statement from

the investigation to apply AFA to an otherwise cooperative processor-respondent based

on an unaffiliated beekeeper supplier's failure to provide requested cost information."

*Id.* (citing *Tianjin Magnesium Intern. Co., Ltd. v. United States*, 35 CIT 187 (2011)).

Supermel understandably objects to the Department's threatened future

application of an adverse inference against it for the future actions of an unaffiliated

party.  Nevertheless, this claim is not directed to an alleged injury resulting from the

determination contested in this litigation but to a potential finding in a future

determination.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 2130, 2134 (1992).  In seeking a

remedy for future harm, Supermel in effect is asking the court for an advisory opinion

that the court cannot provide.  *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) (stating that "the

implicit policies embodied in Article III, and not history alone, impose the rule against

advisory opinions on federal courts").

### III.  CONCLUSION

The court must remand the Final Determination to Commerce for

reconsideration of the determination to apply 19 U.S.C. § 1677e, which was based on

multiple findings of fact for which the record does not contain substantial evidence, and

for determination of a new estimated dumping margin for Supermel.

Upon consideration of all papers and proceedings had herein, and upon due

deliberation, it is hereby

**ORDERED** that plaintiff's motion for judgment on the agency record (Dec. 7,

2022), ECF Nos. 22 (Conf.), 23 (Public) be, and hereby is, granted in part and denied in

part; it is further

**ORDERED** that Commerce shall submit to the court a redetermination upon

remand ("Remand Redetermination") that reconsiders, based on the existing record,

the Department's determination on the application of 19 U.S.C. § 1677e to Supermel;

that determines a new estimated dumping margin for Supermel; and that is in

accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall submit the Remand Redetermination to the court within 60 days of the date of this Opinion and Order; it is further

**ORDERED** that plaintiffs shall have 30 days from the date of submission of the Remand Redetermination to submit to the court comments thereon; and it is further

**ORDERED** that defendant shall have 15 days from the submission of plaintiffs' comments on the Remand Redetermination to submit to the court a response to those comments.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: May 30, 2024
        New York, New York